UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CAROL JEWEL, SHIRLEY HOILAND AND
MARY L. PATRICK, Individually and on
behalf of all others similarly situated,
     Plaintiffs

    V.

UNUMPROVIDENT CORPORATION,
UNUM LIFE INSURANCE COMPANY OF
AMERICA, FIRST UNUM LIFE
INSURANCE COMPANY, PROVIDENT
LIFE AND CASUALTY INSURANCE
COMPANY, PROVIDENT LIFE AND
ACCIDENT INSURANCE COMPANY, and
THE PAUL REVERE LIFE INSURANCE
COMPANY,
     Defendants

CIVIL ACTION NO.

**04 - 40262 FDS**

## NOTICE OF REMOVAL

Defendants UnumProvident Corporation, Unum Life Insurance Company of America,

First Unum Life Insurance Company, Provident Life and Casualty Insurance Company,

Provident Life and Accident Insurance Company, and the Paul Revere Life Insurance Company

(collectively the "Defendants"), pursuant to 28 U.S.C. §§ 1331 & 1441 and 28 U.S.C. § 1442,

hereby file their notice of removal of this case from Massachusetts Superior Court for Worcester

County.  In support of removal, Defendants state as follows:

FILING FEE PAID:
RECEIPT # _____
AMOUNT $ _____
BY DPTY CLK _____
DATE _____

{H:\PA\Lit\16310\00063\A0758904.DOC}

## Background Prior To Plaintiffs' Attempt To Challenge The Directives of the United States Department of Labor

1. Plaintiff commenced this action on December 11, 2003, by filing a Complaint in Massachusetts Superior Court for Worcester County, to which the Court assigned Civil Action No. 03-2391B. *See* Plaintiffs' Class Action Complaint (the "Complaint").

2. The Complaint alleges, among other things, that Defendants improperly denied Plaintiffs' claims for benefits under disability insurance policies issued by Defendants. *See* Complaint at ¶ 19.

3. Plaintiffs sought certification of a class of individuals similarly situated, though no such class has yet been certified. *See* Complaint at ¶¶ 11-18.

4. As pleaded, and until December 17, 2004, the action was not removable to this Court. Plaintiffs restricted their claims to claims under state law, joined a Massachusetts corporation as a defendant, and otherwise took no action such as to render the action removable.

## Related Actions of the United States Department of Labor

5. The United States Department of Labor ("DOL"), through the Secretary of Labor, has been assigned by Congress the authority to, among other things: promulgate requirements for the processing of claims for benefits covered by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1103, ERISA § 503; to investigate whether any person has violated ERISA, 29 U.S.C. § 1104, ERISA § 504; and to bring suit to redress such violations. 29 U.S.C. § 1102(a)(5), ERISA § 502(a)(5).

6. Pursuant to this authority, the DOL commenced an investigation of Defendants' claim handling practices in or around March 2004.

7.  On November 18, 2004, Defendants, the DOL, and Insurance Commissioners from the States of Maine, Massachusetts, and Tennessee, entered into a Regulatory Settlement Agreement ("RSA"), an exemplar copy of which is attached as Attachment 1 to Exhibit 1 of this Notice of Removal. The RSA, which became effective on December 20, 2004, resolved the DOL's investigation.

8.  Under the requirements and terms of the RSA, and pursuant to its aforementioned powers and authority, the DOL, in cooperation with state insurance regulators, required certain of Defendants to undertake certain acts and responsibilities as set forth in the RSA. Certain of Defendants who are parties to the RSA must perform such acts upon pain of penalty.

9.  Among other things, the RSA provides that Defendants will conduct a reassessment of certain previously decided claims for long term disability insurance benefits, including claims covered by ERISA and those not covered by ERISA. Section (B)(2)(b) of the RSA expressly provides a specific form of notice to be sent to certain individuals. The RSA, and the notice required thereunder, without distinction covers, primarily, individuals whose claims for disability benefits arise under ERISA, and those whose claims do not arise under ERISA.

10. There is no practicable and timely method whereby either Defendants or anyone else can determine which of the persons to whom the RSA requires notice be sent have claims covered by ERISA and which do not. The RSA thus requires a single, identical form of notice to be sent to all Specified Claimants without any futile attempt to determine whose claim is subject to ERISA and whose is not.

**The Parallel Federal MDL Proceedings**

11. Counsel for Plaintiffs in this action are also counsel for various Plaintiffs in some or all of a series of actions that have been transferred to and consolidated in the United States District Court for the Eastern District of Tennessee by the Judicial Panel on Multi District Litigation. *See In re: UnumProvident Corp. ERISA Benefits Denial Actions*, MDL Case No. 1:03-md-1552, Lead Case No. 1:03-cv-1000.

12. On behalf of the Plaintiffs in the ERISA Benefits Action, counsel for Plaintiffs in this action have sought an order from the United States District Court for the District of Tennessee requiring that Defendants change the notice that Defendants are required to send to persons under the RSA.

**Plaintiffs' Newly Filed Request In This Action Seeks An Order That Defendant Proceed Other Than As Required By The RSA**

13. On December 17, 2004, and in an apparent effort to preempt any decision by the Court in the ERISA Benefits Action, Plaintiffs in this action filed with the Superior Court an Emergency Motion To (1) Supplement The Record On Plaintiffs' Motion For Class Certification, And (2) Provide Expedited Notice To Class Members Of Pendency Of Proposed Class Action And Statement Of Reasons (the "Emergency Motion"). Part 2 of the Emergency Motion is essentially the same motion that is pending before the Court in the ERISA Benefits Action. Indeed, Plaintiffs have essentially copied – largely *verbatim* – the motion in the ERISA Benefits Action. As in that action, Plaintiffs ask the Court to rewrite the form of notice that the DOL and the state insurance regulators jointly require under the terms of the RSA.

14. The Emergency Motion requests, *inter alia*, that the Court issue injunctive relief in the form of an order that the notice to be sent under the RSA be changed based on a determination by the Court that both the RSA notice and the RSA itself are inadequate. Rather than acting as mandated by the RSA, according to Plaintiffs, "Defendants must be compelled to act under the supervision of the Court and issue a satisfactory, comprehensive notice." Emergency Motion at p. 14. Plaintiffs acknowledge expressly in their Emergency Motion that the DOL is a party to the RSA. Emergency Motion at 2. They offer no method for practicably and timely deciding which recipients of the notice are covered by ERISA and which are not, nor do they condition their request for an injunction upon a finding that such an apportionment and segregation is practicably possible in a timely manner. Therefore, were the requested relief granted, Defendants would be effectively ordered to proceed contrary to the requirements of the DOL as embodied in the RSA.

15. The Secretary of Labor, while performing his official duty as an officer of the United States to oversee the implementation of ERISA plans, through and by the DOL, entered into the RSA and thereby required Defendants to provide a specific notice to certain individuals.

16. By following the terms of the RSA, Defendants therefore act under the directive of the Secretary and the DOL and the state insurance regulators who have joined in the RSA.

17. By asking this Court to order Defendants to alter the content of the notices sent by them under the RSA, Plaintiffs attempt to interfere with Defendants' ability to follow the directive of the Secretary of Labor. This attempt should be rejected, among other reasons, because efforts of a state court in a civil action to review and change a remedial

action by the DOL, and to control the terms of a notice sent to ERISA beneficiaries, is

preempted, 29 U.S.C. § 1144, ERISA § 514, and because the DOL has the primary

responsibility to determine such methods under ERISA. *See The Black & Decker*

*Disability Plan v. Nord*, 538 U.S. 822, 831 (2003)

18. Accordingly, this action is properly removable because Defendants are defendants in a

suit against a person acting under an officer of the United States sued for an act

performed under the color of office within the meaning of 28 U.S.C. § 1442. *See, e.g.,*

*Camacho v. Autoridad de Telefonos de Puerto*, 868 F.2d 482, 486-87 (1st Cir. 1989)

(telephone company acting under direction of federal officers qualifies as state actor for

purpose of removal); *Pack v. AC & S, Inc.*, 838 F. Supp. 1099, 1103 (D. Md. 1993)

(government construction contractor entitled to removal where government specified

materials to be used in construction); *Fung v. Abex Corp.*, 816 F. Supp. 569, 572-73

(N.D. Cal. 1992) (government construction contractor entitled to removal where

government mandated specifications of work); *see generally In re: Methyl Tertiary Butyl*

*Ether ("MTBE") Prods. Liability Litig.*, 2004 WL 1969121, *5-7 (S.D. N.Y.) (finding

removal proper under 28 U.S.C. § 1442).

19. This action is also properly removable under 29 U.S.C. §§ 1331 and 1441 because the

requested relief in the Emergency Motion seeks to change and alter a remedial scheme

entered into by the DOL under ERISA. *See Metropolitan Life Ins. Co. v. Taylor*, 481

U.S. 58, 63-67 (1987).

20. The United States District Court for the District of Massachusetts, Central Division, is the

federal district and division embracing the place where this action is pending.

WHEREFORE, Defendants respectfully request that this action be removed from the Superior Court for Worcester County, Massachusetts, to the United States District Court for the District of Massachusetts, Central Division.

UNUMPROVIDENT CORPORATION, UNUM LIFE INSURANCE COMPANY OF AMERICA, FIRST UNUM LIFE INSURANCE COMPANY, PROVIDENT LIFE AND CASUALTY INSURANCE COMPANY, PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, and THE PAUL REVERE LIFE INSURANCE COMPANY

By their attorneys,

Joseph M. Hamilton, BBO #546394
Kristina H. Allaire, BBO #646001
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

William J. Kayatta, Jr.
Pierce Atwood LLP
One Monument Square
Portland, ME 04101
Phone: (207) 791-1100
Fax:    (207) 791-1350

Dated: 12/22/04

CERTIFICATE OF SERVICE

I, Kristina H. Allaire, hereby certify that I have this day served a copy of the foregoing document, by faxing and mailing a copy, first class mail, postage prepaid, to the following:

David Pastor
Gilman and Pastor, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906

Denise Y. Tataryn
Seymour J. Mansfield
Mansfield Tanick & Cohen, P.A.
1700 Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402-4511

Alan M. Sandals
Scott M. Lempert
Sandals & Associates, P.C.
One South Broad Street, Suite 1850
Philadelphia, PA 19107-3418

William J. Kayatta, Jr., Esq.
Pierce Atwood
One Monument Square
Portland, ME 04101

Kristina H. Allaire

Dated: 12/22/04

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET    04 - 40262 FDS

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I.(a) PLAINTIFFS Carol Jewell, Shirley Hoiland and Mary L. Patrick, Individuall and on behalf of all others similarly situated | DEFENDANTS UnumProvident Corp., Unum Life Ins. Co. of American, First Unum Life Ins. Co., Provident Life and Casualty Ins. Co., Provident Life and Accident Ins. Co. and The Paul Revere Life Ins. Co. |
|---|---|
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Eden Prarie, MN<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Chattanooga, TN<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>TRACT OF LAND INVOLVED. |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br><br>SEE ATTACHED | ATTORNEYS (IF KNOWN)<br><br>SEE ATTACHED |

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br> & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br> Student Loans<br> (Excl. Veterans)<br>☐ 153 Recovery of Overpayment<br> of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br> Liability<br>☐ 320 Assault, Libel &<br> Slander<br>☐ 330 Federal Employers'<br> Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br> Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br> Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury —<br> Med. Malpractice<br>☐ 365 Personal Injury —<br> Product Liability<br>☐ 368 Asbestos Personal<br> Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br> Property Damage<br>☐ 385 Property Damage<br> Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br> of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational<br> Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br> 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br> Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br> Exchange<br>☐ 875 Customer Challenge<br> 12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br> Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate<br> Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards<br> Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting<br> & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc.<br> Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br> or Defendant)<br>☐ 871 IRS — Third Party<br> 26 USC 7609 | ☐ 894 Energy Allocation Act<br>☐ 895 Freedom of<br> Information Act<br>☐ 900 Appeal of Fee Determination<br> Under Equal Access to Justice<br>☐ 950 Constitutionality of<br> State Statutes<br>☐ 890 Other Statutory Actions |

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original Proceeding

☒ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Claim for breach of a disability insurance contract and to enjoin the defendants from following a direction of the Department of Labor.

| VII. REQUESTED IN COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND: ☒ YES   ☐ NO |
|---|---|---|---|

| VIII.RELATED CASE(S) (See instructions):<br>IF ANY | JUDGE N/A | DOCKET NUMBER |
|---|---|---|

| DATE<br>12/22/04 | SIGNATURE OF ATTORNEY OF RECORD<br>*[signature]* |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG JUDGE _____

Plaintiffs Attorney(s)

David Pastor, Esq.
Gilman and Pastor, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Phone:   (781) 231-7850
Fax:      (781) 231-7840

Denise Y. Tataryn, Esq.
Mansfield Tanick & Cohen, P.A.
1700 Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402-4511
Phone:   (612) 339-4295
Fax:      (612) 339-3161

Alan M. Sandals, Esq.
Scott M. Lempert, Esq.
Sandals & Associates, P.C.
One South Broad St., Suite 1850
Philadelphia, PA 19107-3418
Phone : (215) 825-4000
Fax:      (215) 825-4001

Defendants Attorney(s)

William J. Kayatta, Jr.
Pierce Atwood
One Monument Square
Portland, ME  04101
Phone:  (207) 791-1100
Fax:      (207) 791-1350

Joseph M. Hamilton
Kristina H. Allaire
Robert B. Gibbons
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608
Phone: (508) 791-8500
Fax:      (508) 791-8502

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) Carol Jewel, et al v.
    UnumProvident Corporation, et al

2.  CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LIST
    ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1))

    ___    I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT

    ___    II.   195, 368, 400, 440, 441-444, 540, 550, 625, 710, 720,730,
                 740, 790, 791, 820, 830, 840, 850, 890, 892-894, 895, 950.

    XX     III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                 380, 385, 450, 891.

    ___    IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                 690, 810, 861-865, 870, 871, 875, 900.

    ___    V.    150, 152, 153.

3.  TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E))
        N/A

4.  HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN
    FILED IN THIS COURT? ____ No

5.  DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS
    AFFECTING THE PUBLIC INTEREST? ____ No

    IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY? (SEE 28 USC 2403)

6.  IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES
    PURSUANT TO TITLE 28 USC 2284? ____ No

7.  DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF
    MASSACHUSETTS (WORCESTER COUNTY)? (SEE LOCAL RULE 40.1(C)) YES ____ OR IN THE WESTERN
    SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? (SEE LOCAL RULE 40.1(D))
    YES ____

8.  DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN
    SECTIONS OF THE DISTRICT?   YES _____

    (a)    IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE? ____ N/A

9.  IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE? Central

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY
    GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE
    IN THE CENTRAL SECTION_____ OR WESTERN SECTION_____

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME_____ Kristina H. Allaire

ADDRESS__ 100 Front Street, Worcester, MA 01608

TELEPHONE NO.__ 508-791-8500

(COVER_SHT-08/90)



COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

CAROL JEWEL, SHIRLEY HOLLAND and
MARY L. PATRICK
individually and on behalf of all
others similarly situated,

RECEIVED

DEC 11 2003

CLERK OF COURTS
WORCESTER COUNTY

Plaintiffs,

v.

UNUMPROVIDENT CORPORATION,
UNUM LIFE INSURANCE COMPANY OF
AMERICA, FIRST UNUM LIFE INSURANCE
COMPANY, PROVIDENT LIFE AND
CASUALTY INSURANCE COMPANY,
PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY, and THE PAUL
REVERE LIFE INSURANCE COMPANY,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

COMPLAINT
CLASS ACTION
JURY TRIAL DEMANDED

Civil Action No. 03–2391B

Plaintiffs Carol Jewel, Shirley Holland and Mary L. Patrick, on behalf of themselves and

all others similarly situated, bring this class action complaint against UNUMProvident

Corporation and its subsidiaries. This action seeks to fully remedy, under the Court's

supervision, Defendants' violations of Massachusetts law in conducting a widespread and

continuing illegal scheme to implement and enforce abusive and fraudulent claims practices in

order to increase their profits at the expense of participants and beneficiaries of long-term

disability plans administered by UNUMProvident and its subsidiaries. Although Defendants are

insurance carriers, which business involves elements of public trust, and have a duty to act in

good faith with their policyholders, Defendants acted solely in their own interest, perverting their

claims processes for long-term disability benefits and improperly denying claims for benefits

outright, or terminating benefits prematurely. As a result, thousands of men and women were wrongfully deprived of critical income continuation benefits at times of utmost need.

## JURISDICTION

1. This action arises under the Massachusetts consumer protection act, M.G.L., c. 93A, and M.G.L., c. 176D. This Court has jurisdiction over this matter because Defendants are engaged in the business of insurance in Massachusetts, and Defendant The Paul Revere Life Insurance Company ("Paul Revere") is a Massachusetts corporation with its principal place of business in Worcester, Massachusetts.

## PARTIES

2. Plaintiff and proposed class representative Carol Jewel ("Ms. Jewel") is a 47-year-old woman who resides in Eden Prairie, Minnesota. Ms. Jewel purchased a converted individual policy issued by Paul Revere. By reason of Defendants' well-documented scheme to pervert their evaluation and administration of plan participant claims for long-term disability benefits and to deny or terminate such benefits without proper justification, as detailed hereinafter in this Complaint, Ms. Jewel was deprived of her state law statutory rights to fair, honest and faithful administration of her claim for long-term disability benefits and improperly denied disability income benefits needed for her financial security during the time of her proven disability.

3. Plaintiff and proposed class representative Shirley Hoiland ("Ms. Hoiland") is a 63-year-old woman who resides in Minneapolis, Minnesota. Ms. Hoiland is a participant in a long-term disability policy issued by UNUM Life Insurance Company of America ("UNUM Life") and sponsored by her employer, Hennepin County, Minnesota. By reason of Defendants'

well-documented scheme to pervert their evaluation and administration of plan participant claims for long-term disability benefits and to deny or terminate such benefits without proper justification, as detailed hereinafter in this Complaint, Ms. Hoiland was deprived of her state law statutory rights to fair, honest and faithful administration of her claim for long-term disability benefits and improperly denied disability income benefits needed for her financial security during the time of her proven disability.

    4.    Plaintiff and proposed class representative Mary L. Patrick ("Ms. Patrick") is a 47-year-old woman who resides in Collegeville, Minnesota. Ms. Patrick was a participant in a short- and long-term disability policy issued by UNUM Life and sponsored by her former employer, Housing Authority—City of Casper, Wyoming. By reason of Defendants' well-documented scheme to pervert their evaluation and administration of plan participant claims for long-term disability benefits and to deny or terminate such benefits without proper justification, as detailed hereinafter in this Complaint, Ms. Patrick was deprived of her state law statutory rights to fair, honest and faithful administration of her claim for long-term disability benefits and improperly denied disability income benefits needed for her financial security during the time of her proven disability.

    5.    Defendant UNUMProvident Corporation (hereinafter "UNUMProvident") is a publicly owned insurance holding company formed by the June 30, 1999 merger of UNUM Life Insurance Company of America of Portland, Maine, and Provident Companies, Inc., of Chattanooga, Tennessee. The merger was the culmination of a series of corporate transactions combining the three dominant disability carriers - Paul Revere Life Insurance Company of America, Provident Companies, and UNUM - into a single enterprise. Defendant UNUMProvident is incorporated in the State of Delaware and has its principal places of business

in this District in Worcester, Massachusetts, as well as in Portland, Maine, and Chattanooga, Tennessee. UNUMProvident advertises and represents that the remaining Defendants, The Paul Revere Life Insurance Company, UNUM Life Insurance Company of America, First UNUM Life Insurance Company, Provident Life & Casualty Insurance Company, and Provident Life & Accident Insurance Company, are subsidiaries of UNUMProvident which offer products, including short-term and long-term disability income insurance coverage, under the UNUMProvident brand name in the United States. Since at least July 1, 1999, UNUMProvident and its subsidiaries named herein as Defendants have operated as a single integrated enterprise, offering a portfolio of products and services and an integrated claims handling process.

6. Defendant Paul Revere is a Massachusetts corporation with its principal place of business in Worcester, Massachusetts. This Defendant engages in the sale of individual and group long-term disability insurance policies and the administration of such policies with respect to evaluation and payment of benefits claims by its policyholders and group plan participants.

7. Defendant UNUM Life is a Maine corporation with its principal place of business in Portland, Maine. This Defendant engages in the sale of individual and group long-term disability insurance policies and the administration of such policies with respect to evaluation and payment of benefits claims by its policyholders and group plan participants.

8. Defendant First UNUM Life Insurance Company ("First UNUM Life") is a New York corporation with its principal place of business in New York, New York. This Defendant engages in the sale of individual and group long-term disability insurance policies and the administration of such policies with respect to evaluation and payment of benefits claims by its policyholders and group plan participants.

9. Defendant Provident Life and Casualty Insurance Company ("Provident Life and

Casualty") is a Tennessee corporation with its principal place of business in Chattanooga, Tennessee. This Defendant engages in the sale of individual and group long-term disability insurance policies and the administration of such policies with respect to evaluation and payment of benefits claims by its policyholders and group plan participants.

10.      Defendant Provident Life and Accident Insurance Company ("Provident Life and Accident") is a Tennessee corporation with its principal place of business in Chattanooga, Tennessee. This Defendant engages in the sale of individual and group long-term disability insurance policies and the administration of such policies with respect to evaluation and payment of benefits claims by its policyholders and group plan participants.

## CLASS ACTION ALLEGATIONS

11.      Plaintiffs bring this action on behalf of themselves and as representatives of a class of similarly situated persons under M.G.L., c. 93A § 9(2) and Mass.R.Civ.P. 23(a) and (b). The class is defined as:

> All individual long-term disability policyholders and all participants in group, long-term disability plans which are not covered by the Employee Retirement Income Security Act of 1974 ("non-ERISA group plan participants") who (a) had coverage issued by an insuring subsidiary of UNUMProvident named herein as a Defendant, and (b) whose claims for long-term disability benefits were denied, or whose payments of long-term disability benefits were terminated or suspended, on or after July 1, 1999 by any Defendant after being subjected to any one or more of the abusive claims practices alleged in this Complaint.

12.      This action is properly maintainable as a class action, as it meets the class certification requirements of M.G.L., c. 93A § 9(2) and, alternatively, the requirements of Mass.R.Civ.P. 23.

13.      The exact number of Class members is not known at this time. However, given

the dominant position of Defendants in the market for both individual and employer-sponsored group long-term disability coverage, Plaintiffs believe that the members of the Class number in the thousands and that the Class members reside in a number of different states. Accordingly joinder of all members of the Class as individually named Plaintiffs would be impracticable.

14. Common questions of law and fact exist as to all members of the Class and these questions predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(1) Whether the abusive claims practices alleged herein in fact occurred and were the result of a common and continuing widespread scheme on the part of Defendants;

(2) Whether Plaintiffs and the members of the Class were subjected to these claim practices;

(3) Whether Defendants' claim practices violated Massachusetts law;

(4) Whether Plaintiffs and the members of the Class were injured as a result of being subjected to Defendants' claims practices; and

(5) Whether Plaintiffs and the members of the Class are entitled to the relief prayed for in this Complaint.

15. Plaintiffs are members of the Class and the claims they assert are typical of the claims of the members of the class.

16. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel who are competent and experienced in class action, consumer protection, and disability benefits litigation. Plaintiffs do not have interests that are antagonistic to, or in conflict with, the members of the Class whom they seek to represent as Class representatives.

17.    Issues of law and fact common to the members of the class predominate over any questions affecting only individual members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, the expense and burden of individual litigation makes it impractical for the members of the Class to pursue individual litigation in order to vindicate their rights. Plaintiffs are not aware of any problems that would militate against the maintenance of this action as a class action.

18.    Unless a class is certified, Defendants will retain the financial rewards of their illegal scheme, and thousands of men and women who desperately need the disability income benefits to which they are entitled will be unable to obtain these benefits due to their inability to obtain individual representation, both due to its expense and the record of their past dealings with Defendants.

## BACKGROUND FACTUAL ALLEGATIONS

19.    This class action is brought to secure full relief from Defendants' now well-documented, and widespread and continuing, illegal scheme to increase profits for UNUMProvident and the other Defendants by unjustifiably denying or terminating disability income benefits to Plaintiffs and the members of the Class in violation of their rights under policy documents and Massachusetts law. As now detailed in many recent federal and state court proceedings, Defendants carried out and implemented their illegal scheme by improperly targeting benefits claims for initial denial, and benefits payments for review and termination after initial approval, and subjecting Class members to Defendants' abusive and sham claim practices and procedures.

20.    As companies engaged in the business of insurance in Massachusetts, each

Defendant has a duty to not misrepresent pertinent facts or insurance policy provisions relating to coverage, a duty to adopt and implement reasonable standards for the prompt investigation of claims, and a duty to conduct a reasonable investigation based upon all available information before denying claims.

21.    Defendants also had an obligation to review claims in good faith and without any preconceived schemes to target and terminate claims in order to achieve company profit objectives.

22.    Since at least July 1, 1999, Defendants have conducted all claims handling procedures and operations as one company, in an integrated and coordinated fashion, and claims were subject to uniform and common (albeit illegal) practices. During that period of time, the individual policyholder or "ID" claims of Plaintiffs and members of the class were managed by the Worcester, Massachusetts office, without regard to the company issuing the policy. Based on information and belief, non-ERISA group claims were also managed by the Worcester, Massachusetts office, without regard to the company issuing the policy. All claims handling procedures were conducted by Defendants in the same manner without regard to the company issuing the policy. Before 1999, a comprehensive system for improperly targeting and denying or terminating disability claims was first introduced by Ralph Mohney at Provident. Mohney in turn reported to J. Harold Chandler, who was fully informed of and approved the implementation of this system. The same abusive claims processing system was adopted by Defendant Paul Revere after it was acquired by Provident in 1997. Eventually, this abusive claims practices system was adopted by all Defendants when the Provident Companies merged with UNUM in 1999.

23.    Defendants failed to disclose pertinent facts to its policyholders regarding its

abusive claim practices and procedures and its scheme to target and terminate claims, which may have affected its policyholders coverage. Likewise, Defendants' abusive claim practices and procedures and its scheme to target and terminate claims violated its duty to adopt and implement reasonable standards for the prompt investigation of claims and of its duty to conduct a reasonable investigation based upon all available information before denying claims. Defendants' widespread and illegal scheme is more particularly set forth below.

24.    UNUMProvident required its subsidiaries to adopt and implement an enterprise-wide, intentionally aggressive and deceitful approach to claims handling in order to increase profits and meet financial goals and desired "net termination ratios" (the proportion of terminated claims to new claims) without regard to the actual merits of the disability claims. Defendants' senior management closely monitored, directed, and intervened in the claims review and decision-making process allowing for only minimal discretion and autonomy on the part of the claims handlers. Various methods were implemented by Defendants to achieve their enterprise-wide abusive claims practices system, examples of which follow.

25.    Defendants encouraged their staff to terminate and deny meritorious claims for benefits. The failure of claim handlers, including physician reviewers, to follow the directives of Defendants' senior management, even when a claims recommendation was inappropriate given the supportive claims data, resulted in negative employment consequences. Conversely, claims handlers were rewarded based on achievement of claims termination and denial goals.

26.    Defendants' senior management adopted and implemented "Roundtables" as a tool to manufacture reasons to deny claims. Roundtables included both "Team Roundtables" and "Multi-Disciplinary Roundtables," both of which occurred at different times but with the same goals--to improperly deny and terminate claims and to ensure that claims handlers were utilizing

all available resources to construct documentation to support such claims denials and terminations. The Roundtables were usually held after regular business hours and no minutes of the roundtables were kept. Team Roundtables generally occurred at the outset of a new claim for the purpose of seeking and providing medical and vocational support for claims previously identified as "quick hits." Quick hits were claims senior management targeted to be resolved quickly and easily, usually through denial or termination. Multi-Disciplinary Roundtables were generally conducted for claims which were not being actively managed by claims handlers. The Multi-Disciplinary Roundtables became a profitable tool whereby senior management could oversee, direct and ensure reserve reduction by informing the claims handler of steps to take to document support for a denial or termination of a claim, which might include altering or rewriting a claims review or medical report, or conducting surveillance or an IME.

27.  UNUMProvident required UNUMProvident subsidiaries to adopt and implement a database recordkeeping system called "Metrics," which was used by senior management to track each claims handlers' approval/denial rates, and was referenced as a measure of performance for the claims handlers.

28.  UNUMProvident required UNUMProvident subsidiaries to utilize a claims reserve information system called "OMAR," for the purpose of determining claims denials and terminations based on predetermined claim reserve targets allocated to each unit.

29.  UNUMProvident required UNUMProvident subsidiaries to adopt and implement "Blitz searches" to meet monthly financial projections. Blitz searches involved either senior managers conducting a search for claims to terminate, or senior managers ordering claims handlers to review claims with a predetermined protocol process instructed by a senior manager. Examples of a protocol include terminating a claim if a claim handler could find in a medical

record a notation that the claimant was "getting better" or was "doing well."

30. UNUMProvident required UNUMProvident subsidiaries to adopt and implement a system for targeting certain types of claims based on the nature of the claimant's illness. The most highly targeted illnesses were those that were considered "self-reported" in nature, without regard to whether the disability policy provided different treatment for self-reported types of claims. Senior managers directed claims handlers to utilize two tactics to deny or limit liability for self-reported types of claims: 1) to classify such claims as "mental" and, therefore, limit liability to a twenty-four month limitation, or 2) to deny on the basis that they were not impairments and were therefore not disabling.

31. UNUMProvident required UNUMProvident subsidiaries to adopt, and directed their in-house physicians to utilize, a 25-page position paper or template for evaluation and termination of claims based on self-reported symptoms. This position paper instructed physicians on how to discredit claims based on self-reported symptoms for purposes of avoiding or limiting liability.

32. Defendants frequently directed that claims be paid under the twenty-four month mental/nervous limitation so as to manipulate the overall financial status of the company per impairment unit per month or per quarter, and to meet previously determined projection results.

33. UNUMProvident required UNUMProvident subsidiaries to adopt and implement enterprise-wide policies prohibiting doctors from expressing their opinions regarding the disability status of claimants in the claims file. Defendants' physicians were often required to amend, supplement or rewrite a medical report in order to accommodate the demands of senior managers to support claim denial or termination. Defendants also required their in-house physicians to handle a substantial number of files or claims each day, which prevented

meaningful analysis of each claim by these physicians. Defendants also pressured physicians into linking diagnoses to preexisting conditions in order to deny claims on that ground.

34.   UNUMProvident required UNUMProvident subsidiaries to adopt and implement an enterprise-wide "Impairment model" designed to pick apart the diagnoses rendered by treating physicians. Under this model a triage person (usually a nurse) would review a file involving multiple impairments and decide the primary diagnosis, and hence the impairment unit to which the claim would be assigned for review. The impairment unit viewed the claim in isolation, rather than considering the combined and cumulative effects of all conditions and assessing their overall effect. Defendants' senior management also adopted and implemented a practice of pressuring claim handlers to deny claims that previously had been declared as proven in the monthly projections provided at the beginning of the month, if financial projections for a particular unit were not met for a particular month.

35.   UNUMProvident required UNUMProvident subsidiaries to adopt and implement a policy regarding certain claims Defendants referred to as functional disorder claims or "subjective claims," which included claims based on fibromyalgia and chronic fatigue syndrome. Defendants instructed physicians to review these claims by commenting on objective evidence only and to arbitrarily discredit other probative evidence offered by claimants. Defendants regularly denied such claims based on lack of "objective" evidence or lack of physical restrictions and limitations, when the governing plan language did not require objective evidence of physical restrictions and limitations.

36.   Defendants employed a compliant stable of supposed "independent medical examiner" (or "IME") physicians who would cooperate with Defendants' abusive practices. Defendants thus pressured their in-house physicians into directing these supposedly

"independent" IME physicians on what they should or should not include in their reports. In the event that an "independent" physician would not comply with company directives on claims, such physician would be taken "off the panel."

37.    UNUMProvident required UNUMProvident subsidiaries to adopt and implement a "walk-in" policy in which non-physician claims handlers were instructed to manipulate the claims process to obtain desired medical opinions through the use of "walk-ins." A "walk-in" involved the claims handler arriving at a physician's office unannounced and posing a medical question based on an undisclosed claims file then being reviewed by the handler under the guise of learning more about a medical condition.  Claims handlers then would use the doctor's explanation, taken out of context, to deny a claim.  The statement obtained during the "walk-in" would be documented in the claim file, but any contrary communication between the claims handler and a doctor would not be documented in the file but instead excluded from the file.

38.    The foregoing is only a summary of Defendants' abusive claims practices.

## FACTUAL ALLEGATIONS APPLICABLE
## TO PLAINTIFFS' INDIVIDUAL CLAIMS

### CAROL JEWEL

39.    Plaintiff Carol Jewel, formerly known as Carol Thompson, worked as a financial consultant for American Asset Management, Inc. at the time her symptoms began.

40.    In 1990, Ms. Jewel began suffering from symptoms associated with chronic fatigue syndrome, immune deficiency, thyroiditis, and adrenal insufficiency.  Ms. Jewel continued to work part-time for approximately two years, but her disability forced her to stop working completely on March 27, 1992.

41.    Ms. Jewel left American Asset Management, Inc. in 1991, and at that time converted her group policy into an individual policy, which was issued by Paul Revere.  In

addition to the converted individual policy, Ms. Jewel also had purchased her own individual policy issued by Paul Revere.

42.    Ms. Jewel received partial disability benefits under the individual Paul Revere policy from October 1992 to September 1992 and total disability benefits from September 1992 to the present time. Ms. Jewel received total disability benefits under the converted individual policy from September 1992 through July 31, 2001.

43.    After paying benefits for over nine years, UNUMProvident severed Ms. Jewel's converted individual benefits on June 20, 2001. UNUMProvident's claimed reason for denying benefits was that the medical information did not document functional limitations which would prevent Ms. Jewel from light or sedentary work.

44.    Ms. Jewel was approved for social security disability benefits beginning March 27, 1992.

45.    Total disability under the converted individual policy means that after 24 months, the insured must be totally disabled from any occupation for which she is or may become suited by education, training or experience; and the employee is under the regular care of a doctor.

46.    Ms. Jewel provided sufficient evidence in support of a disability and is entitled to benefits under the terms of her policy. Based on information and belief, Defendants failed to disclose pertinent facts or insurance policy provisions relating to coverage, failed to adopt and implement reasonable standards for the prompt investigation of claims, failed to conduct a reasonable investigation based upon all available information before denying Ms. Jewel's claim, and failed to act in good faith in their handling of Ms. Jewel's claim.

## SHIRLEY HOILAND

47.    Plaintiff Shirley Hoiland worked as office specialist for Hennepin County,

Minnesota. Ms. Hoiland developed multiple chemical insensitivity after a long exposure of chemicals at work from an extensive remodeling project.

48.    Ms. Hoiland stopped working completely on October 31, 2001 due to her disability. Shortly thereafter she applied for disability benefits. Defendants denied her application on February 7, 2002 based on lack of objective medical information to support restrictions and limitations that would prevent her from returning to work.

49.    Ms. Hoiland's policy defines disability during the first 12 months as: being limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; a 20% or more loss in earnings due to the sickness or injury, and during the elimination period, you are unable to perform any of the duties of your regular occupation. After 12 months, disability is defined as: due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

50.    Ms. Hoiland provided sufficient evidence in support of a disability and is entitled to benefits under the terms of her policy. Based on information and belief, Defendants failed to disclose pertinent facts or insurance policy provisions relating to coverage, failed to adopt and implement reasonable standards for the prompt investigation of claims, failed to conduct a reasonable investigation based upon all available information before denying Ms. Hoiland's claim, and failed to act in good faith in their handling of Ms. Hoiland's claim.

## MARY PATRICK

51.    Plaintiff Mary L. Patrick worked as the Executive Director for Housing Authority, City of Casper, Wyoming. Ms. Patrick suffered from an illness in November 1999 from which she never recovered. She was forced to take days off work and later reduced her hours of work,

but continued to have difficulty working. In June 2000, she was diagnosed with chronic fatigue syndrome and ordered by her physician to stop working completely. Ms. Patrick's last day of any work was July 31, 2000.

52. Ms. Patrick submitted her application for disability benefits on July 6, 2000. By letter dated October 13, 2000, UNUM Life gave Ms. Patrick notice that her benefits were denied, claiming that she was not disabled under the policy.

53. Ms. Patrick's policy defines disabled as being limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and having a 20% or more loss in weekly earnings due to the same sickness or injury.

54. After Ms. Patrick's termination of employment, she submitted an application to convert the group policy into an individual policy, for which the policy provided. On September 18, 2000, UNUM Life denied her right to convert the policy because her termination of employment was due to a disability.

55. Ms. Patrick provided sufficient evidence in support of a disability and is entitled to benefits under the terms of her policy. Based on information and belief, Defendants failed to disclose pertinent facts or insurance policy provisions relating to coverage, failed to adopt and implement reasonable standards for the prompt investigation of claims, failed to conduct a reasonable investigation based upon all available information before denying Ms. Patrick's claim, and failed to act in good faith in their handling of Ms. Patrick's claim.

## COUNT I
## CLAIM FOR CONTRACTUAL BENEFITS
## (BY EACH PLAINTIFF SUING INDIVIDUALLY)

56. Plaintiffs reallege and incorporate by reference paragraphs 1 through 55 above.

57. Plaintiffs Jewel, Hoiland, and Patrick met and continue to meet the proof required

under the terms of their respective long-term disability policies and are entitled to receive these benefits.

58.    Defendants' denial of Jewel's, Holland's, and Patrick's disability benefits is a breach of Defendants' contractual obligations owed to them under their respective long-term disability policies.

59.    Plaintiffs Jewel, Holland, and Patrick are entitled to a declaration of their entitlement to the long-term disability benefits, a judgment against Defendants for retroactive benefits to the present, and an injunction reinstating plaintiffs to benefits under their respective long-term disability policies, together with pre-and post-judgment interest and reasonable attorneys' fees and costs.

## COUNT II
## CLAIM FOR UNLAWFUL AND DECEPTIVE TRADE PRACTICES
### (BY EACH PLAINTIFF SUING INDIVIDUALLY AND ON BEHALF OF THE CLASS)

60.    Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 59 above.

61.    The conduct of Defendants, as alleged herein, constitutes unfair claims settlement practices in violation of M.G.L., c. 176D, § 3(9), and unfair and deceptive acts or practices in violation of M.G.L, c. 93A, § 2, all of which are actionable under M.G.L., c. 93A, § 9.

62.    Plaintiffs and the members of the Class have been injured by Defendants' scheme to improperly and unjustifiably deny or terminate disability income benefits in the manner described in paragraphs 19 through 59 above.

63.    The unfair and deceptive acts or practices of Defendants as alleged herein were willful or knowing violations of M.G.L., c. 93A, § 2, entitling Plaintiffs and the members of the Class to recovery of multiple damages.

64.     On July 25, 2003, Plaintiffs Jewel and Holland, and on behalf of other members of the Class, served Defendants with a demand letter in accordance with M.G.L., c. 93A § 9(3). The demand letter sent to Defendants explained in detail the nature of the unfair and deceptive acts or practices, the injuries suffered by Plaintiffs and other members of the Class they were seeking to represent, as well as demanding compensation and other relief.

65.     Defendants have not made a reasonable offer of relief.

66.     Pursuant to M.G.L., c. 93A, § 9(3), Plaintiffs and the members of the Class are entitled to injunctive and equitable relief and to recover double or treble the amount of their actual damages, plus their reasonable attorneys' fees and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Class pray that the Court grant the following relief in order to fully remedy and deter Defendants' violations:

A.     That the Court certify this action as a class action under M.G.L., c. 93A, § 9(2) or Rule 23(a) and (b), Mass.R.Civ.P.;

B.     That the Court declare, adjudge and decree that Defendants breached their contractual obligations owed to Plaintiffs and that they are liable to restore all past due benefits to Plaintiffs and must reinstate Plaintiffs to their respective long-term disability policies and pay future benefits to Plaintiffs;

C.     That the Court declare, adjudge and decree that Defendants violated M.G.L., c. 176D in denying and terminating the claims for benefits made by Plaintiffs and members of the Class;

D.     That the Court enter an injunction to establish a Court-supervised process which will re-open each of the claims for benefits submitted by Plaintiffs and the members of the Class,

conduct additional evidence gathering, conduct full and fair review of each of the claims, render a proper decision on the claims, and provide future benefits properly payable as well as incidental monetary relief to restore lost benefits to each claimant who is currently disabled;

E.   That the Court enter an injunction prohibiting each Defendant and their agents and employees from committing each of the practices determined to be unlawful;

F.   That the Court award Plaintiffs and the members of the Class reasonable costs and expenses, pre- and post-judgment interest, and attorneys' fees; and

G.   That the Court grant such other relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand jury trial of all claims so triable in this action.

Date: December 8, 2003

GILMAN and PASTOR, LLP

David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts 01906
Tel: (781) 231-7850

MANSFIELD TANICK & COHEN P.A.
Denise Y. Tataryn (179127)
Seymour J. Mansfield (67271)
Richard J. Fuller (32669)
1700 Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402-4511
Tel: (612) 339-4295

SANDALS & ASSOCIATES, P.C.
Alan M. Sandals
Scott M. Lempert
One South Broad Street, Suite 1850
Philadelphia, PA 19107-3418
Tel: (215) 825-4000

ATTORNEYS FOR PLAINTIFFS

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT
DEPARTMENT OF THE TRIAL
COURT

---

CAROL JEWEL, SHIRLEY HOILAND and
MARY L. PATRICK, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

UNUMPROVIDENT CORPORATION,
UNUM LIFE INSURANCE COMPANY OF
AMERICA, FIRST UNUM LIFE INSURANCE
COMPANY, PROVIDENT LIFE AND
CASUALTY INSURANCE COMPANY,
PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY and THE PAUL
REVERE LIFE INSURANCE COMPANY,

Defendants.

Civil Action No.:
WOCV 2003-02391-B

---

### PLAINTIFFS' EMERGENCY MOTION TO
### (1) SUPPLEMENT THE RECORD ON PLAINTIFFS'
### MOTION FOR CLASS CERTIFICATION, AND
### (2) PROVIDE EXPEDITED NOTICE TO CLASS MEMBERS
### OF PENDENCY OF PROPOSED CLASS ACTION
### AND
### STATEMENT OF REASONS

Now come the Plaintiffs in the above-entitled action and move to (1) supplement the

record on Plaintiffs' Motion for Class Certification, and (2) provide expedited notice to class

members of the pendency of this proposed class action. Compliance with Superior Court Rule

9A is not possible because Defendants intend to send a notice to proposed claim members within

the next fifteen (15) days, and this matter is scheduled for hearing on December 22, 2004.

00003780.WPD ; 1

As grounds therefore, Plaintiffs state as follows:

A.    Each Defendant has entered into a settlement agreement with insurance regulators in Maine, Massachusetts and Tennessee, and the United States Department of Labor, concerning their disability claims handling practices (collectively, the "Regulatory Settlement Agreement" or "RSA"). A copy of the RSA with Unum, which is identical to the agreements with Paul Revere and Provident, is attached hereto as Exhibit 1. The RSA was preceded by a multi-state examination and regulatory findings about Defendants' claims handling practices. *See* Report of the Targeted Multistate Market Conduct Examination, dated November 18, 2004 (copy is attached hereto as Exhibit 2). The examination was conducted by a team which included attorneys from the Boston firm of Rackemann, Sawyer & Brewster, P.C.

B.    In summary, the RSA provides the following: (1) Defendants will pay a penalty of $15 million to the state insurance regulators; (2) Defendants will perform "de novo" reviews of certain claims; (3) Defendants will provide notice of the availability of their claims reassessment process to persons whose claims were denied or terminated since January 1, 2000 (but not to persons whose claims were denied or terminated prior to that date); and (4) Defendants will implement certain limited, prophylactic changes to their claims organization, claims procedures and corporate governance.

C.    The RSA will become effective when at least two-thirds of the states have ratified it. Defendants have asserted that they believe the required ratifications will be obtained by December 20, 2004.

D.    Defendants' agreement to the RSA is highly relevant to the instant Plaintiffs' Motion for Class Certification because (1) the above-referenced investigation and state regulatory findings about Defendants' disability claims handling practices

are consistent with and confirm the allegations of unfair and deceptive acts and practices made by Plaintiffs in this case, including the fact that Defendants' misconduct was pursuant to a common, "top-down" scheme to deny or terminate valid claims to meet corporate financial objectives; (2) the remedy provided by the RSA is similar to, albeit not nearly as comprehensive or effective as, the forms of relief sought by Plaintiffs in this litigation on behalf of the class; and (3) by entering into the RSA, and agreeing to undertake the class-like relief it would provide, Defendants have effectively conceded that their objections to class certification are unfounded. Although Plaintiffs anticipate that Defendants will now argue - wrongly - that the RSA eliminates the need for this case, careful analysis of the severe limitations and deficiencies of the negotiated relief provided by the RSA shows that this case remains an essential vehicle to protect the interests of the class.

E.    In addition, if, as Defendants anticipate, the RSA becomes fully effective, Defendants are required to send within fifteen (15) days thereafter a notice concerning the RSA to approximately 215,000 "eligible claimants," including approximately 39,000 claimants who are individual policyholders and members of the class proposed in this case. *See* Chart tabulating individual policy claims, Exhibit A to Report attached as Exhibit 2. The proposed notice is seriously deficient and will prejudice class members because it does not advise class members of the pendency of this action and this Court's jurisdiction over their claims, or the potential to receive the more comprehensive forms of relief requested in this action, nor does it advise class members that if they elect to participate in the limited claims re-evaluation provided under the RSA, they may be prevented from seeking any other recovery either through an individual lawsuit or through participation in this class action. Absent the issuance of a Court-

00003780.WPD ; 1                                          3

supervised notice describing the pendency of this proposed class action and the nature of the relief that may be available to class members through this action, this Court's jurisdiction will be impaired and the proposed class members will not be advised of alternative remedies they may have and may opt instead for the inferior, limited re-review negotiated by Defendants in the RSA.

F.    Plaintiffs' Motion for Class Certification is scheduled for hearing by this Court on December 22, 2004. Plaintiffs, through one of their undersigned counsel, attempted to obtain Defendants' agreement to make a joint submission concerning the RSA to this Court prior to the hearing, but this proposal was rejected by counsel for Defendants.

All of which more particularly appears from the Statement of Reasons set forth below.

## STATEMENT OF REASONS

I.    **THE REGULATORY SETTLEMENT AGREEMENT NEGOTIATED BY DEFENDANTS AND THE FINDINGS OF THE MULTISTATE TARGETED MARKET CONDUCT EXAMINATION DEMOLISH DEFENDANTS' OBJECTIONS TO CLASS CERTIFICATION**

A.    **The Regulatory Findings Set Forth in the Report of the Multistate Targeted Market Conduct Examination Confirms Plaintiffs' Allegations that Defendants' Misconduct Involves Common Issues, and that This Case is Suitable for Class Treatment**

On September 2, 2003, a Multistate Targeted Market Conduct Examination of disability claims handling practices by Paul Revere, Provident and Unum (i.e., the Defendants in this action) was initiated by the Massachusetts Division of Insurance, the Tennessee Department of Commerce and Insurance, and the Maine Bureau of Insurance. The other forty-seven states, the District of Columbia and American Samoa participated in the examination. A copy of the Report of the Targeted Multistate Market Conduct Examination ("Report") is attached hereto as Exhibit 2.[1] Previously, the Massachusetts Division of Insurance had initiated an examination of

---

[1]  The full Report includes six exhibits, A through F. Exhibits D, E and F to the Report are copies of the separate settlement agreements with Unum, Paul Revere and Provident, respectively. Since these agreements are substantively identical, and since the Unum Agreement is attached to this motion as Exhibit 1, the three agreements

individual disability income claims handling by Paul Revere, and the Tennessee Department of Commerce and Insurance had initiated an examination of litigated disability income claims by Provident.    The purpose of the Multistate Examination was to determine if the Defendants' disability claims handling practices reflected "systemic 'unfair claim settlement practices.'"  The Report and the RSA confirm that Defendants' misconduct was indeed "systemic" and, consequently, that Defendants' unfair claims settlement practices are the appropriate subject of classwide relief.

The Multistate Examination included a review of approximately 375 randomly selected claims files.  Notably, and unlike a litigation process, there was no attempt to look beyond the claims files themselves, to review documents relating to company practices, or to obtain testimony from Defendants' representatives.  Even given this limited scope, the Report of the Multistate Examination makes key findings and conclusions confirming that Defendants engaged in unfair claims practices as follows:

* UnumProvident Corporation was formed as a result of merger between Unum Corporation and Provident Companies, Inc. on June 30, 1999.  Previously, on March 27, 1997, Provident Companies, Inc. had acquired The Paul Revere Corporation.  Worcester, Massachusetts, the home of Revere, remains one of the Defendants' four primary operations centers.  Revere, a Massachusetts corporation, primarily markets individual long term disability insurance (i.e., the type of policy at issue in this action).  Report, p. 4.

* Defendants use "common management and processes in the administration of business ... Specifically, the UnumProvident Companies adjust claims for each member insurer from common locations using common procedures."  Report, p. 5.

---

are not also included in the copy of the Report attached as Exhibit 2, in order to avoid making this submission overly bulky.

*   "The examination team identified no material differences in claim handling among the individual companies or among their claim offices." Report, p. 6.

*   Despite Defendants' right and obligation to obtain an independent medical examination ("IME") where there is conflicting medical evidence or opinion concerning a claim, the "examination team identified numerous instances in which [Defendants] relied heaviliy upon the analysis of their in-house medical professionals, and refrained from securing an IME." Further, "in many such instances, [Defendants] discounted or disputed the opinions of claimants' attending physicians, but chose not to invoke the requirement that the claimant attend an IME." Report, pp. 6-7.

*   Defendants' "excessive reliance upon in-house medical professionals" resulted in a "Company bias," and the "inappropriate interpretation or construction of medical reports." Report, pp. 7-8.

*   Defendants failed to "properly evaluate the cumulative effects" of multiple medical conditions. Report, p. 8.

*   Defendants improperly denied claims based on the claimants' alleged failure to provide "objective evidence" of a disabling condition, even though the policy terms did not require the claimant to provide such evidence and the Defendants could have obtained supposedly "critical" test results by ordering an IME, but failed to do so. Report, pp. 8-9.

The Report of the Multistate Examination is admissible as a report of a government investigation. See Proposed Mass. R. Evid. 803(8). Accordingly, the Report should be deemed a part of the record on the motion for class certification which establishes Plaintiffs' allegations that Defendants' misconduct is common to all class members. In particular, the Report establishes that Defendants' operations center located here in Worcester, Massachusetts had a key role in the implementation of Defendants' unfair and deceptive claims handling practices,

and thereby confirms the appropriateness of applying Massachusetts law to the claims of all members of the Class.

**B.     The Limited Regulatory Settlement Agreement Negotiated by Defendants Does Not Moot this Action.**

As noted above, Plaintiffs expect that Defendants will attempt to use the compromise RSA as a sword, and assert that the RSA that they negotiated to provide limited relief to certain claimants makes this case unnecessary. Careful analysis of the RSA, however, shows that it is limited in its scope and remedies, and that it is deficient even in those areas that it does address. Accordingly, the RSA does not oust the jurisdiction of this Court but instead underscores the need for judicial supervision of and redress for the abusive claims practices through this action.

The terms of the RSA have been extensively reviewed by plaintiffs and third party commentators and found lacking in many respects. Professor Joseph Belth of the Kelley School of Business at Indiana University, who is also editor of the Insurance Forum, recently issued a well-reasoned critique of the RSA. Professor Belth noted, in particular, his concerns about the notification process to be employed by UnumProvident under the RSA. A copy of Professor Belth's findings are attached hereto as Exhibit 3. The primary problems with the RSA, and the features which distinguish it from the relief proposed by Plaintiffs in this action, are as follows:

**1.     The Regulatory Settlement Agreement Fails to Provide for Reassessment By a Neutral Third Party.**

The fact that Defendants and the state regulators have entered into the RSA is a compelling vindication of Plaintiffs' arguments that Defendants' systemic, unfair claims practices are the appropriate subject of classwide relief under the supervision of this Court. Indeed, in many respects the RSA reads like a class action settlement agreement. However, there are critical differences and deficiencies when one compares the limited relief provided by the RSA to the relief requested by the Plaintiffs in this action. Probably the most glaring difference is that under the RSA the Defendants will be conducting the reassessments unilaterally, while

Plaintiffs' Complaint seeks review by neutral third parties. *Plaintiffs' Complaint*, Prayer for Relief, ¶ D.

This is a crucial difference. In spite of the numerous times Defendants have been chastised by courts and regulators for their abusive claims practices and ordered to change their behavior, Defendants have continued to operate the same tainted claims review process. *See, e.g. Hangarter v. The Paul Revere Life Ins. Co.*, 236 F. Supp. 2d 1069, 1110 (N.D. Cal. 2002) ("The court finds it more appropriate in this instance to order Defendants to obey the law, and hereby enjoins them from future violations, including but not limited to, targeting categories of claims or claimants, employing biased medical examiners, destroying medical reports, and withholding from claimants information about their benefits."); Order by the Office of Commissioner of Insurance, State of Georgia, March 19, 2003 (attached to Aff't of Douglas Brooks, Exhibit C, in support of Motion for Class Certification) ("Respondents agree to be sensitive to claims in which a narrow interpretation of policy provisions or legal principles may lead to an unfair result . . . Claims personnel will not overrule medical opinions relating to the disability status of a claim . . . Respondents shall provide improved communications to claimants regarding denial and the availability of the appeals process . . . Respondents shall meet all applicable time standards for appropriately responding to claims filings and correspondence . . ."); *Radford Trust v. First UNUM Life Ins. Co. of Am.*, 321 F. Supp. 2d 226, 247-49 (D. Mass. 2004) ("This is not the first time that First UNUM has sought to avoid its contractual responsibilities, and an examination of cases . . . reveals a disturbing pattern of erroneous and arbitrary benefits denials, bad faith contract interpretations, and other unscrupulous tactics.")

The Multistate Report once again establishes Defendants' willful non-compliance with the remedial orders and concerns of the state regulators. For example, the Report discusses a follow-up review by the examiners for the purpose of assessing the impact of claims administration changes "reportedly" implemented by the Companies during 2003, specifically

00003780.WPD ; 1                                         8

with respect to the areas of concern raised. The follow-up review revealed continued "handling errors" sufficient to merit further regulatory action. Report, pp. 9-10.

In contrast to the RSA, this action seeks re-opening and independent re-evaluation of claims by an independent third party.[2] Despite the possibility of oversight of the claims review process by participating state agencies – a process that may involve tens of thousands of claims rather than a few hundred claims samples by the state regulators as part of their investigation – under the RSA, it will be only Defendants' employees who actually make assessments about their colleagues' prior work.[3] Simply, if there is to be a meaningful re-review of denied claims, there must be independence at the review processing level, as well as claimant and decision maker access to all material information about how Defendants treated and manipulated the claim file previously. Independence is destroyed by having the only authority reviewing the claims comprised exclusively of Defendants' employees, who will have no obligation to dissect past decision making or ensure that a full and fair record is considered in the reassessment process..

2. **The Review of Denied Claims Under the RSA is Substantially More Limited Than the Reopening and Independent Re-Evaluation of Claims That is Sought in This Action.**

Defendants' proposed re-review of denied disability claims, only if requested by the *claimant* as provided for under the RSA, is substantially more limited than the process of re-opening and independent re-evaluation of *all* claims sought in this action.

First, the RSA review process fails to provide any mechanism to ensure that the re-review is being conducted with the correct materials included in a claim file. The class action complaint alleges that as part and parcel of Defendants' bad faith claims handling practices, certain information was either wrongfully excluded or included in the claim files of the denied

---

[2]      Plaintiffs' complaint seek a far broader range of equitable relief than simply the re-evaluation of claims. Plaintiffs also seek injunctions to change claims review procedures for future claims handled by Defendants in addition to the correction of past abusive practices.

[3]      For example, the RSA touts the fact that the review may include independent medical examinations ("IMEs"). However, an IME will only be conducted if there is a disagreement among the Defendants' employees conducting the re-review about the claimant's existing medical records.

claimants. Yet the RSA contains no requirement that defendants reconstruct contaminated files, restore to the claims files any missing information, or remove any information that was improperly added to the files. There must be a safeguard that all information which helps establish the existence of a disability be restored to the file and that all information which was improperly created to facilitate the denial of a claim be removed from the file. The RSA, however, makes no allowance, for such manipulation by Defendants of a claim file. In contrast, the re-opening and independent re-evaluation sought in this action would require full disclosure by Defendants of the practices to which the claim was subjected, including extraneous documents relating to the claim, and would permit a class member full access to his/her claim file and the ability to challenge the inclusion or exclusion of material within that file.

Second, the scope of what constitutes a "denied claim" is narrowly drawn by the RSA. The RSA improperly allows Defendants to deny review to a category of claimants, who while not explicitly denied, instead, had their claims closed after "returning to work." These claimants could well have been subjected to Defendants' bad faith claims handling practices and but for such practices would have been judged disabled and received the benefits due them under the individual policies they purchased from Defendants. The RSA's exclusion of "return to work" claimants is especially egregious when one considers the very plausible scenario where a claimant is disabled from a long-held, well-regarded occupation and compelled to return to work in a different, less desirable, and lower-paying position. Under the claims re-opening and re-evaluation relief sought by the class action, those individuals who "returned to work" would also have a right to re-review of their claims.

Third, the RSA also excludes from re-review claimants who failed to meet an "elimination period." The term "elimination period" may have several different meanings in the context of the disability policy in question. Failure to meet an elimination period on the technical justification that a claimant's documentation was not proper begs the question whether

defendants wrongfully rejected such claim documentation in the first place. The review process sought by plaintiffs would include the re-review of such claims.

Fourth, the RSA does not provide for a review of claims when "maximum benefits" have been paid. The term "maximum benefits" is never defined in the RSA and the maximum amount benefit payments is often dependent upon the nature of the individual's disability. To the extent that Defendants impermissibly mis-characterized a claimant as suffering from one (short-term) disability as compared to another (longer-term) disability, such claims must also be re-evaluated if the review process is to have any integrity.

### 3.    The Notice Contemplated by the RSA Will Not Be Sent to Many Class Members.

The RSA provides that notice will be given only to claimants whose claims were denied or terminated from January 2000 to the present. No notice will be given to those prior to January 2000. In effect, reassessment is available to the pre-January 2000 claimants **only** if those claimants independently learn of the Settlement Agreement, and request reassessment within a limited period of time. Moreover, Claimants whose claims were denied or terminated before January 1997 will not have any right to reassessment under the RSA. Furthermore, for those who are given notice of the reassessment process, it is available only to those who elect to participate, so it would exclude those who do not receive notice because of a change of address or otherwise, or for medical reasons or otherwise do not respond within the time required. *Regulatory Settlement Agreement*, B.2.b.2, p. 11.[4]

Plaintiffs' proposed Amended Complaint defines the class to include all claimants whose claims were denied or terminated on or after January 1, 1994. *Amended Complaint*, ¶ 12. All such claimants would be entitled to the relief requested by Plaintiffs' action.

---

[4] These and other serious flaws with the notice contemplated by the RSA are addressed in Section II. A. below.

4.    **The RSA Does Not Address the Full Scope of Defendants'
Documented, Abusive Claims Practices**

The RSA includes Defendants' agreement to make certain limited changes to its claims handling practices. However, because the multistate examination was limited to a review of claims files themselves and did not investigate other evidence of wrongdoing, the RSA only touches upon a few of the abusive claims handling practices which are set forth in Plaintiffs' Complaint and documented in previous judicial rulings. Plaintiffs seek an injunction prohibiting Defendants from committing each of the practices set forth in the Complaint determined to be unlawful. The RSA fails to address the following abusive claims handling practices:

a.  Using roundtables to target claims for termination. *Amended Complaint*, ¶ 27.

b.  Tracking claim denials by use of a database record-keeping system call Metrics and a claims reserve information system called OMAR in order to facilitate the improper coordination of claims decisions with company fiscal objectives. *Complaint*, ¶¶ 28-29.

c.  Denying physicians control over their opinions regarding the disability status of claimants. *Amended Complaint*, ¶ 34.

d.  Using IME physicians who would cooperate with Defendants' abusive practices. *Complaint*, ¶ 37.

e.  Failing to document and retain in the claim file all activity by Defendants. *Complaint*, ¶ 27.

f.  Mischaracterizing claims as "mental illness" claims in order to limit liability for benefits. *Complaint*, ¶ 31, 33.

g.  Discrediting and denying claims as based on "self-reported symptoms" where the policy does not permit any such exclusion. *Complaint*, ¶ 31-32.

The RSA is a compromise document. It does not address the claims of large groups of claimants who are members of this class, it provides only a limited right of review that is a

deficient means to remedy the past misconduct by Defendants, and it does not even address many forms of abuses documented in previous judicial rulings. For all of these reasons, the RSA negotiated by Defendants does not provide them any quick and easy escape from judicial oversight. The RSA certainly does not mean that this action is unnecessary or that the Court should not continue to exercise its jurisdiction to protect the interests of the class members.

## II.    BECAUSE OF THE SERIOUS FLAWS IN THE NOTICE TO BE PROVIDED UNDER THE REGULATORY SETTLEMENT AGREEMENT, THIS COURT SHOULD ORDER AN EXPEDITED NOTICE OF PENDENCY OF THIS CLASS ACTION.

### A.    The RSA Notice is Fundamentally Flawed

Immediately upon the participating states' ratification of the RSA, which is expected by December 20, 2004, Defendants will directly communicate by letter with approximately 215,000 claimants, including approximately 39,000 individual policyholders who are members of the proposed class, to advise them of their option to have their denied claims re-reviewed by Defendants. Copies of the proposed notification letters that defendants intend to send to class members are exhibits to the RSA. See Exhibit 1, Tab A. Defendants have stated that they expect the notification letters will be sent before the end of December 2004. Claimants will thereafter have sixty days to elect whether to participate in the RSA review. Examination of the notice letters reveals that they make no mention whatsoever of this class action, the nature of the relief sought in this action, the Court's pending jurisdiction over the claims, or any information that would enable a class member to assess the relative merits of proceeding under the limited RSA review process, which would potentially result in a waiver of the superior forms of relief sought in this class action. Thus, the proposed class members will not be informed that they may be entitled to different, more comprehensive relief if they forego the RSA review and instead participate in the fully-independent review process sought by this class action.

This motion is brought on an emergency basis because time is of the essence. Assuming that Defendants' letters do issue in the next few weeks to class members, and that, as intended by Defendants, class members immediately begin to respond to Defendants' invitation to opt into

00003780.WPD ; 1                                    13

the limited claims review process, class members will be induced to take potentially prejudicial actions without disclosure of essential material information regarding the proceedings in this Court.[5]

Common sense and fundamental fairness compel the conclusion that class members must be advised of all of their rights and litigation and non-litigation options for resolution of their claims *at the same time* that Defendants ask them to decide whether to participate in the limited claims review process. An uninformed decision is not a decision that should be tolerated. If a class member unknowingly elects to have his/her claim reviewed under the RSA, the class member may be prevented from seeking any other recovery through an independent lawsuit or participation in the class action – even if only a very small additional benefit is obtained through the RSA. Under Section B2(d) of the RSA, any monetary relief, even a dollar more, will bind the class member to the outcome of that process and deprive him/her of any access to judicial review and the superior forms of relief that it can afford.

In order to preserve this Court's ability to protect the interests of the class, Defendants must be compelled to act under the supervision of the Court and issue a satisfactory, comprehensive notice. Without such oversight, the interests of class members will be severely impaired, if not irreversibly prejudiced.

It is fundamental that, if Defendants are permitted to communicate with and ask class members to waive legal rights, at a minimum they notice must simultaneously inform the class member about what rights exist, what alternative remedies may be available through this class action, and what rights and advantages are actually being waived by opting for the inferior and limited claim review process. Defendants' letter notice to class members provides none of this

---

[5]     Plaintiffs in a related, federal court proceeding involving ERISA claims have filed a similar motion requesting expedited notice to putative class members. The United States District Court for the Eastern District of Tennessee has issued an Order requiring Defendants to respond to this motion by December 17, 2004. A copy of this Order is attached as Exhibit 4 hereto.

essential and legally required information. If a claimant is asked to waive rights, the claimant must certainly be fully informed about what rights are actually being waived.

**B.  The Court Has Authority To Order Pre-Certification Communication With The Class**

Notification of the pendency of a class action is provided for in the Massachusetts Rules of Civil Procedure and the standards are well defined. Mass. R. Civ. P. 23(d). Rule 23(d) expressly provides for pre-certification communication with the proposed class in appropriate circumstances. Thus, the court "may order that notice be given, in such manner as it may direct, of the pendency of the action, of a proposed settlement, of entry of judgment, or of any other proceedings in the action..." Mass. R. Civ. P. 23(d). Ultimately, the court controls the communications among the parties and absent class members on a pre-certification basis "to ensure the integrity of the proceedings and the protection of the class." *Manual For Complex Litigation, Fourth,* § 21.33 at 300 ("*Manual For Complex Litigation*"), citing *Ralph Oldsmobile, Inc. v. Gen. Motors Corp.,* 2001 WL 1035132 (S.D.N.Y. Sept. 7, 2001), and *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100 (1981). *See Also In re Currency Conversion Fee Antitrust Litig.,* 2004 WL 2327938 at *13 (S.D.N.Y. Oct. 15, 2004).

The *Manual For Complex Litigation* (construing the cognate federal rule, Fed.R.Civ.P. 23) explains that a court may order pre-certification communication with proposed class members in order to prevent abuse that might otherwise occur. The example cited by the *Manual For Complex Litigation* is that "defendants might attempt to obtain releases from class members without informing that a proposed class action complaint has been filed." *Manual For Complex Litigation* § 21.12 at 248. This is exactly what Defendants hope to accomplish here by soliciting and inducing class members to opt for the limited relief under the RSA settlement and unwittingly waive their rights to judicial review thereafter, without also informing proposed class members that they may have superior rights under the pending class actions. Defendants are encouraging as many individuals as possible to elect review under their controlled, in-house RSA

review so to avoid the broader exposure to financial liability that independent review may afford. As the Eleventh Circuit explained:

> When confronted with claims pressed by a plaintiff class, it is obviously in defendants' interest to diminish the size of the class and thus the range of potential liability by soliciting exclusions requests. *See* Comment, *Restrictions on Communication By Class Action Parties and Attorneys*, 1980 Duke L.J. 360, 363. Such conduct reduced the effectiveness of the 23(b)(3) class action for no reason except to undermine the purpose of the rule. *See In re General Motors Corporation Engine Interchange Litigation*, 594 F.2d 1106, 1140 n. 60 (7th Cir. 1979).

*Kleiner v. The First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985).

In this action, moreover, Defendants have no ongoing business or other relationship with class members (who by definition are not receiving benefits) that could serve as a basis for unsupervised, uncounselled direct communications with the class members, who are represented by class counsel. Even if Defendants had some day-to-day basis for communicating with class members, a court would be fully authorized to intervene to ensure that any communications touching on the litigation and legal rights would be balanced, neutral, and fully informative of the class members' rights. As explained in the *Manual For Complex Litigation*:

> In appropriate cases, courts have informed counsel that communications during an ongoing business relationship, including individual releases and waivers, must be accompanied by notification to the members of the proposed class that the litigation is pending.

*Manual For Complex Litigation* at 248.

Equally compelling to the arguments based on the language of Rule 23(d) and the cases applying it are the arguments based upon equity and fundamental fairness. Defendants intend to contact thousand of class members within the next few weeks. Indeed, Defendants and their attorneys have already been disseminating material about the RSA to media outlets and certain claimants and their representatives. Copies of such communications are attached hereto as Exhibit 5.[6] If defendants are going to be permitted to communicate with absent class members,

---

[6]    The fact that defendants have already sent out communications without reference to the pending class actions also may require curative communications and other measures such as extending deadlines or providing for a new schedule altogether. *Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 498, 518, 519 (E.D. Pa. 1995)

fundamental fairness requires that plaintiffs' counsel and this Court be permitted to inform the proposed class members of the existence of the class actions, the limited nature and shortcomings of the RSA review, and the alternative remedies proposed through the class actions. To permit only Defendants to tell part of the story – and their part at that – would hardly comport with due process and, for the reasons summarized above, cause a great injustice to class members who would be induced to take potentially prejudicial action without complete and accurate information about their rights. "Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of one-sided presentation of the facts, without any opportunity for rebuttal. The damage from misstatements could well be irreparable." *Kleiner*, 751 F.2d 1193, 1203 (11th Cir. 1985) (citing *Zarate v. Younglove*, 86 F.R.D. 80, 90 n. 13 (C.D. Cal. 1980). Claimants, who in many cases have suffered for years after the denial of their claims, deserve candor in the description of the options going forward and faithful conduct from Defendants.

### C.    The Proposed Form of Notice

The form of the Notice of Pendency of the proposed class actions may take one of two forms; (a) insertion of language into the letter that defendants intend to distribute as part of the RSA that includes: (1) a description of the pending class actions; (2) the nature of the relief sought in the class actions; (3) the potential advantages and disadvantages of the RSA process; and (4) the fact that the claimant may be excluded from participation in the class actions should he/she elect review under the RSA and receive even one dollar more in additional benefits; or (b) the enclosure of a separate notice with the mailing to be made by Defendants.

Under either approach, the most immediate and cost-effective, and the least confusing, way to provide notice to the class members will be to insert the necessary additional information into the mailing to denied claimants contemplated under the RSA. If Defendants do not make these disclosures, then Defendants and the class members run the serious risk that the RSA notice and the waivers or releases executed pursuant to the RSA will later be judged invalid and all

parties will face additional time, expense, confusion, and the risk that the results of the RSA claims process will be meaningless. Plaintiffs contend that claimants would best be informed of their option by inclusion of language directly into the letter proposed by defendants as attached hereto as Exhibit 6. Again, as an alternative, a separate form of notice can be distributed in the same mailing; and a proposed text is attached hereto as Exhibit 7. Regardless of which form the notice takes, principles of fundamental fairness, as well as the legal authority governing pre-certification class communications, require that the class members learn all of their options, and not be induced to make irrevocable decisions based on incomplete and accurate communications by Defendants that have not been approved or supervised by the Court. Preserving the Court's jurisdiction over this dispute requires at least this much.

## CONCLUSION

For the reasons set forth herein, and in their prior memoranda, Plaintiffs respectfully request that the Court enter an order (a) certifying the class, and/or (b) compelling Defendants to include appropriate notification of the pendency of this class action and information permitting class members to make a fully informed decision about the relief available under the RSA and under this action in any communications sent to class members concerning the RSA under the supervision of this Court.

Dated: December _17_, 2004

Respectfully submitted,

David Pastor (BBO # 391000)
Douglas M. Brooks (BBO # 058850)
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts 01906
Tel.: (781) 231-7850

Seymour J. Mansfield
Denise Y. Tataryn
Richard J. Fuller
MANSFIELD TANICK & COHEN P.A.
1700 Pillsbury Center South
220 South Sixth Street
Minneapolis, Minnesota 55402-4511
Tel.: (612) 339-4295

Alan M. Sandals
Scott M. Lempert
SANDALS & ASSOCIATES, P.C.
One South Broad Street, Suite 1850
Philadelphia, Pennsylvania 19107-3418
Tel.: (215) 825-4000

Richard J. Quadrino
QUADRINO & SCHWARTZ
666 Old Country Road
Garden City, New York 11530
Tel.: (516) 745-1122

## CERTIFICATE OF SERVICE

I Hereby Certify That A True Copy of
The Above Document Was Served Upon
The Attorney Of Record . . . ch Other
Party By Mail (By Hand) On *12/17/04*

00003780.WPD ; 1                    19

**EXHIBIT 1**

**CLAIM REASSESSMENT PROCESS, UNIT STRUCTURE AND OPERATING PROCEDURES**

Exhibit 1 is responsive to Paragraph B.2.a of the Regulatory Settlement Agreement

**I.     Purpose**

In accordance with the Regulatory Settlement Agreements (the "Agreements") entered into by Unum Life Insurance Company of America, The Paul Revere Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, the Lead Regulators and Participating Regulators, and the U.S. Department of Labor, and in accordance with a substantially identical regulatory settlement agreement entered into by First Unum Life Insurance Company, the New York Superintendent of Insurance, the Lead Regulators and the United States Department of Labor, a Claim Reassessment Process (the "Reassessment Process") and a Claim Reassessment Unit (the "CRU") have been established. This document describes the Reassessment Process and the structure and operating procedures of the CRU. Unum Life Insurance Company of America, The Paul Revere Life Insurance Company, Provident Life and Accident Insurance Company, First Unum Life Insurance Company and Provident Life and Casualty Insurance Company shall be referred to herein as "the Companies".

**II.    Reassessment Process**

    **a.  Specified Claimant:** "Specified Claimant" is defined in Paragraph B.2.b. of the Agreements.

    **b.  Initial Notice to Specified Claimants:**  Beginning earlier and ending no later than the fifteenth business day following the Implementation Date under the Agreements , the Companies will mail an Initial Notice to Specified Claimants advising them that they may have their claim reassessed by the CRU. The Initial Notice will be dated no earlier than the  date that it is posted in the mail. Specified Claimants electing to participate must respond to the Initial Notice within 60 days of the date of the Initial Notice. The form of notices are set forth in Attachment A-1 and Attachment A-2 to this Exhibit.  With respect to any Specified Claimants whose mailed notice is returned as undeliverable, the Companies shall use reasonable efforts to obtain a more recent address through appropriate means to locate individuals including additional letter-forwarding services offered by the United States Postal Service, the Internal Revenue Service and Social Security Administration and the date for response shall be adjusted accordingly.

    **c.  Acknowledgement:** Specified Claimants who respond that they would like their claim reassessed (a "Confirmed Claimant") will have their response acknowledged in writing within 30 days of receipt of the response.

    **d. Reassessment Information Form:** Prior to the date when the CRU will begin reassessing a Confirmed Claimant's claim, the Confirmed Claimant will be sent a letter stating the approximate time for review of his or her claim. The Confirmed Claimant will also receive a Reassessment Information Form requesting information to support the reassessment of the claim in question. All Reassessment Information Forms must be returned within 60 days of the date of cover letter to the Reassessment Information Form, which will also be a date that is no earlier than the date the letter is posted in the mail, in order to be considered by the CRU, unless the Confirmed Claimant requests in writing an extension and explains why such an extension is needed. The cover letter is set forth as Attachment B to this Exhibit and the Reassessment Information Form is set forth in Attachment C to this Exhibit.

    **e. Acknowledgement:** Confirmed Claimants who return their Reassessment Information Forms will be sent an acknowledgement of the receipt of the completed form within 30 days of its receipt or a request for specific information needed to complete the form in order for the CRU to review the claim.

    **f. Requesting Claimants:** "Requesting Claimants" means (i) those claimants whose claims were denied or terminated prior to January 1, 2000 and no earlier than January 1, 1997 and the claimant would otherwise be included within the definition of "Specified Claimant" except for the application of the January 1, 2000 date, and (ii) those claimants whose claims were denied or terminated on or after January 1, 1997 and prior to the Implementation Date who dispute the Companies' characterization on any rational basis that such denial or termination falls into any of the reasons outlined in (i) – (iv) of the definition of "Specified Claimant" and in both cases are entitled under Paragraph B.2.b. of the Agreements to request to have their claim reassessed. Claimants who come within the definition of Requesting Claimants must make a request to the Companies within 180 days following the Implementation Date. Requesting Claimants who make a request within this time period will be provided a procedure that is essentially identical to that described in Paragraphs II. c. though II. e. above, and as otherwise generally described in this Exhibit 1 for Confirmed Claimants, except that the reassessment process for Requesting Claimants will begin after the reassessment of the Confirmed Claimants is substantially complete. The reassessment schedule for Requesting Claimants will begin with the oldest of the claims of the Requesting Claimants that were denied or terminated being reassessed first. Tracking data on Requesting Claimants will be kept separate from that of Confirmed Claimants.

**III. Claim Reassessment Unit:**

    **a. Structure of CRU:** The CRU will operate as a unit of the Benefit Center and will report to the most senior executive in charge of claim operations. The CRU will be staffed with personnel who have experience with group and/or individual long

term disability claims handling. Other staff available to the CRU will include clinical consultants (nurses), physicians, vocational rehabilitation specialists and attorneys. The staffing of the CRU will be based on the number of individuals needed to review and investigate, within a two year period, all requests for reassessment submitted by Confirmed Claimants.

b. **Claim Review Schedule:** The CRU will review the claims of Confirmed Claimants based upon the date the claim was originally denied or terminated with the oldest claims being reviewed first.

c. **Standard of Review:** The CRU will apply a de novo standard of review using the claims handling procedures, including those provided for in the Regulatory Settlement Agreement which will have been implemented as of the date of any reassessment by the CRU.

d. **Investigation and Decision Process:** The CRU will gather any appropriate information not contained in the claim file or in information provided by the Confirmed Claimant including, but not limited to, medical, occupational and financial information. Medical analysis will involve utilizing internal and external resources as appropriate, including peer calls and independent medical examinations and will adhere to established protocols. Once a claim decision is determined, it will be reviewed by either the Manager of the CRU or a Quality Compliance Consultant, as appropriate, and communicated to the Confirmed Claimant.

e. **Reopened Claims:** Any claim that is reopened and will require additional claim handling will be referred to the appropriate unit of claims operations.

f. **Tracking and Reporting:** The CRU will electronically track information related to the Claim Reassessment Process. The information will include, but not be limited to:

|        |                                                              |
|--------|--------------------------------------------------------------|
| i.     | Names of Specified Claimants and state of residence          |
| ii.    | Date of Mailing Initial Notice to Specified Claimants        |
| iii.   | Names of Confirmed Claimants                                 |
| iv.    | Date Acknowledgement sent to Confirmed Claimants             |
| v.     | Date Reassessment Information Form sent                       |
| vi.    | Date completed Reassessment Information Form is received.     |
| vi.    | Beginning date for reassessment of each Confirmed Claimant's claim. |
| vii.   | Decision date for each reassessment.                         |
| viii.  | Outcomes of reassessment decisions.                          |

Matters listed above that involve mailings to the claimant will be dated no earlier than the date in which they are posted in the mail. Reports will be provided to the Regulatory Compliance Unit and will be produced to reflect results on a state by state

basis using the residence of the claimant as the basis of the state for which a claim is reported as well as on a group basis.

IV.   **Monitoring of Claim Reassessment Process and CRU**

   a.   The Regulatory Compliance Unit will request that internal audits of the CRU process and decision-making be conducted on a quarterly basis, and establish a schedule of internal audits, including the number of reassessed files and other subjects to be audited.  These internal audits will be conducted by the internal audit unit under guidelines approved by the Senior Vice President of the Claims Operations. The results of those audits will be provided to the Regulatory Compliance Unit for reporting to the Regulatory Compliance Committee of the Parent Company's Board of Directors, the Lead Regulators and Senior Management of the Parent Company.

   b.   **Lead Regulator Review:**  Decisions by the CRU and its procedures are also subject to review by the Lead Regulators and the DOL as they deem appropriate.

4

A

Report of the

## Targeted Multistate Market Conduct Examination

As of December 31, 2002 ("Initial Review") and
February 29, 2004 ("Follow-Up Review")

### Of

## Unum Life Insurance Company of America

NAIC Company #62235
Portland, Maine

## The Paul Revere Life Insurance Company

NAIC Company #67598
Worcester, Massachusetts

## Provident Life and Accident Insurance Company

NAIC Company #68195
Chattanooga, Tennessee

### NAIC Group # 0565

November 18, 2004

## Exhibit D

## Unum Settlement Agreement

IN THE MATTER OF

## UNUM LIFE INSURANCE COMPANY OF AMERICA
### Portland, Maine

## REGULATORY SETTLEMENT AGREEMENT

## TARGETED MULTISTATE DISABILITY
## INCOME MARKET CONDUCT EXAMINATION

This Regulatory Settlement Agreement ("Agreement") is entered into as of this ___ day of November, 2004, by and between Unum Life Insurance Company of America (the "Company"), the Superintendent of the State of Maine Bureau of Insurance (the "Lead Regulator"), the Commissioner of the Tennessee Department of Commerce and Insurance, and the Commissioner of the Massachusetts Division of Insurance (collectively with the Lead Regulator, the "Lead Regulators"), the insurance regulators of each of the remaining States, the District of Columbia and American Samoa that adopt, agree to and approve this Agreement (the "Participating Regulators") and the United States Department of Labor (the "DOL").

A.    **Recitals**

1.    The Company maintains its home office at Portland, Maine. At all relevant times, the Company has been a licensed insurance company domiciled in the State of Maine. The Company and its affiliates Provident Life and Accident Insurance Company and Provident Life and Casualty Insurance Company (collectively "Provident") and The Paul Revere Life Insurance Company ("Revere") are subsidiaries of UnumProvident Corporation, a Delaware corporation, with its principal place of business in Chattanooga, Tennessee (the "Parent Company"). At all relevant times, Provident is and has been a licensed insurance company domiciled in the State of Tennessee, and Revere is and has been a licensed insurance company domiciled in the

Commonwealth of Massachusetts. The Company, Provident, and Revere, are collectively referred to as the "Companies."

2.      On September 2, 2003, the Lead Regulators of the domiciliary states of the Companies, Maine, Massachusetts, and Tennessee called a multistate targeted market conduct examination of the Company, Provident Life and Accident Insurance Company and Revere (the "Multistate Examination") to determine if the individual and group long term disability income claim handling practices of the Companies reflected systemic "unfair claim settlement practices" as defined in the National Association of Insurance Commissioners ("NAIC") *Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act (1972)* or *NAIC Claims Settlement Practices Model Act* (1990) (collectively, the "Model Act") pursuant to the procedures established by the *NAIC Market Conduct Examiner's Handbook* (the "Handbook").

3.      The other forty-seven states, the District of Columbia and American Samoa chose to be "Participating States" in the Multistate Examination. Contemporaneously with the Multistate Examination, the DOL was conducting an investigation of the Companies (the "DOL Investigation") pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134.

4.      As a result of the Multistate Examination, the Lead Regulators engaged in discussions with the Companies with respect to regulatory concerns raised by the Multistate Examination, a plan of corrective action by the Companies to address those concerns for the benefit of the Companies' current and former policyholders and insureds, and a means of providing for the enforcement of such a plan. After extensive discussion, the Companies agreed to a plan of corrective action to be set forth in this Agreement and substantially identical

regulatory settlement agreements between each of Provident and Revere and their respective domiciliary regulators and to the payment of a $15,000,000 fine. In addition, the insurance subsidiary of the Parent Company domiciled in New York, First Unum Life Insurance Company (the "New York subsidiary"), will enter into a substantially identical regulatory settlement agreement with the New York Superintendent of Insurance and the Lead Regulators. As the result of the ongoing Multistate Examination and the DOL Investigation, the Companies, the DOL and the Lead Regulators decided to enter into a global settlement resolving common matters pertaining to the Multistate Examination and the DOL Investigation. An Examination Report concerning the Multistate Examination is being released concurrently with this Agreement that contemplates the execution of this Agreement and/or the entry of consent orders where necessary under the law or practice of a particular Participating Regulator's state.

5.    The plan of corrective action addresses a number of regulatory and statutory concerns raised by the Lead Regulators and the DOL. It seeks to accomplish the following:

a.    provide an effective Claim Reassessment Process for an identified class of claimants who seek review of the earlier decision using an experienced claim unit formed by the Companies solely for this purpose to (i) perform a de novo review of the claims using past and current information that is relevant to the claim decision and (ii) apply the improved claim handling procedures contemplated by this Agreement in order that this Claim Reassessment Process constitute a fair way in which to remedy deficiencies that may have affected the earlier claim decisions covered by this Agreement;

b.    provide changes to claim procedures that will improve the claim handling process and benefit current and future policyholders and insureds by (i) reflecting regulatory standards in the area of market conduct for handling disability claims, (ii) addressing the

3

Companies' commitment to claim handling procedures that promote the fair, objective and thorough treatment of claims and be indicative of best practices in the handling of individual and group long term disability claims, and (iii) complying with applicable state and federal laws and regulations; and

      c.     provide for oversight in order to ensure compliance or effect enforcement, which oversight and ongoing monitoring includes (i) additions to the governance structure of the Parent Company and (ii) review by the Lead Regulators and the DOL so that activities of the Companies hereunder and reviews by staff or examiners of the Lead Regulators and the DOL will result in quarterly reporting on the results of the Claim Reassessment Process and generally on the handling of individual and group long term disability claims and appropriate follow-up to resolve questions or correct any potential non-compliance with policies or procedures.

      6.     This Agreement sets forth (i) the plan of corrective action, (ii) provisions concerning the enforcement of the Company's compliance with the plan of corrective action, and (iii) other miscellaneous provisions of this Agreement.

      7.     Location of Definitions.   Listed definitions are contained in this Agreement unless there is specific reference to the definition being in an Exhibit or Attachment to an Exhibit to this Agreement.

      a. "Agreement" is defined in the preamble paragraph.

      b. "AP" is defined in paragraph B.3.c.(i)

      c. "Applicable Consent Order" is defined in paragraph C.5.c.

      d. "Board of Directors" is defined in paragraph B.1.a.

      e. "Claim Reassessment Process" is set forth in paragraph B.2.

      f. "Claim Reassessment Unit" is defined in paragraph B.2.a.

4

g. "Company" is defined in the preamble paragraph.

h. "Companies" is defined in paragraph A.1.

i. "DOL" is defined in the preamble paragraph.

j. "DOL Investigation" is defined in paragraph A.3.

k. "ERISA" is defined in paragraph A.3.

l. "FCE" is defined in paragraph B.3.c.(i)

m. "Governance Implementation Date" is defined in paragraph B.1.a.

n. "Group" is defined in paragraph B.3.j.

o. "Handbook" is defined in paragraph A.2.

p. "IME" is defined in paragraph B.3.c.(i)

q. "Implementation Date" is defined in paragraph B.2.a.

r. "Lead Regulator(s)" is defined in the preamble paragraph.

s. "Model Act" is defined in paragraph A.2.

t. "Multistate Examination" is defined in paragraph A.2.

u. "New York subsidiary" is defined in paragraph A.4.

v. "NAIC" is defined in paragraph A.2.

w. "Parent Company" is defined in paragraph A.1.

x. "Participating Regulators" is defined in the preamble paragraph.

y. "Plan" is defined in the heading to paragraph B.

z. "Regulatory Compliance Committee" is defined in paragraph B.1.c.

aa. "Requesting Claimant" is defined in paragraph B.2.b.

bb. "Specified Claimant" is defined in paragraph B.2.b.

**B.**      **Plan of Corrective Action (the "Plan")**

    1.    <u>Changes in Corporate Governance</u>

        a.    <u>Expansion of Board of Directors</u>.  The Lead Regulators, and the  Board of Directors of the Parent Company (the "Board of Directors") have agreed that additional members with specific experience and qualifications shall be added to the Board of Directors.  (Prior to entering this Agreement the Board of Directors directed a search using an outside search firm to identify candidates with senior management experience in the insurance or financial services industries and on August 12, 2004 elected three new independent directors with such qualifications.)  The Board of Directors shall be expanded by the addition of three other directors who shall be "independent" directors under current rules of the New York Stock Exchange.  In the first instance, two directors will be added, each of whom will have significant insurance industry or insurance regulatory experience, and they will be approved by the Lead Regulators. The Company shall provide the names of the two prospective new members of the Board of Directors to the Lead Regulators by November 19, 2004.  If the two proposed new members are approved by the Lead Regulators prior to December 15, 2004, they will be elected by the Board of Directors no later than December 16, 2004.  However, if either or both of the two proposed new members is disapproved, the Board of Directors will continue in good faith to search to identify to the Lead Regulators as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) one or two additional qualified candidates, as appropriate, to propose as members of the Board of Directors.  Following their approval by the Lead Regulators, such person or persons shall be elected by the Board of Directors at its next regularly scheduled meeting.  The date of the election of the second of the two new members to the Board of Directors will be the "Governance Implementation Date", unless the two new members

6

approved by the Lead Regulators are elected to the Board of Directors prior to November 19, 2004, in which case the Governance Implementation Date will be December 16, 2004.   In addition to the two directors described above, the Board of Directors undertakes that the next following person to be added to the Board of Directors as a result of the retirement, resignation, death or failure to stand for reelection of an existing director or to fill an existing or newly-created vacancy will be a person with significant insurance regulatory experience.  In any event, a person with such qualifications will be proposed by the Board of Directors for board membership and such person's name shall be provided to the Lead Regulators no later than June 30, 2005.  If the Lead Regulators approve the proposed new member, the person will be elected to the Board of Directors at the next regular meeting of the Board of Directors following approval.  If the Lead Regulators disapprove the proposed new member, the Board of Directors will continue in good faith to search to identify as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) a person with such qualifications to propose as a member of the Board of Directors. Following the candidate's approval by the Lead Regulators, the person will be elected to the Board of Directors at its next regularly scheduled meeting. If any of the new directors ceases to serve as a director prior to the end of the term of this Agreement, the process described in this paragraph shall be applied to the selection of any replacement.

           b.     Audit Committee. No later than the Governance Implementation Date, at least one of the new directors referenced in paragraph B.1.a. will be appointed to the Audit Committee.

7

c.    <u>Creation of Regulatory Compliance Committee</u>.  No later than the Governance Implementation Date, the Board of Directors shall establish a new standing committee that shall consist of the two new directors and three existing independent directors, the "Regulatory Compliance Committee".  The responsibilities of the Regulatory Compliance Committee shall include monitoring and reporting to the Board of Directors regarding the Parent Company and its subsidiaries' compliance with applicable laws concerning market conduct, Title 1 of ERISA,  and the Companies' compliance with the Plan, along with such other matters as may be authorized or delegated by the Board of Directors to assist the Board in the discharge of its fiduciary duties and responsibilities.

d.    <u>Creation of Regulatory Compliance Unit</u>.  No later than the Implementation Date, the Parent Company shall form a new Regulatory Compliance Unit of officers or employees of the Parent Company or its subsidiaries who shall not be members of the Claim Reassessment Unit discussed below.  The Regulatory Compliance Unit shall report directly to the Regulatory Compliance Committee (or to the Board of Directors until such Committee is appointed) with respect to all market-conduct matters and ERISA requirements. The responsibilities of the Regulatory Compliance Unit shall include (i) monitoring compliance with applicable laws concerning market conduct and ERISA requirements, (ii) monitoring compliance with the Plan (including the functions of the Claim Reassessment Unit) through the performance of periodic audits, (iii) providing assistance to claimants upon request that will ease and facilitate the claim submission process, and (iv) gathering data to facilitate the Lead Regulators' and the DOL's ongoing monitoring of the Companies' compliance with the Plan. The Regulatory Compliance Unit shall be managed by an officer who is an experienced insurance professional, whose experience includes compliance related matters.  Employees of the

8

Parent Company and all of its subsidiaries shall be provided with a toll free hotline number to confidentially report concerns respecting claim handling, such reports to be provided to the manager of the Regulatory Compliance Unit.  Claimants shall be provided with a toll free hotline number for assistance throughout the claim handling process, the performance of which will be monitored by the Regulatory Compliance Unit.   A log of all telephone calls to both hotline numbers shall be maintained, and quarterly reports concerning such logs shall be provided to the Regulatory Compliance Committee.

   e. <u>Quarterly Board Committee and Management Meetings with Lead Regulators and the DOL</u>.  During each calendar quarter beginning with the regular quarterly meeting of the Board of Directors following the Governance Implementation Date, the Regulatory Compliance Committee and the management of the Company shall each meet separately with the Lead Regulators to evaluate compliance with the Plan.  The DOL shall receive notice of these quarterly meetings and may attend as it deems appropriate.  The Lead Regulators shall update Participating Regulators concerning these meetings through the NAIC on a quarterly basis.

   2. <u>Claim Reassessment Process</u>

   a. <u>Formation of Claim Reassessment Unit</u>.  Thirty (30) days after approval of this Agreement by the Company , the Lead Regulators, the DOL and no less than two-thirds of the Participating States in the Multistate Examination, unless a lesser number is agreed to by the Companies (and assuming approval of substantially identical regulatory settlement agreements between each of Provident and Revere and their respective domiciliary regulators, and the execution of a substantially identical regulatory settlement agreement between the New York subsidiary, the New York Superintendent of Insurance and the Lead Regulators) (the

9

"Implementation Date"), the Company shall form a claim reassessment unit staffed with experienced claim representatives to handle further review of previously denied or terminated individual and group long term disability claims that are resubmitted under this paragraph (the "Claim Reassessment Unit"). The Claim Reassessment Unit shall be managed by an experienced claim manager and shall report to the most senior executive in charge of claim operations. The Claim Reassessment Process, unit structure and operating procedures of the Claim Reassessment Unit, developed in consultation with and approved by the Lead Regulators and the DOL, are described in Exhibit 1 attached hereto. Staffing of the Claim Reassessment Unit shall be adjusted appropriately from time to time so that claim decisions are made in a timely manner in accordance with the operating procedures set forth in Exhibit 1.

       b.    <u>Implementation of Claim Reassessment Process</u>.  Beginning earlier and ending no later than the fifteenth business day following the Implementation Date, the Companies shall mail a notice (in the form of Attachment A-1 to Exhibit 1) to all of the Specified Claimants advising that they may resubmit their claim for further review by the Claim Reassessment Unit established for that purpose. "Specified Claimant" means any claimant of one of the Companies or any claimant of the New York subsidiary, who presented a claim for group or individual long term disability benefits, and whose claim was denied or whose benefits were terminated on or after January 1, 2000 and prior to the Implementation Date for reasons other than the following: (i) death of the claimant, (ii) claim was withdrawn, (iii) claimant did not satisfy the elimination period, or (iv) maximum benefits were paid, and also excludes (x) a claimant who had his or her claim resolved through litigation or settlement, or (y) a claimant who has pending litigation against the Company challenging the denial or termination of his or her claim, which lawsuit was filed after the date of receipt of notice of the Claim Reassessment

10

Process or a claimant whose lawsuit was filed prior to the date of receipt of notice of the Claim Reassessment Process in which lawsuit there has been a verdict or judgement on the merits prior to completion of the reassessment on the claim. Specified Claimants whose claims were denied or benefits terminated due to a return to work shall receive a special notice in the form of Exhibit 1, Attachment A-2 . The Claim Reassessment Process will be available to:

1.     Any of the Specified Claimants who elect to participate within the time period set forth in Exhibit 1; and

2.     Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated prior to January 1, 2000 and who requests participation in the Claim Reassessment Process, provided that any such denial or termination of benefits took place no earlier than January 1, 1997 and the claimant would otherwise be included with the definition of "Specified Claimant" except for the application of the January 1, 2000 date; and

3.     Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated on or after January 1, 1997 and prior to the Implementation Date, who disputes the Companies' characterization on any rational basis that such denial or termination falls into any of the reasons outlined in (i) – (iv) of the definition of "Specified Claimant" and who requests participate in the Claim Reassessment Process.

Any claimant who requests to participate pursuant to subparagraphs 2. or 3. above shall be referred to herein as a "Requesting Claimant". The initial notice will inform each Specified Claimant (i) how to communicate to the Company his or her election to participate and the time period in which to respond, (ii) that he or she will be sent an acknowledgement of their election

11

to participate, (iii) that the Claim Reassessment Process will review claims based on the original dates of their closure or denial with the oldest claims being reviewed first, (iv) that after electing to participate, a subsequent notice (Attachment B to Exhibit 1) will be sent at a time that is closer to the period when his or her claim will be reviewed indicating the approximate time period of that review and seeking information on a Reassessment Information Form (Attachment C to Exhibit 1) to support the Claim Reassessment,  (v) that receipt of a completed Reassessment Information Form will be acknowledged, and (vi) that by electing to have his or her claim reassessed, the claimant conditionally agrees to forego the pursuit of a legal action as specified in paragraph B.2.d.  The phased approach to review and follow up notices are intended to provide Specified Claimants and Requesting Claimants who elect to have their claim reviewed a better indication of the timing of that review and when to expect a decision.   In conducting all reviews, including but not limited to reviews conducted pursuant to the Claim Reassessment Process, the Companies must give significant weight to evidence of an award of  Social Security disability benefits as supporting a finding of disability, unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy.  The Company shall maintain its records so that the filing and results of the Claim Reassessment Process may be tracked on a state-by-state basis as well as on a group basis.

4.      The Company commits to use its best efforts to complete the Claim Reassessment Process by December 31, 2006, although, for good cause shown, the Lead Regulators and the DOL may agree to extend the time for completing that process.

12

c.    <u>Monitoring of Claim Reassessment Process</u>.  The Regulatory Compliance Unit shall conduct or cause to be conducted ongoing audits of the Claim Reassessment Process and report its findings to the Regulatory Compliance Committee, the Lead Regulators, the DOL and senior management at least quarterly.  The Lead Regulators shall monitor the Claim Reassessment Process and shall conduct examinations of the Claim Reassessment Unit decisions in the manner and at such intervals as they deem appropriate.  The DOL may monitor the Claim Reassessment Process and conduct examinations of the Claim Reassessment Unit as it deems appropriate.  The results of the internal audits directed by the Regulatory Compliance Unit and the reviews of claim reassessment decisions directed by the Lead Regulators will be reviewed at the quarterly meetings contemplated by paragraph B.1.e. above in order to specifically evaluate the ongoing performance of the Claim Reassessment Process. Any cases reported by the Regulatory Compliance Unit or by the Lead Regulators at the quarterly meetings that have not resolved an identified potential error or claim handling practice that is non-compliant will be promptly addressed by further review of the Claim Reassessment Unit and reported on at the next quarterly meeting. The Lead Regulators shall meet quarterly with the Regulatory Compliance Committee and senior management of the Companies to review the status of the Claim Reassessment Process.  The DOL shall receive notice of these meetings and may attend as it deems appropriate.

d.    <u>Effect on Litigation</u>.  This Agreement neither imposes any obligations upon, nor takes away any rights of, any claimant who chooses not to resubmit for reassessment his or her previously denied or terminated claim for benefits.  Rather, the purpose of the Claim Reassessment Process provided for under this Agreement is to offer an entirely optional method for claimants who wish to have their claims reassessed under these procedures.  If a claimant

does decide to resubmit his or her claim for reassessment, however, then the Company may require such claimant to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall not pursue any legal action to the extent (and only to the extent) such action is based on any aspect of the prior denial or termination that is reversed or changed. If the Company does so require, then any applicable statutes of limitations shall be tolled during the pendency of the Claim Reassessment Process. A copy of this Agreement shall be the only evidence required of such tolling. If a claimant has pending litigation against the Company, is eligible under this Agreement to participate in the Claim Reassessment Process and decides to resubmit his or her claim for reassessment, then the Company may require the claimant to (i) take such action as is necessary to stay such litigation pending the Claim Reassessment Process, if the court will agree to such a stay, and (ii) agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall withdraw any litigated claim, including any extra-contractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. That is, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any such claimant in whose litigation a final verdict or judgement is entered prior to completion of the claimant's reassessment, the Company's obligation to conduct and/or complete the Claim Reassessment Process pursuant to this Agreement shall cease.

14

3.    <u>Changes in Claim Organization and Procedures</u>

a.    <u>Changes in Claim Organization.</u>  The Company's claim organization shall include the following ongoing objectives:

(i)    Engagement of experienced claim personnel at the earliest stage of reviewing a claim;

(ii)    Increased emphasis upon claim staff accountability for compliance with the terms of insurance policies and applicable law;

(iii)    Increased involvement of higher levels of management in claim denial and benefit termination decisions through approval requirements;

(iv)    Creation of a separate compliance-accountability function at the claim denial and benefit termination level focusing on compliance, documentation, accountability for compliance, whether the claimant has been treated fairly under the circumstances, and any action that may be construed as an instance of an improper claim practice.

No later than the Implementation Date, the Company shall implement changes to its claim organization consistent with the foregoing objectives and developed in consultation with the Lead Regulators and the DOL as described in Exhibits 2 and 3 hereof.

b.    <u>Communications with Appeals Personnel.</u>  Company personnel (including but not limited to claims handling personnel) shall not interfere with nor attempt in any way to influence other Company personnel involved with the separate appeal process following denial of benefits or termination of any claim.

c.    <u>Changes in Claim Procedures.</u>   The Company's claim procedures shall include the following ongoing objectives:

(i)    Increased focus on policies and procedures relating to medical and related evidence, including but not limited to the following:

- Obtaining complete medical records needed for the decision;
- Appropriate use and consideration of in-house medical resources;

15

- Contacting an Attending Physician ("AP") where circumstances warrant and fairly interpreting or applying information from the claimant's AP;
- Obtaining a field visit where circumstances warrant;
- Conducting an occupational review, as appropriate;
- Obtaining an Independent Medical Evaluation ("IME") or Functional Capacity Evaluation ("FCE") in appropriate circumstances and fairly interpreting or applying the IME or FCE , without any attempt to influence the impairment determinations of professionals conducting the IME and/or FCE;

(ii)    Clear and express notice to claimants of the information to be provided by the claimants and the information to be collected by the Company. If a file is determined to lack specific information, Company personnel will work with claimant to obtain such information in accordance with appropriate procedures established for such purposes.

No later than the Implementation Date, the Company shall implement changed claim procedures consistent with the foregoing objectives developed in consultation with the Lead Regulators and the DOL as described in Exhibits 4, 5, 6, and 7 hereto.

    d.    <u>Selection of Evaluation Personnel</u>. The Company shall select individuals to conduct IMEs or FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs conducted by such individuals.

    e.    <u>Professional Certification</u>. Each clinical, vocational and medical professional employed by the Company must execute the "Statement Regarding Professional Conduct" found at Exhibit 5, which includes a commitment to provide fair and reasonable evaluations considering all available medical, clinical, and/or vocational evidence, both objective and subjective, bearing on impairment. In addition, for each determination as to a claimant's impairment(s), each clinical, vocational and medical professional who makes a determination as to claimant impairments must certify that he or she has reviewed all medical, clinical and vocational evidence provided to that professional by Company personnel bearing on the

16

impairment for which such professional is trained prior to making a determination as to such impairments.

      f.    <u>Providing Medical, Clinical and/or Vocational Evidence</u>. Claim personnel, in soliciting evaluations of claimant impairment by clinical, vocational and medical professionals (employed by the Company or otherwise), shall provide to such professionals all available medical, clinical and/or vocational evidence in the claim file, both objective and subjective, concerning impairment.

      g.    <u>Claims involving co-morbid conditions</u>. (i) When multiple conditions or co-morbid conditions are present, Company personnel will ensure that all diagnoses and impairments are considered and afforded appropriate weight in developing a coherent view of the claimant's medical condition, capacity and restrictions/limitations. (ii) No later than the Implementation Date, the Companies will implement improved procedures for evaluating claims which involve multiple or co-morbid conditions in accordance with Exhibit 4 hereto and subparagraph (i) above.

      h.    <u>Training</u>. No later than March 1, 2005, substantially all employees in the Company's claim operations shall be provided appropriate training designed to educate them on the responsibilities arising from the changes in claim procedures included in paragraph B.3 of this Agreement with emphasis on concerns raised in the Multistate Examination and the corrective measures set forth in the Plan. This training will include specific instruction on the following: (i) Company personnel should recognize the special function that medical professionals perform in assessing medical information concerning claimants and should not attempt to influence an in-house physician or an IME or FCE in connection with such professional's opinion concerning the medical evidence or medical condition relating to a

claimant, and (ii) Company personnel in claim handling positions will be evaluated and will be eligible for incentive compensation only on the basis of the quality of performance in the position each holds, and the outcome of any claim decision or any number of claim decisions is not permitted as a part of this evaluation or award of incentive compensation. The Company hereby confirms that it shall not measure the performance of claim personnel or otherwise incentivize their performance, or deny or close specific claims based on claim denial or closure targets. Not later than March 1, 2005, all group policyholder human resources staff shall be offered appropriate training alternatives designed to help them support employee-claimants in making claims.

> i.    <u>Monitoring of Compliance with Revised Claim Procedures</u>. The Lead Regulators shall monitor compliance with the changes in claim procedures set forth in paragraphs B.3.b. through B.3.g. above and may conduct examinations of claims in the manner and at such intervals as the Lead Regulators deem appropriate. The DOL may monitor compliance with changes in claim procedures set forth in paragraphs B.3.b. through B.3.g above and may conduct examinations of claims in the manner and at such intervals as the DOL deems appropriate. The examinations of claims will include but not be limited to review of claim files for the following problems, including failure to:

- Conduct a field visit where circumstances warrant;
- Obtain complete medical records;
- Fairly interpret or apply information from the claimant's AP;
- Use appropriate in-house medical resources;
- Fairly interpret or apply in-house medical opinions;
- Contact AP where circumstances warrant;
- Conduct appropriate occupational review;
- Obtain an IME or FCE where circumstances warrant;
- Select individuals to conduct IMEs and FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs;
- Fairly interpret or apply IME or FCE results;

- Appropriately classify disabilities under the mental and nervous limitation provisions of its policies; or
- Follow Company claim procedures or other Company procedures.

Claim files will also be examined for evidence of:

- Reliance on lack of "objective" data or "objective" medical information as a basis for claim denial or termination of benefits;
- Faulty or overly restrictive interpretation or application of policy provisions, including the definition of "occupation" in "own occupation" policies;
- Actions suggesting a pre-disposition or bias against the claimant;
- Threats to seek repayment of past benefits;
- Forcing claimants to seek legal counsel to obtain benefits; or
- Evidence of any incentives provided to deny or terminate benefits.

j.    <u>Standard for Compliance</u>.  The Company shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the collective number of claim files with errors for the Company and its affiliated companies executing substantially similar agreements as of this date (the "Group") results in an error rate that exceeds such maximum tolerance standard.  Such error rate(s) shall be determined by the Lead Regulators' review of separate statistically credible random samples of the total files for the Group's long term *group* and *individual* disability income insurance claims denied or benefits terminated on or after the Implementation Date, in accordance with paragraph B.3.i above. Separate Group error rates shall be determined for the Group's long term: (i) group disability income claims; and, (ii) individual disability income claims.

k.    <u>Opportunity for Review and Comment</u>.  The Companies shall be entitled to review and comment on any such examination results in accordance with the provisions of the Handbook.

l.    <u>Claim Files</u>.  A claim file shall include all documents relating to a claim history and/or decision, including but not limited to correspondence, medical records, vocational records, forms, internal memoranda and internal communications (including e-mail

19

communications), which shall be maintained in the claim file either in a paper file, or in electronic form in the case of the Companies' offices which operate in a "paperless" environment. The Lead Regulators and the DOL shall have access to all such paper or electronic files at all times. All claims reassessments pursuant to Paragraph B.2. and all new claim reviews pursuant to Paragraph B.3. shall be based upon a review of the entire claim file.

**C.    Other Provisions**

1.    This Agreement shall be governed by and interpreted according to laws of the State of Maine, excluding its conflict of laws provisions, and any applicable federal laws.

2.    It is expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will monitor the Company's compliance with this Agreement and any Consent Order to which it is attached. The DOL may also monitor the Company's compliance with this Agreement and any consent Order to which it is attached. It is further expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will conduct a full re-examination of the issues addressed by the Multistate Examination within twenty-four months after the Implementation Date and make all reasonable efforts to complete such re-examination within six months of its commencement. The DOL also reserves the right to conduct further investigation as it deems appropriate.

3.    The reasonable costs of the Lead Regulators in monitoring the Company's compliance with this Agreement, including the cost of conducting any reviews or examinations provided for by the Agreement, shall be paid by the Company.

4.    This Agreement is being made in conjunction with the entry of related Consent Orders arising from the Multistate Examination, and it shall be implemented and administered harmoniously with those Consent Orders.

20

5.  a.    The Lead Regulator shall deliver this Agreement to each of the Participating States within five (5) days following its execution by the Company, the DOL and the Lead Regulator.

b.    Each person signing on behalf of a Participating State gives his/her express assurance that under applicable state laws, regulations and judicial rulings, that the person has the authority to enter into this Agreement on behalf of the Participating State.

c.    Each Participating Regulator shall execute and deliver this Agreement to the Lead Regulator within thirty (30) days following the receipt of this Agreement from the Lead Regulator. If a Participating Regulator finds that, under applicable state law, regulation or procedure, the preparation and execution of a consent order is necessary to carry out the terms of this Agreement, such a consent order (the "Applicable Consent Order") shall be prepared by such Participating Regulator within thirty (30) days following the receipt of this Agreement from the Lead Regulator. The Lead Regulators may waive the thirty (30) day period for Participating Regulators to execute this Agreement.

d.    For purposes of this Agreement, an "Applicable Consent Order" shall be satisfactory to the Company if it: (i) incorporates by reference and attaches via exhibit a copy of this Agreement, (ii) expressly adopts and agrees to the provisions of this Agreement, and (iii) includes only those other terms that may be legally required in the state of the applicable Participating Regulator. However, nothing in this Agreement shall be construed to require any state to execute and deliver an Applicable Consent Order if such state elects instead to sign this Agreement.

6.    Within ninety (90) days of the Implementation Date, the Company will send a letter to the Plan Administrator of each ERISA-covered plan as to which any of the Companies

21

provided group long term disability insurance coverage between January 1, 1997 and December 31, 1999, indicating that the Agreement is available on the Parent Company's website and making particular reference to Section B.2.b.

7.    Time is of the essence in implementing the provisions of this Agreement, and the times specified may only be extended for good cause and with the advance written consent of the Lead Regulators, but such consent of the Lead Regulators shall not be unreasonably withheld.

8.    A decision by the Lead Regulator in this Agreement means a decision that has been agreed to by all three of the Lead Regulators under this Agreement and substantially identical agreements referred to in the Recitals.

9.    This Agreement shall remain in effect until the later of (i) January 1, 2007;  (ii) the substantial completion of review by the Claim Reassessment Unit of claims for which review has been requested by Specified Claimants and Requesting Claimants and information needed for the review has been submitted on a timely basis; or (iii) the completion of the full re-examination referenced in paragraph C.2.  Except as set forth in paragraph C.10 below, this Agreement and its provisions terminate for all purposes pursuant to this paragraph C.9.

10.    Notwithstanding the termination of this Agreement to the extent provided in accordance with paragraph C.9 above:

(i) This Agreement shall survive as to the following provisions, which also individually survive:  paragraphs -- B.2.b.3 (insofar as it relates to the consideration to be given Social Security disability awards); B.3.a (insofar as it establishes objectives for the Company's claim organization); B.3.b; B.3.c. (insofar as it establishes objectives for the Company's claim procedures); B.3.d; B.3.e; B.3.f; B.3.g. (insofar as it establishes objectives regarding evaluation of claims with co-morbid conditions); B.3.h (insofar as it confirms that claim personnel

22

performance shall not be measured based on claim denial or termination targets or that claims will be closed based on termination or denial targets); B.3.1 (insofar as it describes the content of a claim file).

(ii) The foregoing surviving obligations of the Company may only be amended by obtaining the consent of the Lead Regulators (acting in accordance with paragraph C.8), two-thirds of the Participating Regulators and the DOL, to any such amended provision: and,

(iii) Following termination of this Agreement for purposes of paragraph C.9 above, the Company will not materially change the claim procedures described in Exhibits 4, 5, 6 and 7 hereto unless (1) it first notifies the Lead Regulators and the DOL thirty days in advance of the proposed change and (2) the Lead Regulators and the DOL, within ten days of receipt of such notice, do not reasonably object.

11.    Neither this Agreement nor any related negotiations, statements or court proceedings shall be offered by the Company, the Lead Regulator, the DOL or the Participating Regulators as evidence of or an admission, denial or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to the Company, the Companies or the Parent Company, or as a waiver by the Company, the Companies or the Parent Company of any applicable defense, including without limitation any applicable statute of limitations or statute of frauds, except as set forth in B.2.d. of this Agreement.

12.    The Company does not admit, deny or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against it, but considers it desirable for this matter to be resolved because this Agreement will provide substantial benefits to the Company's present and former policyholders and insureds.

23

13.    Neither this Agreement nor any of the relief to be offered under this Agreement shall be interpreted to alter in any way the contractual terms of any policy, or to constitute a novation of any policy.  Neither this Agreement nor any relief to be offered under this Agreement shall be interpreted to reduce or increase any rights of participants in ERISA-covered plans, including but not limited to rights to which they may be entitled pursuant to ERISA 29 U.S.C. 1133, and 29 C.F.R. 2560.503-1, including any appeal or review rights under the plan. Other than those rights afforded under this Agreement, no additional rights are provided to the extent that any Specified Claimants or Requesting Claimants have previously exercised their rights as mentioned in this paragraph 13 (or have failed to exercise their rights and therefore, as provided for under ERISA, have permitted those rights to lapse).

14.    The effectiveness of this Agreement is conditioned upon the following: (i) approval and execution of the Agreement by the Company, the Lead Regulators and the DOL, (ii) approval and execution of the Agreement by appropriate documentation of no less than two-thirds of the Participating States unless a lesser number is agreed by the Company, (iii) approval and execution of substantially identical regulatory settlement agreements between each of the other two insurance companies that come within the definition of Companies and their respective domiciliary regulators, and (iv) the approval and execution of a substantially identical regulatory settlement agreement between the New York subsidiary,  the New York Superintendent of Insurance and the Lead Regulators.

15.    During the pendency of this Agreement, each of the Participating Regulators agrees that such Participating Regulator and his or her insurance department (i) will not conduct a market conduct examination of the Companies relating to the Model Act, and (ii) will not impose a fine, injunction or any other remedy on any of the Companies for any of the matters

24

that are the subject matter of this Agreement and may only participate on terms set forth in this Agreement in any fine or remedy that may be imposed under this Agreement . Notwithstanding the foregoing, upon notice from any Participating Regulator to the Lead Regulators, the Participating Regulator and the Lead Regulators shall proceed to investigate an assertion of the Company's non-compliance herewith regarding residents of said Participating Regulator's state.

16.    This Agreement (or its Exhibits and their Attachments) may be amended by the Lead Regulators, the DOL and the Company without the consent of any Participating Regulator, provided that any such amendment does not materially alter this Agreement. Any amendment to the terms of the Agreement (or to its Exhibits and their Attachments) which would affect the regulatory authority of any Participating Regulator(s) shall not become effective without the consent of such Participating Regulator(s). All such amendments to this Agreement shall be in writing.

17.    The DOL may enter into arrangements or agreements with any of the Lead Regulators or Participating Regulators pursuant to Section 506 of ERISA, 29 U.S.C. Section 1136, for cooperation, mutual assistance, or use by the DOL of facilities or services in connection with monitoring compliance with the Agreement and Title 1 of ERISA (including 29 C.F.R. Section 2560.503-1) and receiving reports on activities undertaken in connection with this Agreement. To the extent the Secretary enters into such an arrangement or agreement with any of the Lead Regulators or Participating Regulators, the Company shall provide reimbursement for any expenses incurred pursuant to C.3 of this Agreement.

18.    For the duration of this Agreement, if any Lead Regulator or Participating Regulator finds any information which it believes constitutes a violation of ERISA with respect

to any employee benefit plan, such regulator shall report that information to the DOL as soon as practicable.

**D.    Remedies**

    1.    In the event that the Group fails to implement all of the changes in corporate governance provided for in paragraph B.1. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured; provided, however, the Group will not be deemed to be non-compliant with the time requirements of paragraph B.1. if the Lead Regulators have not approved both of the candidates proposed by the Board of Directors to become new directors.

    2.    In the event that the Group fails to implement the Claim Reassessment Process provided for in paragraph B.2. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

    3.    In the event that the Group fails to provide the initial notice to Specified Claimants within the period set forth in Exhibit 1, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

    4.    In the event that the Group fails to implement the changes to the claim organization or the changes to the claim procedures provided for in paragraph B.3.a., paragraph B.3.c. or paragraph B.3.g. within the times specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

    5.    In the event that the Group fails to conduct the training provided for in paragraph B.3.h. within the time specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

26

6.    Upon material completion of the Claim Reassessment Process, should the Lead Regulators upon examination determine that claim reassessment decisions were made in a manner inconsistent with the procedures of the Claim Reassessment Unit, the Group shall pay a fine of $145,000,000. The Group shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the number of claim files with errors results in an error rate for either their collective subject *group* or *individual* claims hereunder that exceeds such maximum tolerance standard. Such error rates shall be determined by the Lead Regulators based on a review of statistically credible random separate samples of each of the *group* and *individual* claim reassessment decisions for the Group. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.7, but not both, in the event that the error rate exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this determination by July 1, 2007.

7.    Upon completion of the examination described in paragraph C.2, should the Lead Regulators determine that claims denied or benefits terminated after the Implementation Date did not meet the standard for compliance set forth in paragraph B.3.j, the Group shall pay a fine of $145,000,000. Such error rates shall be determined by the Lead Regulators based on review of a statistically credible random separate sample of each of the *group* and *individual* subject claims denied or benefits terminated after the Implementation Date. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.6, but not both, in the event that the number of claim files with errors results in an error rate that exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this examination by July 1, 2007.

27

8.    The purpose of any fines imposed pursuant to paragraphs D.1 through D.5 is to encourage timely implementation of the matter set forth in each paragraph.

9.    Within fifteen (15) days of being advised in writing by the Lead Regulators that the required two-thirds of Participating States have approved and consented to this Agreement (unless the Company consents to a lower number) and the other conditions of effectiveness set forth in paragraph C.14 having been satisfied, the Group shall pay to the Lead Regulators a fine of $15,000,000.

10.    In addition to the other penalties applicable pursuant to this Agreement, and notwithstanding the error rate threshold, the Lead Regulators and Participating Regulators retain the right to impose any regulatory penalty otherwise available by law, including fines, with respect to the Company's willful violation of the terms of this Agreement or other violation of law.

11.    The obligation, as among the individual Company members of the Group, to pay any such fines shall be equal to the proportional capital and surplus of each Company to the Group's obligation, such calculation to be based on the most recently filed NAIC financial statement of each such Company.

12.    All fines paid under the foregoing subparagraphs shall be paid to the Lead Regulators and then allocated among the Lead Regulators and all Participating Regulators on the basis of the Company's premium volume for in-force policies of individual and group disability insurance as of December 31, 2003.

13.    The Lead Regulators, the DOL and the Participating Regulators reserve the right to pursue any other remedy or remedies for violations of this Agreement. Nothing in this

28

Agreement shall be construed to waive or limit the rights of the Lead Regulators, the DOL and the Participating Regulators to seek such other and additional remedies.

14.    The enforcement of any fine imposed hereunder and the findings upon which any such fine are based shall be subject to judicial review as otherwise provided by law.

UNUM LIFE INSURANCE COMPANY OF AMERICA

BY: _____
       Thomas R. Watjen
ITS: President and Chief Executive Officer

November _18_ 2004


MAINE BUREAU OF INSURANCE

BY: _____
    Alessandro A. Iuppa, Superintendent

November ___, 2004

MASSACHUSETTS DIVISION OF INSURANCE

BY: _____
    Julianne M. Bowler,
    Commissioner

November ___, 2004

TENNESSEE DEPARTMENT OF COMMERCE AND INSURANCE

BY: _____
    Paula A. Flowers, Commissioner

November ___, 2004

29

Agreement shall be construed to waive or limit the rights of the Lead Regulators, the DOL and the Participating Regulators to seek such other and additional remedies.

14.     The enforcement of any fine imposed hereunder and the findings upon which any such fine are based shall be subject to judicial review as otherwise provided by law.

UNUM LIFE INSURANCE COMPANY OF AMERICA

BY:_____

ITS:_____

      November ___, 2004


MAINE BUREAU OF INSURANCE

BY: _____
      Alessandro A. Iuppa, Superintendent

      November 11, 2004


MAINE OFFICE OF THE ATTORNEY GENERAL

BY:_____
      G. Steven Rowe, Attorney General

      November 17, 2004


MASSACHUSETTS DIVISION OF INSURANCE

BY:_____
      Julianne M. Bowler,
      Commissioner

      November ___, 2004

Agreement shall be construed to waive or limit the rights of the Lead Regulators, the DOL and the Participating Regulators to seek such other and additional remedies.

14.    The enforcement of any fine imposed hereunder and the findings upon which any such fine are based shall be subject to judicial review as otherwise provided by law.

UNUM LIFE INSURANCE COMPANY OF AMERICA

BY:_____

ITS:_____

November ___, 2004

MAINE BUREAU OF INSURANCE

BY:_____
     Alessandro A. Iuppa, Superintendent

November ___, 2004

MASSACHUSETTS DIVISION OF
INSURANCE

BY: _Julianne M Bowler_____
     Julianne M. Bowler,
     Commissioner

November 18, 2004

TENNESSEE DEPARTMENT OF COMMERCE
AND INSURANCE

BY:_____
     Paula A. Flowers, Commissioner

November ___, 2004

29

Agreement shall be construed to waive or limit the rights of the Lead Regulators, the DOL and the Participating Regulators to seek such other and additional remedies.

14.    The enforcement of any fine imposed hereunder and the findings upon which any such fine are based shall be subject to judicial review as otherwise provided by law.

UNUM LIFE INSURANCE COMPANY OF AMERICA

BY:_____

ITS:_____

November ___, 2004

MAINE BUREAU OF INSURANCE

BY:_____
Alessandro A. Iuppa, Superintendent

November ___, 2004

MASSACHUSETTS DIVISION OF INSURANCE

BY:_____
Julianne M. Bowler,
Commissioner

November ___, 2004

TENNESSEE DEPARTMENT OF COMMERCE AND INSURANCE

BY: _Paula A. Flowers_____
Paula A. Flowers, Commissioner

November 18, 2004

29

ELAINE L. CHAO
SECRETARY OF LABOR

ANN L. COOMBS
ASSISTANT SECRETARY
EMPLOYEE BENEFITS SECURITY ADMINISTRATION

BY: _____
James M. Benages
Regional Director
Employee Benefits Security Administration

November 18, 2004

Post Office Address:

U.S. Department of Labor
Employee Benefits Security Administration
JFK Federal Building, Room 575
Boston, MA 02203
TEL:(617)565-9600
FAX:(617)565-9666

30

## PARTICIPATING REGULATOR ADOPTION

On behalf of __[Insert the State and Insurance Regulatory Agency]. I, _[Insert name of insurance regulatory official executing the Agreement], hereby adopt, agree and approve this Agreement.

[NAME OF INSURANCE REGULATORY AGENCY]


BY:_____
    [Title of Regulator]

    November __, 2004

31

## Exhibit 1 -- Attachment A-1

## (General Notice to Claimants Eligible for Reassessment)

[Date]

[Name]
[Address]
[Address]

Re:   Claim No. _____

Dear [personalized]:

As part of a multistate settlement with insurance regulators and the United States Department of Labor (the "DOL"), The Paul Revere Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, First UNUM Life Insurance Company and UNUM Life Insurance Company of America ("the Companies") have agreed to implement a Claim Reassessment Process, under which your long term disability claim as captioned above has been determined to be eligible. For that reason, if you believe that you may be eligible for benefits for which you have not been paid, you are entitled to request that the Companies review their previous decision to deny your disability income claim or terminate benefits being paid on such claim. The settlement with insurance regulators and the DOL sets forth the procedures under which the Companies will conduct the Claim Reassessment Process. This Process will be monitored by the insurance regulators and, as to claimants who are or were covered under an employee benefit plan, by the DOL. A copy of the Regulatory Settlement Agreement is available on the website of UnumProvident Corporation.

If you wish to elect to participate in the Claim Reassessment Process, you must do one of the following within 60 days of the date of this letter:

- Fill out and return the enclosed sheet in the envelope provided; OR

- Visit www.unumprovident.com/[TO BE DETERMINED] with your claim number ready (provided at the top of this page); OR

- Place a toll-free call to 800.xxx.xxxx and provide your name, current address and claim number. This phone number is provided for your convenience in making your election to participate, but no other information is available currently through this special temporary line.

Your decision to participate in the Claim Reassessment Process will be acknowledged by the Companies.

The Companies will review claims of those electing to participate based on the original dates of when the claim was denied or closed with the oldest closure dates being reviewed first. The Companies will send you a second notice at a time that is closer to the period when your claim will be reviewed indicating the approximate time period of that review and requesting that you complete and return a Reassessment Information Form to provide information needed for the review of your claim.

Once you have completed and returned your Reassessment Information Form, the Companies will acknowledge its receipt and indicate any specific information that is still needed in order for the Companies to reassess your claim. Once our prior claim decision has been reassessed and any additional investigation is completed, the Companies will advise you in writing whether your claim will be re-opened and further benefits paid.

You are under no obligation to participate in the Claim Reassessment Process. Should you decide not to participate you will not lose any rights that you otherwise have. However, should you choose to participate, you will need to agree that if (and only if) the reassessment results in a reversal or other change in our prior decision denying or terminating benefits, you will not pursue legal action against the Companies to the extent (and only to the extent) such action would be based on any aspect of the prior denial or termination that is reversed or changed.

If you have already commenced legal action relating to your prior claim(s) decision, please provide a copy of this letter to your attorney as soon as possible so that he or she might advise you concerning the alternatives. If, after consulting with your attorney, you decide to participate in the reassessment, you will need to agree to take such action as is necessary to seek to stay such litigation pending the outcome of the reassessment process. If the court does not agree to a stay and a final verdict or judgement is entered prior to completion of the reassessment, the Companies will have no further obligation to reassess your claim. If the court stays the litigation relating to your claim, you will need to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, you will withdraw and dismiss with prejudice your litigated claims, including extracontractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. In other words, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any portion of a prior denial that is reversed or changed and you have agreed to withdraw the action as described above, the Companies will attempt to reach agreement with you regarding the payment of any reasonable attorney's fee to which you may be entitled under law, and if we are unable to reach such an agreement, you will not be prejudiced from pursuing such fees in a court of law. After you have discussed this with your attorney, we encourage your attorney to

2

contact the attorney representing the Companies to discuss these matters so that you might make an informed decision regarding participation in the reassessment process and your other alternatives.

These agreements relating to commencing legal action and any pending litigation, which will be included with the Reassessment Information Form for you to sign, will not apply to the extent that our prior decision denying or terminating benefits is not reversed as a result of the Claim Reassessment Process and any applicable statute of limitations will be tolled during the pendency of the reassessment process.

Sincerely,


[Name]
[Title]


3

**Exhibit 1 -- Attachment A-2**

**(Notice to Claimants w/Claim Closure Coded as RTW)**

[Date]

[Name]
[Address]
[Address]

      Re:    Claim No. _____

Dear [personalized]:

      As part of a multistate settlement with insurance regulators and the United States Department of Labor (the "DOL"), The Paul Revere Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, First UNUM Life Insurance Company and UNUM Life Insurance Company of America ("the Companies") have agreed to implement a Claim Reassessment Process, under which your long term disability claim as captioned above *may* be eligible.

      Our records show you returned to work and that places you in a special category relating to eligibility for the Claim Reassessment Process. If you believe your claim was *inappropriately denied or terminated* you may be eligible for benefits for which you have not been paid and are entitled to request that the Companies review their previous decision to close your claim. The settlement with insurance regulators and the DOL sets forth the procedures under which the Companies will conduct the Claim Reassessment Process. This Process will be monitored by the insurance regulators and, as to claimants who are or were covered under an employee benefit plan, by the DOL. A copy of the Regulatory Settlement Agreement is available on the website of UnumProvident Corporation.

      If you wish to elect to participate in the Claim Reassessment Process, you must do one of the following within 60 days of the date of this letter:

- Fill out and return the enclosed sheet in the envelope provided; OR

- Visit www.unumprovident.com/[TO BE DETERMINED] with your claim number ready (provided at the top of this page); OR

- Place a toll-free call to 800.xxx.xxxx and provide your name, current address and claim number. This phone number is provided for your convenience in making your election to participate, but no other

information is available currently through this special temporary line.

Your decision to participate in the Claim Reassessment Process will be acknowledged by the Companies.

The Companies will review claims of those electing to participate based on the original dates of when the claim was denied or closed with the oldest closure dates being reviewed first. The Companies will send you a second notice at a time that is closer to the period when your claim will be reviewed indicating the approximate time period of that review and requesting that you complete and return a Reassessment Information Form to provide information needed for the review of your claim.

Once you have completed and returned your Reassessment Information Form, the Companies will acknowledge its receipt and indicate any specific information that is still needed in order for the Companies to reassess your claim. Once our prior claim decision has been reassessed and any additional investigation is completed, the Companies will advise you in writing whether your claim will be re-opened and further benefits paid.

You are under no obligation to participate in the Claim Reassessment Process. Should you decide not to participate you will not lose any rights that you otherwise have. However, should you choose to participate, you will need to agree that if (and only if) the reassessment results in a reversal or other change in our prior decision denying or terminating benefits, you will not pursue legal action against the Companies to the extent (and only to the extent) such action would be based on any aspect of the prior denial or termination that is reversed or changed.

If you have already commenced legal action relating to your prior claim(s) decision, please provide a copy of this letter to your attorney as soon as possible so that he or she might advise you concerning the alternatives. If, after consulting with your attorney, you decide to participate in the reassessment, you will need to agree to take such action as is necessary to seek to stay such litigation pending the outcome of the reassessment process. If the court does not agree to a stay and a final verdict or judgement is entered prior to completion of the reassessment, the Companies will have no further obligation to reassess your claim. If the court stays the litigation relating to your claim, you will need to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, you will withdraw and dismiss with prejudice your litigated claim, including extracontractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. In other words, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any portion of a prior denial that is reversed or changed and you have agreed to withdraw the action as described above, the Companies will attempt to reach agreement with you regarding the payment of any reasonable attorney's fee to which you may be entitled under law, and if we are unable to reach such an agreement, you will not be prejudiced from pursuing such fees in a court of

2

law.  After you have discussed this with your attorney, we encourage your attorney to contact the attorney representing the Company to discuss these matters so that you might make an informed decision regarding participation in the reassessment process and your other alternatives.

These agreements relating to commencing legal action and any pending litigation, which will be included with the Reassessment Information Form for you to sign, will not apply to the extent that our prior decision denying or terminating benefits is not reversed as a result of the Claim Reassessment Process and any applicable statute of limitations will be tolled during the pendency of the reassessment process..

Sincerely,

[Name]
[Title]

3

ATTACHMENT B

[Date]


[Name]
[Address]
[Address]

Re:    Claim No. _____


Dear [personalized]:


You previously elected to participate in our Claim Reassessment Process with respect to the captioned claim. As we previously indicated, we are proceeding with the reassessment of claims based on their original dates of denial or closure. We are now ready to begin the reassessment of your claim, and appreciate your patience.

Our records indicate that your claim was closed or terminated on _____. We ask for your assistance in ensuring that your claim file is updated beyond that date, including your work history, medical information and details of other income or earnings you have received. Please use the attached Reassessment Information Form to provide this information. Also, please include any additional information you feel would be helpful to assist us in reassessing your claim.

The instructions on the Reassessment Information Form explain where to send your completed form. You will need to complete and return your Reassessment Information Form within 60 days of the date of this letter, which is no earlier than the date we will post it in the mail. We will send you an acknowledgement notifying you that we have received your completed Reassessment Information Form within 30 days of its receipt. If you need additional time to complete the Reassessment Information Form, please provide your reasons for needing an extension of time in writing to us within 60 days of the date of this letter.

Prior to reassessment of your claim, you must sign the Reassessment Information Form in each of the indicated places. This will confirm your agreement that if (and only if) the reassessment results in a reversal or other change in our prior decision denying or terminating benefits, that you will not pursue legal action against the Company to the extent (and only to the extent) such action would be based on any aspect of the prior denial or termination that is reversed or changed. It will also confirm your agreement that if you have already commenced legal action relating to your prior claim(s) decision, you will

seek to stay such litigation pending completion of the reassessment of your claim, and your further agreement that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then you will withdraw any litigated claim, including extracontractual claims to the extent, (and only to the extent) such claim is based on any aspect of the prior denial or termination that is reversed or changed. In other words, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived.

If we do not receive your completed Reassessment Information Form or request for extension within the timeframe noted above, we will assume that you no longer wish to participate in the Claim Reassessment Process and your claim will remain closed.

Once we have received your Reassessment Information Form and any other information we need to review, the reassessment of your claim could take from four to twelve weeks, depending on the complexity of your particular situation. We will contact you regarding any additional information that we may need. While your claim will be given a thorough review, please understand that participation in the Claim Reassessment Process does not necessarily mean that you will receive benefits or that a different decision will be reached.

If you have any questions regarding your claim and the Claim Reassessment Process, please feel free to call (1-800-___-____). Thank you very much for your cooperation.

Sincerely,



## Reassessment Information Form

**Mail to:** UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:** 1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

<u>**REASSESSMENT INFORMATION FORM**</u>                **Attachment C**

Instructions:

A.  Claimant Statement: Provide an update of certain personal information as indicated in this section.

B.  Employment Statement: Provide details regarding any work activity from the date your claim was closed through the present. Depending on the terms of your policy, to qualify for benefits you may need to demonstrate a loss of functional duties and/or a loss in income. In order to properly assess your claim we will need to have information regarding all work you have performed. If you are claiming a loss in income while working, provide all supporting documentation available including tax returns and related IRS Forms W-2 and/or 1099; otherwise, this financial information is not needed to reassess your claim.

C.  Medical Information Details: Provide all details regarding medical treatment received since your claim was closed. This enables us to obtain any additional medical information we may need from your medical treatment providers. To assist us in the Claim Reassessment Process, enclose any medical records or information you may have in your possession.

D.  Other Income Benefits: Provide us with details concerning any other income benefits you may have received or are receiving. Please complete this section of the form and attach any supporting information you may have, including benefit awards, summaries etc.

*You must sign and date each of the following sections of the form in order for us to begin the Claim Reassessment Process.*

E.  Certification: Sign and date this form.

F.  Conditional Waiver and Release: Sign and date this form.

G.  Authorization: Sign and date this form.

Also please enclose any additional information that you feel will assist us in reassessing your claim.

The completed form should be sent to:

UnumProvident
Claim Reassessment Unit
PO Box XXXX
Portland, Maine 04104-5028

Page 1 of 9



**Reassessment Information Form**

**Mail to:** UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:** 1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

## A. CLAIMANT'S PERSONAL INFORMATION (PLEASE PRINT)

| Claimant's Name (as printed on your Social Security Card) | Home Telephone Number Including Area Code | Date of Birth | Social Security Number |
|---|---|---|---|
| | | ☐ Male ☐ Female | ___ - ___ - ___ |

| Home Address (Street, City, State, Zip) |
|---|
| |

| Policy Number: | Claim Number: |
|---|---|

| Preferred e-mail address where you can be reached |
|---|



# Reassessment Information Form

**Mail to:** UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:** 1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

---

Explain why you believe that our previous decision to deny or terminate your claim was incorrect.

**UNUMPROVIDENT**

# Reassessment Information Form

**Mail to:** UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:** 1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

## B. CLAIMANT'S EMPLOYMENT INFORMATION (PLEASE PRINT)

| Name of Employer A. | Employer's Telephone Number |
|---|---|
| Dates of Employment | |
| Employer's Address (Street, City, State, Zip) | |
| Your occupation and work schedule with this employer | |
| Weekly or Monthly Earned Income Before Taxes $ | (please provide documentation of earnings) |

| Name of Employer B. | Employer's Telephone Number |
|---|---|
| Dates of Employment | |
| Employer's Address (Street, City, State, Zip) | |
| Your occupation and work schedule with this employer | |
| Weekly or Monthly Earned Income Before Taxes $ | (please provide documentation of earnings) |

| Name of Employer C. | Employer's Telephone Number |
|---|---|
| Dates of Employment | |
| Employer's Address (Street, City, State, Zip) | |
| Your occupation and work schedule with this employer | |
| Weekly or Monthly Earned Income Before Taxes $ | (please provide documentation of earnings) |



**UNUMPROVIDENT.**

# Reassessment Information Form
**Mail to:** UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5008
**Claim Questions:** 1-866-xxx-xxxx
**Fax to:** 1-866-xxx-xxxx

## C. CLAIMANT'S MEDICAL INFORMATION (PLEASE PRINT)

Please provide full and complete responses, indicating "none" where applicable. If more space is needed, please attach lists as necessary.

1. Name(s) and complete address(es) of any medical care provider you consulted for any condition since your claim was closed.

| Name of Doctor | Complete Address (Street, City, State, Zip) | Dates of Treatment | Telephone/Fax# |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

2. Indicate the name(s) and complete addresses of any hospital/clinic where you received medical treatment, consultation, care or services (including diagnostic measures) since your claim was closed.

| Name of Hospital/Clinic Telephone/Fax# | Complete Address (Street, City, State, Zip) | Dates Treated |
|---|---|---|
| | | |
| | | |
| | | |

3. List any medications and prescribed drugs taken since your claim was closed.

| Name of drug or medicine | Prescription Number | Pharmacy | Date | Physician |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

4. Please provide the complete address of any pharmacy listed in response to Question#3.

| Name of Pharmacy | Complete Address(Street, City, State, Zip) | Telephone/Fax # |
|---|---|---|
| | | |
| | | |
| | | |



# Reassessment Information Form

**Mail to:** UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:** 1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

## D. CLAIMANT'S OTHER INCOME BENEFITS (PLEASE PRINT)

Check the other income benefits you have received, or are receiving, or are eligible to receive as a result of your disability and complete the information requested.

Please also report any changes to previously reported benefits.
If you have been approved or denied for any of these benefits, please send a copy of award or denial notification.

| Social Security/Retirement | Social Security/Disability | Canada Pension Plan | State Disability |
|---|---|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Workers' Compensation | Pension/Retirement | Pension/Disability | Unemployment |
| ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| No-fault insurance ☐ Yes ☐ No | Short Term Disability    ☐ Yes ☐ No – Ins. Co. Name and Policy # | | |
| Other (include Individual Disability or Group Disability Benefits)    ☐ Yes ☐ No – Ins. Co. Name and Policy # | | | |



# Reassessment Information Form

**Mail to:** UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:** 1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

### Claim Fraud Warning Statements

For your protection, the laws of several states, including Alaska, Arkansas, Delaware, Idaho, Indiana, Kentucky, Louisiana, Minnesota, New Hampshire, Ohio, Oklahoma, and others require the following statement to appear:

#### Fraud Warning

Any person who knowingly, and with intent to injure, defraud, or deceive an insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of insurance fraud which is a felony.

#### Fraud Warning for California Residents

For your protection, California law requires the following to appear:

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

#### Fraud Warning for Colorado Residents

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company,. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete , or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

#### Fraud Warning for District of Columbia, Maine, Tennessee and Virginia Residents

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purposes of defrauding the company. Penalties may include imprisonment, fines or denial of insurance benefits.

#### Fraud Warning for Florida Residents

Any person who knowingly and with intent to injure, defraud, or deceive any insurance company, files a statement of claim or an application containing false, incomplete or misleading information is guilty of fraud in the third degree.

#### Fraud Statement for New Jersey, New Mexico, and Pennsylvania Residents

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

#### Fraud Statement for New York Residents

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

E. The Information which I have provided on this Reassessment Information Form is true and complete to the best of my knowledge and belief.

Signature _____     Date_____

Page 7 of 9



**Reassessment Information Form**

Mail to:  UnumProvident Claim Reassessment Unit
                 PO Box xxx, Portland, ME 04104-5028

**Claim Questions:**  1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

F.  **Conditional Waiver and Release**

By choosing to participate in the Claim Reassessment Process, I hereby agree that if (and
only if) the reassessment results in a reversal or other change in the prior decision denying or
terminating benefits, I will not pursue any legal action to the extent (and only to the extent)
such action is based on any aspect of the prior denial or termination that is reversed or
changed.  If I receive any additional benefits as a result of this reassessment, I hereby waive
and release any right to sue UnumProvident Corporation, its insurance subsidiaries* and duly
authorized representatives, for their prior failure to pay those same benefits to me. If I have
already commenced legal action relating to my prior claim(s) decision, I will take such action
as is necessary to stay such litigation pending the reassessment process, if the court will
agree to such a stay, and I agree that if (and only if) the reassessment results in a reversal or
other change in the prior decision denying or terminating benefits, then I will withdraw any
litigated claim, including any extra-contractual claims, to the extent (and only to the extent)
such claims are based on any aspect of the prior denial or termination that is reversed or
changed.  To the extent that following the reassessment there remains a complete or partial
denial of benefits, my right to initiate or continue litigation regarding that portion of the prior
denial that has not been reversed or changed is not waived.  In addition, any applicable
statute of limitations is tolled during the pendency of the reassessment of my claim; however,
I understand that my participation in the Claim Reassessment Process will not revive or
reinitiate the statute of limitations with respect to the previous claim decision.

This waiver and release will not apply to the extent that any prior decision is not reversed as
a result of the Claim Reassessment Process.

Signature _____        Date_____

* This waiver and release is valid for the following UnumProvident subsidiaries: Unum Life
   Insurance Company of America, First Unum Life Insurance Company, Provident Life and
   Accident Insurance Company, Provident Life and Casualty Insurance Company, The Paul
   Revere Life Insurance Company.



# Reassessment Information Form

**Mail to:** UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:** 1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

G.  NOTE: Federal law requires that we obtain this authorization from you. You are not required to sign the authorization, but if you do not, UnumProvident may not be able to evaluate or administer your claim(s). Please sign and return this authorization with the completed Reassessment Information Form.

### Authorization

I authorize any health care provider including, but not limited to, any health care professional, hospital, clinic, laboratory, pharmacy or other medically related facility or service; health plan; rehabilitation professional; vocational evaluator; insurance company; reinsurer; insurance service provider; third party administrator; producer; the Medical Information Bureau; the Association of Life Insurance Companies, which operates the Health Claims Index and the Disability Income Record System; government organization; and employer that has information about my health, financial or credit history, earnings, employment history, or other insurance claims and benefits to disclose any and all of this information to persons who administer claims for UnumProvident Corporation, its insurance subsidiaries* and duly authorized representatives ("UnumProvident"). Information about my health may relate to any disorder of the immune system including but not limited to, HIV and AIDS; use of drugs and alcohol; and mental and physical history, condition, advice or treatment, but does not include psychotherapy notes. I understand that information on financial or credit history or earnings will not be sought from an employer if it is not relevant to evaluating my claim(s) for benefits.

I understand that any information UnumProvident obtains pursuant to this authorization will be used for evaluating and administering my claim(s) for benefits, which may include assisting me in returning to work. I further understand that the information is subject to redisclosure and might not be protected by certain federal regulations governing the privacy of health information.

This authorization is valid for two (2) years from the date below, or the duration of my claim, whichever period is shorter. A photographic or electronic copy of this authorization is valid as the original. I understand I am entitled to receive a copy of this authorization.

I may revoke this authorization in writing at any time except to the extent UnumProvident has relied on the authorization prior to notice of revocation or has a legal right to contest a claim under the policy or the policy itself. I understand if I revoke this authorization, UnumProvident may not be able to evaluate or administer my claim(s) and this may be the basis for denying my claim(s). I may revoke this authorization by sending written notice to the Company.

I understand if I do not sign this authorization or if I alter its content in any way, UnumProvident may not be able to evaluate or administer my claims(s) and this may be the basis for denying my claim(s).

Signature _____    Date_____

Print Name _____    Social Security Number _____

If signed on behalf of the claimant as personal representative, please indicate relationship here _____. If signed on behalf of the claimant as designee under power of attorney, as guardian, or as conservator, please attach a copy of the document granting authority.

*   This authorization is valid for the following UnumProvident subsidiaries: Unum Life Insurance Company of America, First Unum Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, The Paul Revere Life Insurance Company.

## EXHIBIT 2

## CHANGES IN CLAIM ORGANIZATION

Exhibit 2 is responsive to Paragraph B.3.a. of the Regulatory Settlement Agreement.

**Current Organization**

In the current organization of the Companies' claims operation the primary responsibility for making a claim decision rests with a Disability Benefit Specialist ("DBS") who generally receives guidance on a given claim from a Consultant who has more claim handling experience. The DBS also has access to additional internal resources, including nurses, physicians, vocational rehabilitation specialists, accountants and lawyers. The DBS's are in units that report to Managers and Directors, who have more claims handling experience but generally perform management roles and are not involved in individual claim files. Consultants generally do not have management responsibilities.

**Changes in Claim Organization**

In order to address areas of concern noted in the Multistate Examination Report and increase the effectiveness of the claims operation in processing claims, changes are being made to increase the claim handling experience of personnel involved at the earliest stage of reviewing a claim, add to the accountability for compliance and increase the involvement of higher level management in approving claim decisions. The primary changes are as follows:

1) The Consultant position is being eliminated, and the individuals serving in that position are being reassigned to various other positions, including DBS, Manager, newly created positions in the Claim Reassessment Unit, and the newly created Quality Compliance Consultant positions.

2) Individuals serving in the existing Manager positions will become more directly involved in daily activities and decisions associated with claims; will be directly accountable for claim decisions made in their unit; will ensure that appropriate actions are taken and information received on claims before a decision is made; and will be responsible for developing the technical expertise of the staff in their unit. Managers generally have at least five years of claim handling experience.

3) A new position, Quality Compliance Consultant ("QCC") will be created to focus upon compliance, documentation, accountability for compliance, issues of fairness to claimants, and avoidance of improper claim practices. The position description for QCC is set forth in Exhibit 3.

Exhibit 3

Position Title: **Quality Compliance Consultant**
Job Code:   New role to organization
Job Level:
Exemption Status:   Exempt

## General Summary

This highest level technical position is directly responsible for ensuring quality (appropriate file documentation and decision rationale) and compliance.  They are relied upon to provide guidance, training and direction to the Disability Benefits team with a strong partnership with Legal.

## Principal Duties and Responsibilities

### Claim Management

- Enhance organizational performance through ensuring quality of claim documentation and decision rationale
- Develop and build in-depth technical expertise in the Disability Benefits team
- Analyze and conduct needs assessment to assist with development of strategies to improve quality of  performance
- Utilize and convey expertise in multiple product lines (STD, LTD, IDI)
- Mentor claims personnel
- Utilize appropriate resources, as needed, to arrive at thorough, fair and objective decisions
- Proactively review files to assess quality and compliance
- Ensure corporate and claimant compliance with ERISA standards, as applicable

### Customer Service and Partnering

- Provide feedback to Disability Benefits Specialists, Managers, and Directors on quality of specific claim documentation and decision rationale
- Build and maintain partnerships with management team members and legal team
- Partner with Legal to provide quantitative and qualitative feedback on overall quality of claim documentation and decision rationale
- Partner with QPS (Appeals, Audit and Training) to identify trends and develop action plans to improve overall quality of claim management
- May perform other duties as assigned

**Job Specifications**

- Any combination of education or experience equivalent to ten years disability experience and/or seven years disability claims experience preferred
- Demonstrated success in managing highly complex claims
- Undergraduate degree required
- Strong preference for one or more Insurance Industry designations (ALHC, FLMI, ACS, etc.)
- Proven ability to successfully coach and mentor others
- Strong decision making and problem solving skills
- Ability to effectively and professionally interact/partner with internal and external representatives and resources
- Exceptional written and oral communications
- Superior analytical skills with an understanding of the functional requirements of the organization
- Demonstrated understanding of disability claim operations

**Exhibit 4**

**Improved Procedures for Evaluating Multiple Conditions or Co-Morbid Conditions**

1. **Guiding Principles (see also UnumProvident Clinical, Vocational, and Medical Services Statement Regarding Professional Conduct)**

>   Benefit Center professionals will evaluate all data available regarding a claim
> > Both objective and subjective
> > Both supporting impairment and supporting capacity

>   Benefit Center professionals will consider and afford appropriate weight to all diagnoses and impairments, and their combined effect on the whole person, when evaluating medical data in a claim file.

>   Where multiple conditions or co-morbid conditions are present, each medical professional and all other Benefit Center professionals evaluating the claim share responsibility to ensure that all diagnoses and impairments are considered and afforded appropriate weight.

>   When multiple medical professionals review a file, each medical professional and all other Benefit Center professionals share responsibility for coordinating their opinions and ensuring that each understands how the various opinions fit together in a coherent view of the claimant's medical condition, capacity, and restrictions/limitations.

2. **Changes in procedures**

Several techniques will be used to ensure that claimants with multiple conditions are fully and fairly evaluated regarding the totality of their limitations. These alternatives include

- Designated clinical consultant in each impairment unit to receive and manage consultation requests from other units
- Access to multi-disciplinary meetings to consider totality of impairments
- Referral to generalist or primary care physician (internist, occupational physician, or family practitioner) to consider effects of all conditions on overall function and limitations

>   Each of these techniques is currently in use at two or more locations, and all locations use at least two of these techniques.

>   A Medical Analysis Checklist (see format below) has been developed as a tool for Benefit Center professionals. The checklist should be used when multiple on-site physicians have reviewed a file, and is available as a tool for organizing a whole person analysis of impairments for any claimant.

3. **Training**

   Clinical, Vocational, and Medical Directors at each claim processing location will
   identify areas for company-sponsored continuing nursing and physician education.

### Medical Analysis Checklist

The checklist may be useful at several points during a claim, including liability determination, change of
definition, and contemplated claim closure. It provides a "snapshot" at a particular point in time of all
recent treaters, diagnoses/syndromes/problem areas identified, restrictions and limitations arising from
each, and our contractual assessment of those restrictions and limitations.
For illustrative purposes only, an example is offered below on how the form might be used.

Claimant: _Jeff Styles_____     Soc Sec #: _345_-_67_-_8912_     Date: _8_/_11_/_2004_

| Physicians Consulted In Last Year | | Diagnoses or Syndromes | Restriction Identified | Limitation Identified | Assessment |
|---|---|---|---|---|---|
| Physician | Date Last Seen | | | | |
| Thos. Moore, MD | 7/9/04 | 1. Cardiomyopathy | | Sedentary work only | Mr. Styles' insured occ as foreman required frequent walking; at change of def we have identified gainful sedentary positions in his region |
| | | | Must be able to elevate feet above chest 10" every hour | | Voc reports this is an accommodation permitted by most employers, and confirmed by those offering gainful positions |
| | | | No lifting over 10# | | Available in gainful positions |
| | | 2. Atrial fibrillation | No work near microwaves or large electrical power sources due to implanted defibrillator | No lifting over 20# | Available in gainful positions |
| Roger Grise, PhD | 6/7/04 | 3. Depression | | Impairments in interpersonal relations; concentration; deep pessimism | Dr. Grise reports depressive symptoms have remitted; GAF now 72; limitations considered resolved per OSP assessment of 7/29/04; Dr. G agrees per letter of 8/4/04 |
| James Fisher, MD | 4/12/04 | 4. Fatigue | No prolonged standing or walking (>30"); | | Re-conditioning via PT improved endurance as of 7/29/04 per Dr. Liu |

| | | | requires variable schedule and up to 1 hr of rest per 4 hrs worked | | |
|---|---|---|---|---|---|
| Frederick Liu, MD | 5/7/04 | 5. Diabetes mellitus | Regular meals; no overtime; needs regular schedule | | Gainful occupations permit regular hours |
| | | 6. Epilepsy | | | Never asserted as cause of disability; has been well controlled since 1993 by medication |
| | | 7. Chronic pain (fibromyalgia) | | Cannot work more than 2 hrs daily | Through cog-behav program delivered through Dr. Grise, Mr. Styles has improved his conditioning and attitude and now reports he is ready for a gradual RTW. Dr. Liu concurs and will manage rehab program |

**EXHIBIT 5**

## UnumProvident Clinical, Vocational, and Medical Services Statement Regarding Professional Conduct

Dear Benefits Center Clinical, Vocational, or Medical Professional:

UnumProvident is committed to standards for the prompt, fair and reasonable evaluation and settlement of claims. As participants in the claims process we play an integral role in achieving these service standards and must be willing to subscribe to the Benefits Center Philosophy:

*With a commitment to integrity, quality and superior service, we will:*

- Make appropriate decisions by providing a thorough, fair and objective evaluation of all claims.

- Pay all valid claims in a timely manner with a high level of service.

- Partner with our customers in their efforts to return to work or to independent living.

The Benefits Center Philosophy cannot be fully realized without our full commitment to our professional ethical standards. Likewise, UnumProvident's commitment is that these standards not be compromised in the course of our work activities on its behalf. Ultimately, however, professional ethical conduct is an individual responsibility. The measure of our success is how we conduct ourselves each day.

Please review and retain the attached "UnumProvident Clinical, Vocational, and Medical Resource Statement Regarding Professional Conduct." I/we am/are confident in your commitment to conduct yourselves in accordance with these high standards.

Sincerely,


Chief Ethics Officer

**UnumProvident Clinical, Vocational, and Medical Professionals'
Statement Regarding Professional Conduct**

Clinical, vocational, and medical professionals within the Benefits Center will:

➢ Comply with all applicable laws, ethical codes, and standards of professional conduct.

➢ Communicate with partners and internal customers promptly and professionally.

➢ Discuss medical and/or vocational facts in an open and honest manner.

➢ Provide fair and reasonable evaluations considering all available medical and/or vocational evidence, both objective and subjective, both supporting impairment and supporting capacity.

➢ Consider all diagnoses and impairments, and their effect on the whole person, when evaluating medical and/or vocational data in a claim file.

➢ Work with or refer files to other appropriate medical personnel when specialization prevents one professional from considering all impairments and diagnoses in an evaluation of the whole person.

➢ Complete "Fair Claims Settlement Practice" training annually.

➢ Represent medical and/or vocational facts accurately.

➢ Provide reasonable, clear, and accurate explanations of professional opinions so that clear and full explanations of decisions based on those opinions are available to the claimant.

➢ Avoid redundant or unnecessary requests for information, e.g. duplicate information, data not reasonably required for adequate analysis, or data not material to the analysis of the claim.

➢ Report any significant barriers to achieving the Benefits Center Philosophy and its application to your management, directly to the company's Chief Ethics Officer or through the Business Practices & Ethics Hotline as outlined in UnumProvident's Code of Business Practices & Ethics.

I have read and understand the principles and guidelines above. I agree to abide by these principles in my work on behalf of UnumProvident Corporation, and to consult with peers, managers, and ultimately the Chief Ethics Officer if I am unclear regarding my responsibilities under these principles or encounter barriers to abiding by them. In addition, prior to making each determination as to a claimant's impairment, for which I have been trained, I will certify that I have reviewed all medical, clinical, vocational and other evidence provided to me bearing upon impairment.

_____                    _____
**Name**                                                              **Date**

## EXHIBIT 6

### Guidelines for Independent Medical Evaluations

A.  Attending Physician ("AP") Related.  If a determination is made that the medical information in the claim file lacks clarity or sufficiency in assessing the insured's medical condition in order to validate the claim under the requirements of the applicable policy or if the Company has reason to question the opinions or information provided by a claimant's AP, the appropriate Company medical professional should contact the AP either by phone or by letter for clarification or additional information.  If a telephone contact cannot be arranged, a letter outlining the question(s) and issues should be sent to the AP, which invites a reply either by phone or by letter.

Following such contact, if the Company's medical professional and the AP are unable to reach an agreement on the medical issue or issues and its or their effect on the claimant's capacity for work an independent medical evaluation should be sought under the following guidelines unless the decision is made to pay or continue to pay the claim:

1.  An independent record review should be sought whenever the lack of agreement primarily concerns an issue of data interpretation, and therefore an examination of the claimant would not be useful to understand the allegedly impairing condition.

2.  An independent medical examination ("IME") of the claimant should be sought whenever there is lack of agreement and the opinion of the Company's medical professionals involved in the claim file is the primary basis for the denial or termination of benefits unless the following conditions are satisfied in which instance an IME need not be sought, and the claim file is documented with regard to these conditions being satisfied:

    i.  The Chief Medical Officer ("CMO") of the Company or one of the Company's certified medical specialists with the highest level credentials in the specialty field in the Company relating to the claim and designated by the CMO to perform such reviews ("DMO") has reviewed the specific claim, focusing particularly on the area or areas of disagreement between the AP and the Company's medical professionals involved in the claim file,

    ii.  The CMO or the DMO reviewing the specific claim file performs his or her separate analysis of the issue or issues upon which there is disagreement, including any other information in the file deemed by the reviewing CMO or DMO to be relevant to the claim decision, and

1

      iii.  The CMO or the DMO reviewing the specific claim file concludes
that there is reasonable medical certainty supporting the position of
the Company's medical professionals involved in the claim file
and in disagreement with the AP, after having determined that the
AP's opinion is not well supported by medically acceptable
clinical or laboratory diagnostic techniques and is inconsistent with
the other substantial evidence in the claim file.

If the CMO or the DMO reviewing the specific claim file is unable to reach
the conclusion set forth in subparagraph 2.iii. above, then an IME should be
performed.

If the CMO or DMO agree with the AP's opinion, there is agreement as to the
current existence of a disabling condition and no IME is needed at the present
time.

B. An IME (or in circumstances relating to an issue of data interpretation in which case
an independent record review) should be sought whenever any of the following occurs
unless the decision is made to pay or continue to pay the claim:

    1.  A prior IME found disabling limitations and the current impairment is based on
the same limitations;

    2.  A Company medical professional or other Company resource, e.g.,
legal/compliance, Benefit Specialist responsible for the claim, states that an IME
is needed;

    3.  There is a difference of opinion between two or more of the Company's medical
professionals with respect to the existence of a disabling condition; or

    4.  The claimant or the AP requests an IME, either directly or through the claimant's
representative.

C. An IME must be obtained and conducted on the basis of objective, professional
criteria:

    1.  The Company shall select individuals to conduct IME's solely on the basis of
objective, professional criteria, and without regard to results of previous IME's
conducted by such individuals; and,

    2.  Neither the Company nor any of its officers or employees shall attempt to
influence the impairment determinations of professionals conducting IME's.

**Exhibit 7**

## PROOF OF LOSS—DISABILITY CLAIMS

**Introduction:** The Companies' disability contracts require claimants to file a completed claim form when they are making a claim for benefits. This completed claim form satisfies the claimant's initial obligation to provide proof of loss as discussed below. Thereafter, the Company and the claimant work together to expedite the identification, retrieval and review of all information necessary to validate the payment of benefits under the applicable policy. The following details the proof of loss process:

**Initial Proof of Loss:** As part of the claim submission process, the claimant must provide information concerning the impairing condition. This information includes:

> Claim forms, medical records, letters from physicians and other sources
> Employment records, tax records and other professional records

**Ongoing Proof of Loss:** Once initial information is provided, the claimant has a legal obligation to cooperate with the Company's efforts to obtain any material information needed to assess the claim on an ongoing basis.

**Company's Obligation to Verify and Validate:** When a claimant submits a claim, the Company must first verify that the claimant is eligible for coverage under the applicable policy(ies). The Company also must validate the nature of the impairment and how it limits or restricts the claimant from engaging in his or her occupation. The Company's obligation may be fulfilled by seeking additional information, which can include:

> Additional medical records and/or tests
> Financial records for purposes of determining income loss and benefit levels
> Records related to employment as well as occupational duties
> Other lawful methods of information-gathering that assist in validating the claim

The Company is entitled to request a written authorization from the claimant in order to obtain additional medical or other information. The Company has an obligation to use such authorization to seek needed information at its own expense. The claimant is obliged to cooperate by providing information or documents in his or her possession and by otherwise participating in the claim investigation (e.g. attendance at an Independent Medical Examination.)

**Communications with the Claimant:** Throughout the claim administration process, the Company must alert the claimant as to any information or documents which are needed to pay benefits under the applicable policy.

**Independent Medical Examinations and testing:** In some instances, it may be appropriate for the Company to invoke its contractual right to request that the claimant submit to an Independent Medical Examination, which may include additional medical tests. Specific guidelines for such Examinations are set forth in Exhibit 6.

**Claim Handling Decisions:** After the Company has made a good faith effort to obtain all material information necessary to make an informed claim decision, the information is analyzed and weighed in a fair and balanced manner. If the Company has sufficient evidence to validate the payment of benefits under the applicable policy's requirements, the claim will be paid.



## Request to Participate Form

Name: [Name]

Claim Number:     [Claim Number]

Insuring Company:     [Insuring Company]


**By returning this letter, I am requesting to participate in the Claim Reassessment Process.**


Signature: _____

Last four (4) digits of Social Security Number: _____

Date: _____


In order to have your claim included in this reassessment process, this form must be mailed to the address provided by     [date = original Notice date + 60 days]     .


PO Box xxxx
Portland, ME 04104-5028
Phone: 1-xxx-xxx-xxxx

2

A

Report of the

## Targeted Multistate Market Conduct Examination

As of December 31, 2002 ("Initial Review") and
February 29, 2004 ("Follow-Up Review")

For

## Maine Bureau of Insurance

## Massachusetts Division of Insurance

## Tennessee Department of Commerce and Insurance

And

## Forty-Nine Participating Jurisdictions: Alabama, Alaska, American Samoa,
Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia,
Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota,
Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New
York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South
Carolina, South Dakota, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and
Wyoming

Of

## Unum Life Insurance Company of America
NAIC Company #62235
Portland, Maine

## The Paul Revere Life Insurance Company
NAIC Company #67598
Worcester, Massachusetts

## Provident Life and Accident Insurance Company
NAIC Company #68195
Chattanooga, Tennessee

### NAIC Group # 0565

### November 18, 2004

<u>Contents</u>

| <u>Topic</u> | <u>Page</u> |
|---|---|
| Salutation | 1 |
| Foreword | 2 |
| Background and Scope of Examination | 2 |
| Profile of the Companies | 4 |
| Claim Selection Methodology | 5 |
| Areas of Concern | 6 |
| Plan of Corrective Action | 10 |
| Report Submission | 14 |
| Exhibit A | |
| Exhibit B | |
| Exhibit C | |
| Exhibit D | |
| Exhibit E | |
| Exhibit F | |

# RACKEMANN, SAWYER & BREWSTER

PROFESSIONAL CORPORATION

COUNSELLORS AT LAW

ESTABLISHED 1886

ONE FINANCIAL CENTER
BOSTON, MASSACHUSETTS 02111-2659

TELEPHONE 617-542-2300
FACSIMILE 617-542-7437
www.rackemann.com

November 18, 2004

Honorable Alessandro A. Iuppa
Superintendent
State of Maine
Bureau of Insurance
124 Northern Avenue
Gardiner, ME 04345

Honorable Julianne M. Bowler
Commissioner of Insurance
Commonwealth of Massachusetts
One South Station
Boston, MA 02110

Honorable Paula A. Flowers
Commissioner
State of Tennessee
Department of Commerce and Insurance
500 James Robertson Parkway - 5th Floor
Davy Crockett Tower
Nashville, TN 37243-1162

To:    The Chief Insurance Regulator of Each of the Jurisdictions Participating in the
       Targeted (Disability Income) Multistate Examination

Dear Superintendent Iuppa, Commissioner Bowler, Commissioner Flowers and the Chief
Insurance Regulators of the Participating States:

Pursuant to the authority granted by Section 24-A *Maine Revised Statutes
Annotated*, Chapter 175 *Massachusetts General Laws* Section 4 and *Tenn. Code Ann.* §
56-1-408, your instructions, and in accordance with the *NAIC Handbook on Market
Conduct Examinations*, a targeted multistate examination has been conducted of the
disability income claim handling practices of:

**Unum Life Insurance Company of America ("Unum")**
**The Paul Revere Life Insurance Company ("Revere")**
**Provident Life and Accident Insurance Company ("Provident")**
(collectively, the "Companies")

The report of examination is herewith respectfully submitted.

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 2

### Foreword

The report on the targeted multistate market conduct examination of the
Companies is provided pursuant to the *NAIC Market Conduct Examiner's Handbook,
Chapter VI.* This report is made by exception, i.e. it omits discussion of those claim files
reviewed during the examination that did not show improprieties.

### Background and Scope of Examination

On January 7, 2003, the Massachusetts Division of Insurance initiated a targeted
market conduct examination of the individual disability income ("IDI") claims handling
practices of Revere. That examination was organized into two phases. The first phase
involved the review of Revere's IDI policy forms, claim administration manuals, claim
training manuals, claim administration and organizational charts. The second phase of
the examination involved the review of a random sample of 100 IDI claim files, the
selection methodology for which is described in further detail below.

The Tennessee Department of Commerce and Insurance had initiated a market
conduct examination of Provident's disability income business as part of its financial
examination as of December 31, 2000. The market conduct examination focused on
litigated disability income claims. The resulting examination report did not refer to
market conduct issues due to the initiation of the multistate examination described below.

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 3

On September 2, 2003, a multistate targeted market conduct examination was commenced by the Maine Bureau of Insurance, the Massachusetts Division of Insurance and the Tennessee Department of Commerce and Insurance concerning, respectively, Unum, Revere and Provident. Each domiciliary state acted as the Lead State (as defined in the *Market Conduct Examiners Handbook* adopted by the National Association of Insurance Commissioners ("NAIC")) for its respective domiciled company, and the other two Lead State chief regulators were Active Participants. All fifty states, the District of Columbia and American Samoa chose to act as Participating States in the multistate examination.

The multistate examination addressed claims handling practices for both IDI and group long term disability ("LTD") policies. The first phase of the multistate examination involved the review of policy forms, claim administration manuals, claim training manuals, claim administration and organizational charts. The second phase of the multistate examination involved the review of a random sample of 200 Provident and Unum claim files, the selection methodology for which is described in further detail below. After the completion of the second phase of the multistate examination, an update review of a random sample of 75 additional Provident, Revere and Unum claim files was performed, as further described below.

The purpose of the multistate examination was to determine if the disability income claims handling practices of the Companies reflected systemic "unfair claim settlement practices" as defined in the *NAIC Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act* (1972) or *NAIC*

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 4

*Claims Settlement Practices Model Act* (1990) (collectively, the "Model Act"), and

particularly, as defined in ME. REV. STAT. ANN. tit. 24-A, § 2164-D(3), (4) & (5); MASS.

GEN. LAWS ch. 176D, § 3; and TENN. CODE ANN. § 56-8-104(8). The claim file reviews

were conducted in the Worcester, Massachusetts and Glendale, California offices of the

Companies during the months of June, November and December 2003 and April 2004.

### Profile of the Companies

Unum, Revere and Provident are subsidiaries of UnumProvident Corporation

("the Parent Company"), a Delaware corporation. The Parent Company is the result of a

merger between Unum Corporation and Provident Companies, Inc. on June 30, 1999.

Previously, on March 27, 1997, Provident Companies, Inc. had acquired The Paul Revere

Corporation. The four primary operations centers for the Companies are located in

Chattanooga, Tennessee, Portland, Maine, Worcester, Massachusetts and Glendale,

California.

Unum, a Maine corporation, primarily markets short term disability and group

and individual long term disability insurance as well as long term care insurance and

group life insurance. It is licensed to transact business in the District of Columbia and all

states, except New York. Revere, a Massachusetts corporation, primarily markets

individual long term disability insurance. Revere is licensed to transact business in all

fifty states and the District of Columbia. Provident, a Tennessee corporation, primarily

markets individual long term disability insurance as well as life insurance through an

employee-paid voluntary benefits program. It is licensed to transact business in the

District of Columbia and all states, except New York.

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 5

The Parent Company uses common management and processes in the
administration of the business for Unum, Revere and Provident as well as for its New
York subsidiary, First Unum Life Insurance Company.   Specifically, the UnumProvident
Companies adjust claims for each member insurer from common locations using
common procedures.  The issues identified by the Multistate Examination are therefore
assumed to also be present for each member company.  The Companies and their New
York affiliate are ranked first in market share—based on annual premium—in both IDI
and LTD insurance and in group short term disability insurance, according to the 2003
JHA U.S. Group Disability Market Survey and the JHA 2003 U.S. Individual Disability
Market Survey published in April 2004.

### Claim Selection Methodology

The multistate examination team requested the Companies to provide a
comprehensive database including all claims closed during 2002.  Initially, 300 claim
files randomly selected from IDI and LTD claims closed during 2002, or for which
benefit determinations were appealed or litigated during 2002, or claims open as of year-
end 2002 were reviewed (the "Initial Review").  The Initial Review comprised 100
claims each for Unum, Revere and Provident. The proportion of selected IDI and LTD
claims was based on the relative reported reserves for each company as of December 31,
2002.  Based upon representations by the Companies that a number of changes in claim
administration were implemented during 2003, the examination team subsequently
reviewed 75 claim files (25 each for Unum, Revere and Provident) which were randomly
selected from the Companies' IDI and LTD claims for which benefit determinations were

BACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 6

first appealed during the period of December 2003 through February 2004 ("the Follow-up Review"). Exhibit "A" depicts the distribution of such claims by company, by line of business and by category for both the Initial Review and the Follow-up Review, including the total number of claims in the population, and the claims randomly selected for review. Exhibit "B" depicts the distribution of the claims included in the Initial Review by the state of residence of the claimant. Exhibit "C" depicts the distribution of the claims included in the Follow-up Review by the state of residence of the claimant.

### Areas of Concern

The Initial Review of 299 claim files (the Companies were not able to locate one claim file which had been selected for review) noted several general areas of concern, which applied to the Companies' handling of both IDI and LTD claims. The examination team identified no material differences in claim handling among the individual companies or among their claim offices. The general areas of concern included the following:

1.    Excessive reliance upon in-house medical professionals: The Companies have invested significant resources in the creation of a staff of physicians and nurses whose function is to provide support to and education of claim handling personnel. These in-house medical professionals include both full-time and part-time employees. The Companies also use the services of medical professionals who are independent contractors. These medical professionals review medical records of claimants and provide interpretation and analysis of such records to the claim staff who are ultimately

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 7

responsible for making the claims decisions.   In certain instances, in-house medical
professionals will interact by telephone or by correspondence with attending physicians
or other treatment providers of the claimants.   In so doing, their objective is to determine
whether sufficient medical evidence exists for restrictions and/or limitations which will
be used to determine if the claimant meets the policy's definition for total, partial or
residual disability.     In-house medical professionals do not examine or otherwise interact
with claimants directly.   The Companies' insurance contracts generally allow the
Companies to require claimants to submit to an independent medical examination
("IME") conducted by a physician of the Companies' choice.   The examination team
identified numerous instances in which the Companies relied heavily upon the analysis of
their in-house medical professionals, and refrained from securing an IME.   In many such
instances, the Companies discounted or disputed the opinions of claimants' attending
physicians, but chose not to invoke the requirement that the claimant attend an IME.
Where there is conflicting medical evidence or conflicting medical opinions with respect
to a claimant's eligibility for benefits, the Companies have the ability to invoke the policy
provision and obtain an IME, and should do so.

    2.    <u>Unfair construction of attending physician or IME reports</u>: The
Companies' excessive reliance upon in-house medical professionals also suggests the
Companies' employment of such professionals often resulted in a Company bias and the
inappropriate interpretation or construction of medical reports, to the detriment of
claimants.  In certain instances, this bias was reflected in the interpretation of attending
physicians' statements or medical records supplied by attending physicians.  In other

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 8

instances in which the Companies had obtained an IME, the reports supplied by the IME providers were narrowly or even incorrectly construed. The bias of the in-house medical professionals was also reflected in attempts to focus upon any apparent inconsistencies in the medical records or other information supplied by claimants, rather than attempt to derive a thorough understanding of the claimant's medical condition.

  3.    Failure to evaluate the totality of the claimant's medical condition:  The examination team identified instances in which claimants who suffered from multiple medical conditions were denied benefits as a result of the Companies' apparent failure to properly evaluate the cumulative effects of such conditions. In some instances, the Companies' failure to properly evaluate such "co-morbid" conditions appeared to stem from an excessively narrow focus upon the specific medical condition for which benefits had originally been sought by the claimant. By way of example, certain claimants exhibited a psychological "overlay" which was related to or may have resulted from an underlying medical condition. Although the Companies' claim handling may have included an evaluation of each separate condition, there was an insufficient effort made to assess the disabling effects of the conditions cumulatively.

  4.    Inappropriate burden placed on claimants to justify eligibility for benefits:  The examination team identified a significant number of instances in which benefits were denied by the Companies on the grounds that the claimant had failed to provide "objective evidence" of a disabling condition. The Companies' policy forms do not require the claimant to provide such evidence. Alternatively, the Companies in certain instances denied eligibility for benefits on the grounds that the claimant had failed to

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 9

submit particular medical test results which were deemed by the Companies to be critical

to an evaluation of the claim.    In such instances, the Companies could have obtained

such test results by ordering an IME and requesting that such tests be performed by the

IME provider.  In general, the examination team found evidence of the Companies' effort

to "shift" the burden of responsibility to the claimant to provide medical or other records

in support of the claim, rather than obtain such records through the use of authorizations

executed by the claimant.  These practices are particularly of concern for claimants

whose medical conditions may be interfering with their ability to interact with the

Companies' staff in the handling of their claims.

Following completion of the Initial Review, representatives of the Lead States and

the examination team met with representatives of the Companies in February 2004 to

review the foregoing areas of concern as they related to specific claims which had been

identified for discussion.   After additional explanation was provided by the Companies,

the examiners and the Lead States concluded that the level of claim handling errors

identified was sufficient to merit further review and regulatory action.

Following that meeting, the Lead States concluded that the examination team

should perform the Follow-up Review.  The objective of the Follow-up Review was to

assess the impact of claim administration changes reportedly implemented by the

Companies during 2003, specifically with respect to the areas of concern.  For that

reason, 75 claim files were randomly selected from the population of claims for which a

first appeal of an adverse claim determination had been filed during the three month

period from December 1, 2003 – February 29, 2004. Following completion of the

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 10

Follow-up Review, representatives of the Lead States and the examination team again met with representatives of the Companies to review areas of concern as they related to specific claims which had been identified for discussion. After additional explanation was provided by the Companies, the examiners and the Lead States concluded that the level of claim handling errors identified was sufficient to merit further regulatory action.

After consultation with the Companies' senior management and the Board of Directors of the Parent Company, agreement in principle was reached between the Lead States and the Companies on the Plan of Corrective Action described below. This agreement obviated the need for additional investigation, review of a larger claim sample, specific claim findings or reaching a formal conclusion concerning the examination objective, thereby assuring, for the benefit of the Companies' policyholders, prompt implementation of a reassessment plan, changes in corporate governance and changes in claim handling procedures. All of these steps are described in greater detail in the attached Regulatory Settlement Agreement and implementing Consent Orders.

**Plan of Corrective Action**

The Lead States have designed a Plan of Corrective Action ("the Plan") with the Companies and their New York affiliate, to address the concerns raised by the examination. The Plan will be implemented through a regulatory settlement agreement or consent orders (collectively, "Agreement") entered into by each of the Companies with its Lead State regulator and subscribed to by at least two-thirds of the Participating States, unless a lesser number is agreed to by the Companies, and the United States Department of Labor. (Once the Agreement becomes effective, the Lead States are thereafter referred to as Lead

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 11

Regulators and the subscribing Participating States as Participating Regulators.)  In addition,

the Companies' New York affiliate, First Unum Life Insurance Company, will enter into a

similar agreement with the New York Superintendent of Insurance.  This Agreement is

supported by the Office of the Attorney General of the State of New York.  The Agreement is

included herewith as Exhibits "D", "E' and "F".  The Agreement provides for a penalty of

$15,000,000, will provide for the assessment of substantial additional fines or other

significant regulatory action should the Companies fail to comply with their terms, including

the accomplishment of specified improvements in claim administration established in such

Agreement.  The Lead Regulators will monitor the Companies' (including their New York

affiliate) compliance with the terms of the Agreement at the Companies' cost through an

established framework of quarterly reports and meetings as well as periodic examination of

the reassessment process or general claim handling, and will conduct a full re-examination of

the issues addressed by this examination within twenty-four months of the Implementation

Date of the Agreement.

The most significant provisions of the Agreement are the following:

A.    Claim Reassessment Process:  The Companies will form a new Claim

Reassessment Unit located primarily in their Worcester, Massachusetts and Portland,

Maine offices (IDI and LTD claims, respectively), for the purpose of providing a "de

novo" review of claims previously denied or terminated pursuant to a review procedure

approved by the Lead Regulators.  Written notice of this reassessment process will be

provided to eligible claimants (as outlined in the Agreement), representing approximately

215,000 claims, whose IDI or LTD insurance claims were denied or whose benefits were

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 12

terminated on or after January 1, 2000 and prior to the Implementation Date (as defined

in the Agreement).   The reassessment process will be open to eligible claimants who

elect to participate, as well as any other claimants who indicate an interest in participation

provided that the claim denial or termination of benefits took place no earlier than

January 1, 1997. The Companies' performance will be subject to regulatory scrutiny and

monitoring, and the claim reassessment process will be subjected to further independent

review by agents of the Lead Regulators.

     B.     <u>Changes in Claim Organization and Procedures</u>:  The Companies will

implement changes to its claim organization and claim procedures with the following

objectives:

- The engagement of experienced claim personnel at the earliest possible stage of claim reviews

- Increased emphasis upon claim staff accountability for compliance with the terms of insurance policies and applicable law

- Increased involvement of higher levels of claim management staff in each claim denial or claim termination decision

- Creation of a separate compliance/accountability function at the claim denial and claim termination level

- Assurance that co-morbid conditions are properly evaluated at every level of claim review

- Increased utilization of IME's

- Additional compliance training for all claim staff, with emphasis upon the results of the multistate examination, the Plan, and the NAIC Unfair Claim Settlement Practices Act; and

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 13

- Additional training for group policyholder human resources personnel so as to better facilitate the process for LTD claims

C.    <u>Changes in corporate governance</u>:    The Companies will address

regulatory concerns regarding corporate control issues by implementation of the

following changes:

- The Board of Directors of the Parent Company will be expanded by three members, each of which will have significant insurance industry or insurance regulatory experience (two will have regulatory experience); each candidate will be approved by the Lead States

- The Audit Committee of the Board of Directors will be expanded by one member; at least one of the new members of the Board of Directors will be appointed to the Audit Committee

- The Board of Directors will establish a new Regulatory Compliance Committee, comprised of two of the new members of the Board, and three existing independent directors; the Regulatory Compliance Committee will have responsibility for monitoring compliance with the Plan and other compliance-related oversight functions; and

- The Companies will create a Regulatory Compliance Unit, which will report directly to the Regulatory Compliance Committee; the Regulatory Compliance Unit will monitor compliance with the Plan (including the functions of the Claim Reassessment Unit) through the performance of periodic audits, provide assistance to claimants to ease and facilitate the claim submission process, and gather data for the Lead States' ongoing monitoring of compliance with the Plan

D.    <u>Quarterly Meetings between the Lead Regulators and the Companies</u>:

The Lead Regulators and the DOL will meet separately with the Regulatory

Compliance Committee of the Parent Company and with senior management of the

Companies on a quarterly basis, to evaluate compliance with the Plan.   Participating

States will be updated quarterly by the Lead Regulators, through the NAIC.

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 14

## Report Submission

The report of examination is herewith respectfully submitted.

Sincerely,

J. David Leslie
Rackemann, Sawyer & Brewster, P.C.

Examiners:

*Rackemann, Sawyer & Brewster, P.C.*
Ronald S. Duby, Esq.
Margaret L. Hayes, Esq.
Fannie I. Minot, Esq.

*Monarch Life Insurance Company*
Kevin J. McAdoo, Special Deputy Receiver
John S. Coulton, Esq.
Claudia J. Reed, Esq.
Daniel T. Wright, Esq.

## Acknowledgement

The assistance of Richard Kelly, an examiner appointed by the State of Nevada, in reviewing certain claim files during the Initial Review, is hereby acknowledged with appreciation.

Exhibit A

## UNUMPROVIDENT CLAIM SUMMARY BY COMPANY

**UNUM LIFE INSURANCE COMPANY OF AMERICA**
**Initial Review**

| Line of Business | Category | Claims for Period | Reviewed |
|---|---|---|---|
| Group LTD | Litigated | 693 | 19 |
| | Pending | 70,319 | 19 |
| | Closed | 65,200 | 20 |
| | Appeals | 9,502 | 19 |
| | Sub-total | 145,714 | 77 |
| Individual DI | Litigated | 258 | 6 |
| | Pending | 6,087 | 6 |
| | Closed | 2,232 | 5 |
| | Appeals | 217 | 6 |
| | Sub-total | 8,794 | 23 |
| **TOTALS** | | **154,508** | **100** |

**UNUM LIFE INSURANCE COMPANY OF AMERICA**
**Follow-up Review**

| Line of Business | Category | Claims for Period | Reviewed |
|---|---|---|---|
| Group LTD | Litigated | | |
| | Pending | | |
| | Closed | | |
| | Appeals | 1,292 | 19 |
| | Sub-total | 1,292 | 19 |
| Individual DI | Litigated | | |
| | Pending | | |
| | Closed | | |
| | Appeals | 20 | 6 |
| | Sub-total | 20 | 6 |
| **TOTALS** | | **1,312** | **25** |

**Provident Life and Accident Insurance Company**
**Initial Review**

| Line of Business | Category | Claims for Period | Reviewed |
|---|---|---|---|
| Group LTD | Litigated | 186 | 5* |
| | Pending | 9,049 | 5 |
| | Closed | 4,872 | 5 |
| | Appeals | 1,406 | 5 |
| | Sub-total | 15,513 | 20 |
| Individual DI | Litigated | 369 | 20* |
| | Pending | 10,445 | 20 |
| | Closed | 7,549 | 20 |
| | Appeals | 364 | 20 |
| | Sub-total | 18,727 | 80 |
| **TOTALS** | | **34,240** | **100** |

**Provident Life and Accident Insurance Company**
**Follow-up Review**

| Line of Business | Category | Claims for Period | Reviewed |
|---|---|---|---|
| Group LTD | Litigated | | |
| | Pending | | |
| | Closed | | |
| | Appeals | 118 | 5 |
| | Sub-total | 118 | 5 |
| Individual DI | Litigated | | |
| | Pending | | |
| | Closed | | |
| | Appeals | 52 | 20 |
| | Sub-total | 52 | 20 |
| **TOTALS** | | **170** | **25** |

* 25 Litigated files taken from 50 files provided in the 2002 Tennessee financial and market conduct exam

| Paul Revere Life Insurance Company | | | | | Paul Revere Life Insurance Company | | | |
|---|---|---|---|---|---|---|---|---|
| **Initial Review** | | | | | **Follow-up Review** | | | |
| Line of Business | Category | Claims for Period | Reviewed | | Line of business | Category | Claims for Period | Reviewed |
| Group LTD | Litigated | | | | Group LTD | Litigated Closed | | |
| | Pending (Open) | | | | | Pending (Open) | | |
| | Closed | | | | | Closed | | |
| | Appeals | | | | | Appeals | 58 | |
| | Sub-total | 0 | 0 | | | Sub-total | 58 | 0 |
| Individual DI | Litigated | 284 | 25 | | Individual DI | Litigated Closed | | |
| | Pending (Open) | 7,750 | 25 | | | Pending (Open) | | |
| | Closed | 3,859 | 25 | | | Closed | | |
| | Appeals | 200 | 25 | | | Appeals | 34 | 25 |
| | Sub-total | 12,093 | 100 | | | Sub-total | 34 | 25 |
| **TOTALS** | | 12,093 | 100 | | **TOTALS** | | 92 | 25 |

B

Exhibit·B

*Distribution of UnumProvident Claim Selections by State (Initial Claim Review)*

| State | Code | Revere - Individual | Unum- Individual | Unum - Group | Provident – Individual | Provident - Group | Provident - Litigation | Total |
|---|---|---|---|---|---|---|---|---|
| ALABAMA | AL | 0 | | 1 | 2 | | 1 | 4 |
| ALASKA | AK | 0 | | | | | | 0 |
| ARIZONA | AZ | 1 | | 1 | 2 | | | 4 |
| ARKANSAS | AR | 0 | | | | | | 0 |
| CALIFORNIA | CA | 9 | 1 | 9 | 4 | 1 | 5 | 29 |
| COLORADO | CO | 3 | | | 1 | 1 | | 5 |
| CONNECTICUT | CT | 1 | | 1 | 1 | | | 3 |
| DELAWARE | DE | 3 | | | | | | 3 |
| DISTRICT OF COL | DC | 1 | | 1 | | | | 2 |
| FLORIDA | FL | 8 | 4 | 5 | 7 | 1 | 5 | 30 |
| GEORGIA | GA | 3 | | 4 | 4 | 1 | | 12 |
| HAWAII | HI | 1 | | | | | | 1 |
| IDAHO | ID | 0 | | | | | | 0 |
| ILLINOIS | IL | 5 | | 2 | | | 1 | 8 |
| INDIANA | IN | 0 | | 3 | | | | 3 |
| IOWA | IA | 2 | | | | | | 2 |
| KANSAS | KS | 1 | | 1 | | | | 2 |
| KENTUCKY | KY | 2 | | 2 | 1 | 1 | 1 | 7 |
| LOUISIANA | LA | 2 | 1 | 1 | 2 | | | 6 |
| MAINE | ME | 0 | | 7 | | | 1 | 8 |
| MARYLAND | MD | 1 | | 1 | 1 | 1 | 1 | 5 |
| MASSACHUSETTS | MA | 4 | | 2 | 2 | 1 | | 9 |
| MICHIGAN | MI | 0 | 1 | 2 | 6 | 1 | 1 | 11 |
| MINNESOTA | MN | 0 | 1 | | | | | 1 |
| MISSISSIPPI | MS | 1 | | | 1 | | 1 | 3 |
| MISSOURI | MO | 1 | | 1 | | | | 2 |
| MONTANA | MT | 0 | | | | | | 0 |
| NEBRASKA | NE | 0 | | 2 | | | | 2 |
| NEVADA | NV | 1 | | 1 | | | | 2 |
| NEW HAMPSHIRE | NH | 0 | | 2 | | | | 2 |
| NEW JERSEY | NJ | 10 | 4 | 1 | 3 | | | 18 |
| NEW MEXICO | NM | 1 | | | | | | 1 |
| NEW YORK | NY | 11 | | 2 | | 2 | | 15 |
| NORTH CAROLINA | NC | 4 | | 2 | 1 | 2 | 1 | 10 |
| NORTH DAKOTA | ND | 0 | | | | | | 0 |
| OHIO | OH | 3 | | 4 | 1 | | | 8 |
| OKLAHOMA | OK | 1 | | | 2 | | | 3 |
| OREGON | OR | 1 | 2 | | | | | 3 |
| PENNSYLVANIA | PA | 3 | 4 | 4 | 2 | 1 | 1 | 15 |
| RHODE ISLAND | RI | 2 | 1 | | 1 | | | 4 |
| SOUTH CAROLINA | SC | 1 | | 4 | 1 | 1 | | 7 |
| SOUTH DAKOTA | SD | 0 | | | | | | 0 |
| TENNESSEE | TN | 5 | 1 | 2 | 5 | 1 | 3 | 17 |
| TEXAS | TX | 0 | 1 | 6 | 6 | | | 13 |
| UTAH | UT | 0 | | | | | 1 | 1 |
| VERMONT | VT | 0 | 1 | | 1 | | | 2 |
| VIRGINIA | VA | 2 | | | 1 | | 1 | 4 |
| WASHINGTON | WA | 2 | 1 | 1 | 1 | | 1 | 6 |
| WEST VIRGINIA | WV | 2 | | | | | | 2 |
| WISCONSIN | WI | 2 | | 2 | 1 | | | 5 |
| WYOMING | WY | 0 | | | | | | 0 |
| | | | | | | | | |
| Total | | 100 | 23 | 77 | 60 | 15 | 25 | 300 |

C

Exhibit C

*Distribution of UnumProvident Claim Selections by State (Follow-Up Claim Review)*

| State | Code | Revere - Individual | Unum - Individual | Unum - Group | Provident - Individual | Provident - Group | Total |
|-------|------|------|------|------|------|------|------|
| ALABAMA | AL | | | | 1 | | 1 |
| ALASKA | AK | | | | | | 0 |
| ARIZONA | AZ | | | | | | 0 |
| ARKANSAS | AR | | | | | | 0 |
| CALIFORNIA | CA | 3 | 1 | 2 | 2 | | 8 |
| COLORADO | CO | | | | | | 0 |
| CONNECTICUT | CT | 1 | | 1 | | | 2 |
| DELAWARE | DE | | | 1 | | | 1 |
| DISTRICT OF COL. | DC | | | 1 | | | 1 |
| FLORIDA | FL | 3 | | 1 | 1 | 1 | 6 |
| GEORGIA | GA | | | | | | 0 |
| HAWAII | HI | | | | | | 0 |
| IDAHO | ID | | | | 1 | | 1 |
| ILLINOIS | IL | 3 | 1 | | | | 4 |
| INDIANA | IN | | | | 1 | | 1 |
| IOWA | IA | | | 1 | | | 1 |
| KANSAS | KS | | | | | | 0 |
| KENTUCKY | KY | 1 | | 1 | 2 | | 4 |
| LOUISIANA | LA | | | 1 | | | 1 |
| MAINE | ME | 1 | | 2 | | | 3 |
| MARYLAND | MD | | | | | | 0 |
| MASSACHUSETTS | MA | 1 | | | 1 | | 2 |
| MICHIGAN | MI | 1 | | | 2 | 1 | 4 |
| MINNESOTA | MN | | | 1 | | | 1 |
| MISSISSIPPI | MS | | | | | | 0 |
| MISSOURI | MO | | | | | | 0 |
| MONTANA | MT | | | | | | 0 |
| NEBRASKA | NE | | | | | | 0 |
| NEVADA | NV | | | | | | 0 |
| NEW HAMPSHIRE | NH | | | | | | 0 |
| NEW JERSEY | NJ | 1 | | 1 | 1 | 1 | 4 |
| NEW MEXICO | NM | | | | | | 0 |
| NEW YORK | NY | 2 | 2 | 1 | 2 | | 7 |
| NORTH CAROLINA | NC | 1 | | 1 | 1 | | 3 |
| NORTH DAKOTA | ND | | | | | | 0 |
| OHIO | OH | 1 | 2 | | 1 | | 4 |
| OKLAHOMA | OK | | | | | | 0 |
| OREGON | OR | | | | | | 0 |
| PENNSYLVANIA | PA | 3 | | 1 | | | 4 |
| RHODE ISLAND | RI | | | | | | 0 |
| SOUTH CAROLINA | SC | | | 1 | | 1 | 2 |
| SOUTH DAKOTA | SD | | | | | | 0 |
| TENNESSEE | TN | 1 | | 1 | 1 | | 3 |
| TEXAS | TX | 1 | | 1 | | | 2 |
| UTAH | UT | | | | | | 0 |
| VERMONT | VT | | | | | | 0 |
| VIRGINIA | VA | | | | | 1 | 1 |
| WASHINGTON | WA | 1 | | | 3 | | 4 |
| WEST VIRGINIA | WV | | | | | | 0 |
| WISCONSIN | WI | | | | | | 0 |
| WYOMING | WY | | | | | | 0 |
| | | | | | | | |
| **Total** | | 25 | 6 | 19 | 20 | 5 | 75 |

3



the
## INSURANCE
## FORUM

Joseph M. Belth, **Editor**
Ann I. Belth, **Business Manager**
Jeffrey E. Belth, **Circulation Manager**

*. . . for the unfettered exchange of ideas about insurance*

P.O. Box 245, Ellettsville, Indiana 47429 • (812) 876-6502 • www.theinsuranceforum.com

November 22, 2004

Hon. Julianne M. Bowler
Commissioner of Insurance
One South Station
Boston, MA 02110

Dear Commissioner Bowler:

Enclosed is a copy of my letter to New York Attorney General Eliot Spitzer about the multistate settlement relating to disability insurance claims practices at the operating subsidiaries of UnumProvident Corporation. Also enclosed is a copy of my statement that accompanied the letter.

I request that you acknowledge receipt of this letter and the enclosures.

Sincerely yours,

Joseph M. Belth
Editor

Enclosures (1-page letter and 5-page statement)



the
**INJURANCE
FORUM**

Joseph M. Belth, Editor
Ann I. Belth, Business Manager
Jeffrey E. Belth, Circulation Manager

*. . . for the unfettered exchange of ideas about insurance*

P.O. Box 245, Ellettsville, Indiana 47429 • (812) 876-6502 • www.theinsuranceforum.com

November 22, 2004

Hon. Alessandro Iuppa
Superintendent of Insurance
124 Northern Avenue
Gardiner, ME 04345

Dear Superintendent Iuppa:

Enclosed is a copy of my letter to New York Attorney General Eliot Spitzer about the multistate settlement relating to disability insurance claims practices at the operating subsidiaries of UnumProvident Corporation. Also enclosed is a copy of my statement that accompanied the letter.

I request that you acknowledge receipt of this letter and the enclosures.

Sincerely yours,

Joseph M. Belth
Editor

Enclosures (1-page letter and 5-page statement)



the
**INSURANCE
FORUM**

Joseph M. Belth, Editor
Ann L Belth, Business Manager
Jeffrey E. Belth, Circulation Manager

*. . . for the unfettered exchange of ideas about insurance*

P.O. Box 245, Ellettsville, Indiana 47429 • (812) 876-6502 • www.theinsuranceforum.com

November 22, 2004

Hon. Paula A. Flowers
Commissioner of Insurance
500 James Robertson Parkway, 5th Floor
Nashville, TN 37243-1162

Dear Commissioner Flowers:

Enclosed is a copy of my letter to New York Attorney General Eliot Spitzer about the
multistate settlement relating to disability insurance claims practices at the operating
subsidiaries of UnumProvident Corporation.  Also enclosed is a copy of my statement
that accompanied the letter.

I request that you acknowledge receipt of this letter and the enclosures.

Sincerely yours,

Joseph M. Belth
Editor

Enclosures (1-page letter and 5-page statement)

the
**INSURANCE FORUM**

Joseph M. Belth, Editor
Ann L Belth, Business Manager
Jeffrey E. Belth, Circulation Manager

. . . *for the unfettered exchange of ideas about insurance*

P.O. Box 245, Ellettsville, Indiana 47429 • (812) 876-6502 • www.theinsuranceforum.com

November 22, 2004

The Honorable Eliot Spitzer
New York Attorney General
120 Broadway
New York, NY 10271

Re: Multistate Settlement with UnumProvident

Dear Attorney General Spitzer:

Your insurance investigation, as exemplified by your October 14 civil complaint against Marsh & McLennan and your November 12 civil complaint against Universal Life Resources, is timely and necessary. Also, the complaints reflect an extraordinarily high level of diligence.

For those reasons, I am disappointed by your endorsement of the November 18 multistate settlement relating to disability insurance claims practices at the operating subsidiaries of UnumProvident Corporation. The factors causing my negative reaction to the settlement are discussed in the enclosed statement.

My best wishes to you in your efforts on behalf of the public.

Sincerely yours,

Joseph M. Belth
Editor

Enclosure (5-page statement)

cc: Chief insurance regulators in 52 U. S. jurisdictions
    Mr. James M. Benages, U. S. Department of Labor
    J. David Leslie, Esq., Rackemann, Sawyer & Brewster
    Mr. Kevin J. McAdoo, Monarch Life Insurance Company
    Mr. Thomas R. Watjen, UnumProvident Corporation

### STATEMENT OF JOSEPH M. BELTH ON
### MULTISTATE SETTLEMENT WITH UNUMPROVIDENT

November 22, 2004

I am professor emeritus of insurance in the Kelley School of Business at Indiana University and editor of *The Insurance Forum*, an independent periodical. The views expressed here are mine. I am not being compensated for preparing this statement.

## Introduction

At 4:00 p.m. on Thursday, November 18, the chief insurance regulators of Maine, Massachusetts, and Tennessee announced a multistate settlement relating to the disability insurance claims practices of the operating subsidiaries ("Companies") of UnumProvident Corporation (NYSE: UNM). The settlement is disappointing. The factors causing my negative reaction are discussed in this statement.

## Lack of a Finding

The report of the multistate examination says: "The purpose of the multistate examination was to determine if the disability income claims handling practices of the Companies reflected systemic 'unfair claim settlement practices'" in violation of state laws. There is no finding that the Companies were allegedly engaged in a systemic pattern of unfair claims practices in violation of state laws. Nor is there a finding that the Companies were not in violation of state laws. Therefore, the examination did not achieve its purpose. The report says:

> This agreement obviated the need for additional investigation, review of
> a larger claim sample, specific claims findings or reaching a formal
> conclusion concerning the examination objective, thereby assuring, for
> the benefit of the Companies' policyholders, prompt implementation of a
> reassessment plan, changes in corporate governance and changes in
> claim handling procedures.

The settlement imposes a $15 million fine on the Companies. Normally a fine is assessed as punishment for an alleged violation. In this case, the report identifies only "areas of concern." Therefore, the basis for the fine is unknown.

Undoubtedly UNM was reluctant to enter into an agreement containing an allegation of wrongdoing. Such an allegation would be troublesome in the hundreds (or thousands) of outstanding lawsuits against the Companies relating to claims practices,

1

and it would adversely affect the market for UNM shares. Nonetheless, the lack of a finding is troubling.

UNM stock surged upward on news that the Companies had reached a settlement containing no allegation of wrongdoing. Near the beginning of the press release issued when the agreement was announced, UNM said: "The examination report did not make any findings of violations of law or market conduct regulations." During the conference call at 9:00 a.m. the next morning, UNM spokesmen used that language repeatedly.

**The Georgia Incident**

UNM has experience in persuading insurance regulators to enter into settlements with no findings. In March 2003, Georgia Insurance Commissioner John W. Oxendine issued an order stemming from an examination of the Companies' disability insurance claims practices. He imposed a $1 million fine, ordered the Companies to change their claims practices, placed them on probation for two years, and said the examination will continue during the two years of probation.

However, Commissioner Oxendine made no finding of alleged wrongdoing. His views on the Companies' claims practices were expressed only in unofficial comments that he made to the media. Here are two examples:

- "People were being denied claims unfairly."

- "We believe there was a corporate philosophy of pushing the envelope to the edge, of looking for every technicality possible to get out of paying the claim."

The fact that the investigation was continuing was the basis for the Georgia insurance department's denial of my open records request for the examination report. The department said the matter remained under investigation and investigatory materials are exempt from disclosure.

The $1 million fine made an insignificant order seem significant. Also, it was a small price for the Companies to pay in exchange for an order with no finding and an arrangement under which the examination report would remain secret. When I inquired about the basis for the fine, a Georgia department spokesman said only that the parties agreed to it.

**The Notification Process**

The multistate agreement says those whose claims were denied or terminated in 2000 and later will receive an extremely complex, three-page notification letter offering

2

to reassess their claims, those whose claims were denied or terminated in 1997 through 1999 will not be notified of the settlement, and those whose claims were denied or terminated prior to 1997 apparently are not eligible for reassessment. I have six concerns about the notification process.

First, most of those who receive the notification letter will not read it or will not understand it if they do read it. Most will discard it without taking any action on the offer. The agreement says nothing about a follow-up letter, and in response to my inquiry one of the lead regulators confirmed there will be no follow-up letter.

Second, most of those who do not receive a notification letter will never learn of the settlement and their possible eligibility for reassessment of their claims. When I raised this issue, one of the lead regulators said the states will "reach out" through press releases. If there is to be "reaching out" through newspapers, it should be by the Companies through paid legal advertisements.

Third, the omission of claims denied or terminated prior to 1997 is a matter of concern. The claims practices prompting the investigation began, at least in some of the companies that are now part of UNM, in 1993.

Fourth, instead of placing on claimants the burden of initiating and participating in the reassessment process, the Companies should be required to take the initiative and reassess each denied or terminated claim. Many of those claimants went through a process akin to torture, and they should not now be expected to volunteer for another potentially frustrating process.

Fifth, there is provision only for reassessment of claims that were denied or terminated. There is no provision for reassessment of settlements that may have been forced unfairly on claimants.

Sixth, the procedure raises extremely complex questions for claimants who have lawsuits currently pending against the Companies. For example, although there exists the possibility of a "reasonable attorney's fee," there are no provisions for other extra-contractual damages. The agreement may be an effort on the part of the Companies to encourage withdrawal or meager settlements of some of the many pending lawsuits against the Companies.

**The Transferred Policies**

It is my understanding that the settlement excludes policies issued by insurers that exited the disability business and transferred their existing blocks of disability policies to the Companies for claims administration. When I raised this issue, one of the lead regulators confirmed my understanding. Among the major insurers with large blocks of disability business transferred to the Companies for claims administration are AXA Equitable Life Insurance Company (formerly The Equitable Life Assurance Society of the United States), General American Life Insurance Company, John

3

Hancock Life Insurance Company, Metropolitan Life Insurance Company, National
Life Insurance Company (Vermont), and New York Life Insurance Company.

The number of policyholders affected by transfers may exceed the number of
policyholders eligible for reassessment. The claims practices to which transferred
policyholders were subjected were the same as the claims practices that prompted the
investigation. It is regrettable that transferred policyholders whose claims were denied
or terminated (or settled) are not eligible for reassessment of their claims.

### The Examiners

The examination was based on reviews of small, random samples of files on
denied and terminated claims. The report of the examination was submitted to the three
lead states' regulators over the signature of J. David Leslie of the Boston law firm of
Rackemann, Sawyer & Brewster. When I saw the report on November 18, I learned
that the examination was not conducted by insurance examiners employed by state
insurance departments. Instead, the examiners are members of the Rackemann firm
and employees of Monarch Life Insurance Company. Monarch, based in Springfield,
Massachusetts, and once a prominent writer of disability insurance, has been under
state supervision and has written no new business for more than decade; it continues to
administer its existing block of disability insurance policies.

The examiners were attorneys Ronald S. Duby, Margaret L. Hayes, and Fannie
I. Minot of the Rackemann firm; Kevin J. McAdoo, special deputy receiver of
Monarch; and attorneys John S. Coulton, Claudia J. Reed, and Daniel J. Wright of
Monarch. The report also acknowledges "with appreciation" the assistance of Richard
Kelly, an examiner appointed by the State of Nevada.

I know nothing of the qualifications of the examiners to review claim files, and
there is no mention of anyone with medical credentials. I submitted today to the
Massachusetts Division of Insurance an open records request for the file on the
procedure used in selecting the Rackemann firm, Monarch, and the examiners.

### Conflicts of Interest

Neither the report nor the agreement contains any mention of conflicts of
interest on the part of the Rackemann firm, Monarch, and the individual examiners.
Although conflicts may have been disclosed to the regulators when the examination was
being arranged, conflicts should have been disclosed in the report and in the agreement.

### Magnitude of the Reassessment

UNM's November 18 press release says there are approximately 215,000 claims
in the "potential pool of claims" that may be eligible for reassessment. Yet UNM
estimates that the "benefit costs and reserves from claims reopened from the

reassessment" are only $44 million. That is about $200 per claim potentially eligible for reassessment. The $44 million figure may be a massive underestimate of the estimated benefit and reserve costs of the reassessment. On the other hand, the figure may be an overestimate or a reasonable estimate because the estimators believe (as I do) that very few claimants will accept the offer to have their claims reassessed.

I submitted today to the Massachusetts Division of Insurance an open records request for the report showing how the estimators arrived at the $44 million figure. In response, a Division spokesperson said no report has been filed, that the estimates were made by the Companies, and that I should ask UnumProvident for the information. I did so. I am now awaiting a response from a UnumProvident spokesman about whether any information can be released to me.

If the $44 million estimate is reasonable, it would be appropriate to conclude that the settlement is meaningless for most of the claimants victimized by the claims practices of the Companies. Furthermore, during the question-and-answer portion of the conference call the morning after the settlement was announced, UNM spokesmen struggled with several questions from analysts about the current and future financial impact on UNM of the enhanced claims practices contemplated in the agreement. The UNUM spokesmen insisted there would be no material effect. If they are correct, it would be appropriate to conclude that the settlement is meaningless not only for past claimants eligible for reassessment but also for future claimants.

**Conclusion**

The settlement of the multistate examination of the Companies' disability insurance claims practices does not become effective until at least 33 of the non-lead state regulators agree to it, or until the Companies agree to have it become effective with a smaller number of regulators agreeing to it. The non-lead regulators have until December 20 to agree to it, although the Companies may extend the deadline. The $15 million fine is to be allocated among the states in proportion to premium volume.

The settlement is a victory for the Companies. It will offer significant help to very few of the claimants who have been victimized by the disability insurance claims practices of the Companies over the years. Also, it may offer little improvement for the benefit of future claimants. It is regrettable that the U. S. Department of Labor signed on to the settlement, and that New York Attorney General Eliot Spitzer supported it.

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| In re:<br><br>UNUMPROVIDENT CORP.<br>ERISA BENEFITS DENIAL ACTIONS | )<br>)<br>)<br>)<br>)<br>)<br>) |

Lead Case No. 1:03-cv-1000

CLASS ACTION

MDL Case No. 1:03-md-1552

Judge Curtis L. Collier

| | |
|---|---|
| CAROL J. TAYLOR,<br><br>           Plaintiff,<br><br>v.<br><br>UNUMPROVIDENT CORP., et al.,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:03-cv-1009

CLASS ACTION

MDL Case No. 1:03-md-1552

Judge Curtis L. Collier

## O R D E R

Plaintiffs have moved the Court for an expedited hearing on their Motion for Expedited Notice to Class Members of Pendency of Proposed Class Actions (Case No. 1:03-cv-1000, Court File Nos. 95, 97, 99; Case No. 1:03-cv-1009, Court File Nos. 62, 64, 66). Plaintiffs represent to the Court Defendants intend to notify certain insureds of Defendants' proposed settlement with state insurance regulatory authorities after approval of the settlement by state insurance regulatory authorities, which Plaintiffs speculate may occur as soon as within the next two weeks.

In order to determine whether an expedited hearing is necessary on this matter, the Court **ORDERS** Defendants to respond to Plaintiffs' Motion for an Expedited Hearing ((Case No. 1:03-cv-1000, Court File No. 95; Case No. 1:03-cv-1009, Court File No. 62). Particularly, Defendants

are **ORDERED** to inform the Court of their progress in obtaining approval of the regulatory

settlement agreement from the Lead Regulators, the United States Department of Labor, and the

Participating States in the Multistate Examination, obtaining approval of substantially identical

regulatory settlement agreements between the subsidiary companies and their respective domiciliary

regulators, and the date or dates, if any, on which they intend to send notice of the settlement

agreement to certain insureds. Defendants are hereby **ORDERED** to file such response on or before

**FRIDAY, DECEMBER 17, 2004.**


      **SO ORDERED.**

      **ENTER:**


                                  /s/
                                CURTIS L. COLLIER
                      UNITED STATES DISTRICT JUDGE

2

5



PRN        UnumProvident Announces Settlement of Multistate Market Conduct
           Nov 18 2004  16:00

Examination

Agreement Subject to Consent of Participating States;
Special Investor Call Set for 9:00 A.M. (EST) on November 19

CHATTANOOGA, Tenn., Nov. 18 /PRNewswire-FirstCall/ -- UnumProvident Corporation (NYSE: UNM) today announced that certain of its insurance subsidiaries had entered into settlement agreements with state insurance regulators upon conclusion of a multistate market conduct examination led by Maine, Massachusetts and Tennessee relating to disability claims handling practices. In addition, the U.S. Department of Labor, which has been conducting an inquiry relating to certain ERISA plans, has joined the settlement agreements, and the New York Attorney General's Office, which had engaged in its own investigation of the Company's claims handling practices, has notified the Company that it is in support of the settlement and is, therefore, closing its investigation on this issue. The insurance authorities of the 47 remaining states and two other jurisdictions also participated in the examination.  The agreements are conditioned upon obtaining the consent of two-thirds of these 47 states and two jurisdictions.

(Logo: http://www.newscom.com/cgi-bin/prnh/20030929/CHM022LOGO-a )

The examination report did not make any findings of violations of law or market conduct regulations. However, the exam report did identify areas of concern. These became the focus of specific changes and enhancements to the Company's disability claims handling operations which were designed to assure each claim decision is made in a consistently high quality manner.

The primary components of the settlement agreement include: enhancements to the Company's claims handling procedures; a reassessment of certain previously denied or closed claims; additional corporate and board governance to support the oversight of the reassessment process and general claims handling practices; and payment of a fine in the amount of $15 million to be allocated among the states and jurisdictions that join the agreement.

UnumProvident anticipates recording a loss of $127 million, before tax, or $88 million, after tax, which is $0.29 per diluted common share, upon obtaining consent of two-thirds of the 47 other states and two jurisdictions, or such lesser number of consents as the Company may choose to accept for the agreements to be binding.  The Company expects to receive the required number of consents during the fourth quarter 2004.  The loss is comprised of four elements: $27 million of incremental direct operating expenses to conduct the two-year reassessment process; $44 million for benefit costs and reserves from claims reopened from the reassessment; $41 million for additional benefit costs and reserves for claims already incurred and currently in inventory that are anticipated as a result of the claim process changes being implemented; and the $15 million fine.  The ongoing costs of changes in the claims handling process and governance improvements will be included in the Company's operating expenses as incurred going forward.  These ongoing costs are not anticipated to materially affect the Company's results of operations.

"UnumProvident is committed to handling customers' claims in a fair,

Copyright (c) 2004

PRN        UnumProvident Announces Settlement of Multistate Market Conduct
           Nov 18 2004  16:00

thorough and objective manner," said Thomas R. Watjen, UnumProvident president
and chief executive officer. "We have committed significant resources over a
number of years to build a sound claim process. At the same time, we have
always been willing to make changes as needed. We have learned from this
process, especially the regulators' view of this important activity at our
Company, and I am confident the steps we are taking in response to this review
will improve the consistency and quality of our claims decisions, improving
further the quality of service we provide our customers, and help establish
best practices throughout the industry. I am very pleased with the efforts of
those leading the multistate examination process, that the U.S. Department of
Labor has joined the settlement agreement and that the Office of the Attorney
General of New York is supporting the settlement agreement and closing its
investigation on this matter. Although the number of parties obviously led to
complicated negotiations, by successfully concluding this settlement we will
have put a number of related matters behind us. I am very confident that
through the actions we are taking internally we will meet the requirements
contained in these settlement agreements."

   The insurance commissioners of Maine, Massachusetts and Tennessee, the
states in which the Company's three principal insurance subsidiaries are
domiciled, began the multistate targeted market conduct examination in
September 2003 and, as the lead state regulators, directed the course of the
exam. The Company also has an insurance subsidiary domiciled in New York, but
New York had been proceeding separately with its market conduct exam prior to
commencement of the multistate exam. It became a participating state and also
entered into a substantially identical settlement agreement covering the
subsidiary domiciled in New York.  The insurance departments of 46 other
states, the District of Columbia and American Samoa have since joined as
participants in the exam.  The purpose of the exam was to determine whether
the long-term disability claims handling practices of the Company's insurance
subsidiaries reflected unfair claim settlement practices. Examiners working
under the direction of the three lead state regulators reviewed policy forms,
manuals and administration and organization charts, but primarily focused on
reviewing individual or group long-term claim files closed, appealed or open
during two time periods from 2002 to early 2004.  The claim file review led to
discussions with the Company that resulted in the settlement agreement.

   A principal feature of the settlement is a reassessment process.  Under
the agreement, UnumProvident is offering to reassess any individual or group
long-term disability claim that was denied or closed since January 1, 2000,
except for specific categories of closures such as settlement, death or
payment of maximum benefits. The potential pool of claims decided over the
nearly five year period that may be eligible for reassessment if the claimant
elects to participate is approximately 215,000 claims. However, almost half of
these claims are subject to a preliminary determination as to whether the
claimant seeking reassessment "returned to work" under the policy, in which
case the claim is not eligible for further reassessment. Once the agreement is
effective, the Company will begin notifying these claimants over a several
week period that they may elect to have their prior claim decision reassessed

Copyright (c) 2004

by a special reassessment unit of experienced claims professionals applying
the enhanced claim procedures outlined in the settlement agreement.  The
special unit is headed by an officer of the Company with over 28 years
experience in claims handling.  The Company will also accept requests for
reassessment from other individuals whose claims were closed after January 1,
1997, and through December 31, 1999, subject to the same closure exceptions as
the group receiving notice, and from claimants who dispute the category for
closure if it affects their eligibility for reassessment. There will be
ongoing oversight by the Company and lead state regulators of the reassessment
process. The DOL may also participate in this monitoring of the reassessment
process.

    UnumProvident has also agreed to enhance certain aspects of its claim
operations, including making changes to its organization and procedures to
improve the consistency of and the support for each claim decision and create
an easier process for claimants.  First, UnumProvident is increasing the
number of experienced claims professionals involved in making claims
decisions, as well as more heavily involving higher levels of management in
the signing off on adverse claim decisions.  Doing so will not only put more
experienced people into closer contact with claim decisions, but it should
also improve turnaround times and clarify accountability for claims decisions.
Second, to improve the support for the initial claim decisions, the Company is
modifying its policies regarding medical information, including guidelines for
the use of independent medical evaluations and the process for handling
claimants with multiple medical conditions.  Third, to make it easier for a
claimant to understand and proceed through the claim process, the Company is
adding a number of service components, including referring certain claims to a
field case manager who will meet with the claimant in an effort to make the
process less burdensome.  Also, there will be an additional telephone hotline
available to claimants who seek additional assistance.  Finally, to further
assure consistency in the initial claim decision, the Company is adding a
position of quality compliance consultant to assess the totality of the claim
decision and to focus on issues of compliance and documentation.

    The final principal part of the settlement agreement addresses aspects of
corporate governance which are intended to reflect today's greater emphasis in
this area and to help establish best practices for the industry.  A regulatory
compliance unit is being created to monitor the reassessment process,
compliance with market conduct regulations and ERISA requirements, as well as
general claims handling compliance. This unit will be headed by the Company's
chief ethics officer and will report directly to a newly formed regulatory
compliance committee of the board of directors.  This committee will be
responsible for monitoring compliance with the settlement agreement as well as
with a broader range of regulatory and compliance laws and regulations.  The
committee will be composed of five independent directors, including two
directors with significant insurance industry or insurance regulatory
experience and subject to the approval of the lead state regulators.
Additionally, the board of directors intends to add an additional director
with significant insurance or regulatory experience by June 30, 2005.  As

Copyright (c) 2004

PRN      UnumProvident Announces Settlement of Multistate Market Conduct
         Nov 18 2004  16:00

previously announced, three independent directors with senior management
experience in the insurance or financial services industries were elected at
the company's August 2004 board meeting.

    Separate settlement agreements have been approved and executed by the
respective insurance subsidiaries of UnumProvident, the lead state regulators
for the Maine, Massachusetts and Tennessee insurance subsidiaries, the
Superintendent of Insurance of New York for the company's insurance subsidiary
domiciled in New York, and the U.S. Department of Labor. In addition to these
parties who have executed settlement agreements, the effectiveness of the
agreements is conditioned upon the consent of at least two-thirds of the
"participating states," which does not include the three lead states, but
includes the 47 other states and two other jurisdictions, so that two-thirds
would be 33 of the participants, unless the company approves a lesser number.
The agreements are being circulated to the participating states, which have
until December 20, 2004, to sign the documents in order to consent. Once the
settlement agreements are effective, they will remain in place until the later
of January 1, 2007 or the completion of an examination of claim handling
practices and an examination of the reassessment process, both of which will
be conducted by the lead state regulators. In addition to the fine of
$15 million to be paid when the settlement agreements become effective, the
insurance subsidiaries that are parties to the settlement agreements are
subject as a group to potential fines for non-compliance with the settlement
agreements, including contingent fines of $100,000 per day if certain
implementation deadlines are not met and a contingent fine of $145 million for
failure to satisfactorily meet the performance standards in the settlement
agreements relating to the examinations referred to above, which will be
conducted in approximately two years. This latter contingent fine relating to
examination of the claims handling practices or the reassessment process is
limited to a maximum of $145 million for both examinations should the
performance standards not be met. The performance standard is based on
compliance with a maximum tolerance standard for claims procedures based on
review of a statistically credible random sample of individual or group
claims.  The company believes that the changes it has made and will be making
to its claims operations and to enhance its oversight functions will
substantially reduce the likelihood that the company would fail to meet the
performance standards in the agreement when these examinations are concluded.

    "I am confident that the plans and people are in place to meet the
requirements of these agreements," Mr. Watjen stated.. "In addition to the
changes occurring in our benefits area, we will also have a special internal
claim audit team dedicated to reviewing the matters required by the settlement
agreements, including claim decisions in the reassessment process as well as
those made in the normal claims operations. We will be reviewing the results
of this audit team's work on a regular basis. The multistate exam team will
also be reviewing claim decisions and compliance with procedures contained in
the agreements. We expect to have frequent discussions with this multistate
exam team to jointly review our progress. We believe these activities over a
period of almost two years prior to these examinations will minimize the

Copyright (c) 2004

PRN         UnumProvident Announces Settlement of Multistate Market Conduct
            Nov 18 2004  16:00

potential for any failure of the Company to meet the requirements of the
agreements when the exams are undertaken."
     Arizona, California, Minnesota and New Mexico are participating in the
multistate examination; however, while the multistate examination was in
progress these states chose to continue pursuing their own market conduct
examinations and investigations, each of which had begun prior to the
beginning of the multistate exam.  The Company has reached agreement with the
Minnesota Department of Commerce covering three exam periods dating from 1995
and involving three of the Company's insurance subsidiaries, which have agreed
to pay a penalty totaling $250,000 relating to various matters outside the
general scope of the multistate examination.  California has conducted an
examination with two phases and an investigation relating to claims handling.
Discussions with the California Department of Insurance have been ongoing
relating to various issues, some of which are within the general scope of the
multistate examination and others that are outside its scope and relate to
such matters as policy provisions.  It is uncertain as to whether California,
Arizona or New Mexico will consent to the multistate settlement agreements,
pursue their own examinations to conclusion or a combination of joining the
multistate settlement agreements and resolving certain state specific issues
separately.
     Through a significant investment of resources, UnumProvident has developed
the industry's largest disability claims and return-to-work organization,
managing approximately 450,000 new short term and long term disability claims
annually.  In 2003, UnumProvident paid $4.1 billion in disability benefits,
more than double any other insurance provider.  To meet future policyholder
obligations, the company maintains a sound balance sheet, including
$16 billion in statutory disability reserves.
     UnumProvident Corporation senior management will host a conference call on
Friday, November 19, at 9:00 a.m. (Eastern) to discuss the multistate market
conduct examination and settlement agreements and may include forward-looking
information as well as other material information.  The dial-in number is
(913) 981-5591.  Alternatively, a live webcast of the call will be available
at http://www.unumprovident.com in a listen-only mode.  About fifteen minutes
prior to the start of the call, you should access the "Investor and
Shareholder Information" section of our website.  A replay of the call will be
available by telephone (888) 203-1112 and on our website through Wednesday,
November 24.
     For full examination report and regulatory settlement agreement, please
visit http://www.unumprovident.com/commitment .

     About UnumProvident
     UnumProvident is the largest provider of group and individual disability
income protection insurance in North America. Through its subsidiaries,
UnumProvident insures more than 25 million people and paid $5.7 billion in
total benefits to customers in 2003.  With primary offices in Chattanooga,
Tennessee, and Portland, Maine, the company employs more than 12,500 people
worldwide.

Copyright (c) 2004

PRN        UnumProvident Announces Settlement of Multistate Market Conduct
           Nov 18 2004  16:00


       Safe Harbor agreement
       A "safe harbor" is provided for "forward-looking statements" under the
Private Securities Litigation Reform Act of 1995.  Statements in this press
release, which are not historical facts, are forward-looking statements that
involve risks and uncertainties that could cause actual results to differ
materially from those contained in the forward-looking statements.  These
risks and uncertainties include such general matters as general economic or
business conditions; events or consequences relating to terrorism and acts of
war; competitive factors, including pricing pressures; legislative,
regulatory, or tax changes; and the interest rate environment.  More
specifically, they include fluctuations in insurance reserve liabilities,
projected new sales and renewals, persistency rates, incidence and recovery
rates, pricing and underwriting projections and experience, retained risks in
reinsurance operations, availability and cost of reinsurance, level and
results of litigation, rating agency actions, regulatory actions, negative
media attention, the level of pension benefit costs and funding, investment
results, including credit deterioration of investments, and effectiveness of
product and customer support.  For further information of risks and
uncertainties that could affect actual results, see the sections entitled
"Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors"
in the Company's Form 10-K for the fiscal year ended December 31, 2003 and
subsequently filed Form 10-Qs.  The forward-looking statements are being made
as of the date of this press release and the Company expressly disclaims any
obligation to update any forward-looking statement contained herein.

SOURCE  UnumProvident Corporation
     -0-                        11/18/2004
     /CONTACT:  MEDIA, Jim Sabourin, Vice President, Corporate Communications,
+1-423-294-6300, or Toll free, +1-866-750-8686 (UNUM), or INVESTORS, Thomas A.
H. White, Senior Vice President, Investor Relations, +1-423-294-8996, both of
UnumProvident Corporation/
     /Photo:  http://www.newscom.com/cgi-bin/prnh/20030929/CHM022LOGO-a
              AP Archive:  http://photoarchive.ap.org
              PRN Photo Desk, photodesk@prnewswire.com /
     /Web site:  http://www.unumprovident.com
                 http://www.unumprovident.com/commitment /

     (UNM)


CO:  UnumProvident Corporation
ST:  Tennessee, Maine, Massachusetts
IN:  FIN INS
SU:  CCA MAV SVY LBR
-0- Nov/18/2004 21:00 GMT

Copyright (c) 2004

DEC-07-2004  12:05    P.02

### BAIRAN, GREEN, FRANK & TERZIAN LLP
#### ATTORNEYS AT LAW

355 SOUTH FLOWER STREET  SUITE 2700
LOS ANGELES, CALIFORNIA 90071
TELEPHONE (213) 362-1177
FACSIMILE (213) 362-1186
www.bgftlaw.com

November 22, 2004

**VIA FACSIMILE**

Charles J. Fleishman, Esq.
8363 Wilshire Blvd., Suite 1030
Beverly Hills, CA 90211-2495

RE:    *Fitzgibbon v. UNUM*

Dear Chuck:

In the event that you may not have seen the recent news concerning UNUMProvident, I am sending you this letter to let you know that the company and certain of its subsidiaries have executed a Regulatory Settlement Agreement with certain state and federal insurance regulators. If and when effective, the agreement will provide for, among other things, the reassessment of many previously denied or terminated claims. A copy can be found at www.unumprovident.com

Very truly yours,

LESLEY C. GREEN

LCG/cc

6

**PROPOSED LANGUAGE FOR INSERTION INTO THE RSA LETTER**

ALTERNATIVE REMEDIES

As an alternative to the claims review process established pursuant to the RSA, you may be entitled to participate in a re-review process sought pursuant to a class action lawsuit pending in the Worcester, Massachusetts Superior Court Department. The attorneys for the plaintiffs in the class action were not included as part of the negotiations of the proposed settlement under the RSA and proposed class members did not have independent representation in the RSA negotiations.

The class action alleges that UnumProvident and other defendants engaged in bad faith claims handling that resulted in the denial of otherwise valid long-term disability claims in order to advance the financial interest of the defendants solely at the expense of the proposed class members. The class action defines the eligible class of participants as:

> All individual long-term disability policyholders and all participants in group, long-term disability plans which are not covered by the Employee Retirement Income Security Act of 1974 ("non-ERISA group plan participants") who (a) had coverage issued by an insuring subsidiary of Unumprovident and (b) whose claims for long-term disability benefits were denied, or whose payments of long-term disability benefits were terminated or suspended, on or after January 1, 1994, by any Defendant.

The review process under the RSA Settlement (the "RSA Review") is materially different from the review process sought in the class action (the "Class Review"). The RSA Review will be conducted by Defendants' employees; the Class Review seeks review by a panel of independent claim review experts who are not Defendants' employees. Plaintiffs in the class action believe that, given Defendants' alleged prior misconduct, they should not be allowed to conduct the re-review process. The RSA Review does not provide a denied claimant with the

00003852.WPD ; 1

right to review the claim file for accuracy; the Class Review would provide the denied claimant with the right to review the claim file and challenge whether material had been wrongfully excluded or improperly included in the claim file. The RSA Review excludes any claimant who had their claim closed because of a "return to work" or "failure to meet the elimination period"; the Class Review seeks to include the right of review for all such claims.

The Court in the above-reference actions has not yet ruled on pending motion for class certification and the Court has not yet certified a class. If the Court certifies a class and the class action proceeds, you may be entitled to a re-review of your denied claim by an independent claim review process according to the terms provided for by the Class Review. If you elect to have your denied claim reviewed by Defendants, you will have your claim reviewed pursuant to the terms of the RSA Review. According to the terms of the RSA Review, if Defendants award even one dollar more after completing their review, you will be prevented from seeking any other recovery through independent action or participation in the class action.

## EXAMINATION OF PAPERS AND INQUIRIES

For a more detailed statement of the matters involved in these actions, reference is made to the pleadings and other papers filed in this action which may be inspected in the Office of the Clerk of the Worcester, Massachusetts Superior Court Department during business hours of each business day.

00003852.WPD ; 1

Other inquiries regarding the proposed class actions should be addressed to one of the following Plaintiffs' attorneys:

Douglas M. Brooks
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts 01906
Tel.: (781) 231-7850

Seymour J. Mansfield
Denise Y. Tataryn
Richard J. Fuller
MANSFIELD TANICK & COHEN P.A.
1700 Pillsbury Center South
220 South Sixth Street
Minneapolis, Minnesota 55402-4511
Tel.: (612) 339-4295

Alan M. Sandals
Scott M. Lempert
SANDALS & ASSOCIATES, P.C.
One South Broad Street, Suite 1850
Philadelphia, Pennsylvania 19107-3418
Tel.: (215) 825-4000

Richard J. Quadrino
QUADRINO & SCHWARTZ
666 Old Country Road
Garden City, New York 11530
Tel.: (516) 745-1122

## PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE REGARDING THIS NOTICE.

Dated:_____, 2004

BY ORDER OF THE COURT
WORCESTER, MASSACHUSETTS
SUPERIOR COURT DEPARTMENT

00003852.WPD ; 1

7

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT
DEPARTMENT OF THE TRIAL
COURT

|  |  |
|---|---|
| CAROL JEWEL, SHIRLEY HOLLAND and MARY L. PATRICK, individually and on behalf of all others similarly situated, )<br>)<br>)<br>) | |
| Plaintiffs, ) | Civil Action No.:<br>WOCV 2003-02391-B |
| ) | |
| v. ) | |
| ) | |
| UNUMPROVIDENT CORPORATION, UNUM LIFE INSURANCE COMPANY OF AMERICA, FIRST UNUM LIFE INSURANCE COMPANY, PROVIDENT LIFE AND CASUALTY INSURANCE COMPANY, PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY and THE PAUL REVERE LIFE INSURANCE COMPANY, )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. )<br>) | |

## NOTICE OF PENDENCY OF PROPOSED CLASS ACTION

TO:     **ALL INDIVIDUAL LONG-TERM DISABILITY POLICYHOLDERS AND ALL PARTICIPANTS IN GROUP, LONG-TERM DISABILITY PLANS WHICH ARE NOT COVERED BY THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 ("NON-ERISA GROUP PLAN PARTICIPANTS") WHO (A) HAD COVERAGE ISSUED BY AN INSURING SUBSIDIARY OF UNUMPROVIDENT AND (B) WHOSE CLAIMS FOR LONG-TERM DISABILITY BENEFITS WERE DENIED, OR WHOSE PAYMENTS OF LONG-TERM DISABILITY BENEFITS WERE TERMINATED OR SUSPENDED, ON OR AFTER JANUARY 1, 1994, BY ANY DEFENDANT.**

00003850.WPD ; 1

YOU ARE HEREBY NOTIFIED, the above-captioned action is pending before the

Worcester, Massachusetts Superior Court Department. You may be a class member and entitled

to re-review of your claim if the class action is successful. In addition to this notice, you have

also received notice of separate proposed settlement between UnumProvident defendants, state

insurance regulators, and the Department of Labor that provides for a different re-review of your

claim (the "RSA Proposed Settlement"). If you choose to accept the re-review offered in the

RSA Proposed Settlement, you may forego the right to have your claim re-reviewed in

connection with the class actions. The attorneys who have moved for class certification in this

case were not included as part of the negotiations of the proposed settlement under the RSA and

proposed class members did not have independent representation in the RSA negotiations.

## DESCRIPTION OF THE ACTION

The above-referenced action alleges that defendants engaged in bad faith claims handling

that resulted in the denial of otherwise valid long-term disability claims in order to advance the

financial interest of the defendants at the expense of the proposed class members.

## NOTIFICATION OF DIFFERENT CLAIMS RE-REVIEW PROCESSES

The review process under the RSA Settlement (the "RSA Review") is materially different

from the review process sought in the class action (the "Class Review"). The RSA Review will

be conducted by Defendants' employees; the Class Review seeks review by a panel of

independent claim review experts who are not Defendants' employees. Plaintiffs in the class

action believe that, given Defendants' alleged prior misconduct, they should not be allowed to

conduct the re-review process. The RSA Review does not provide a denied claimant with the

00003850.WPD ; 1                              2

right to review the claim file for accuracy; the Class Review would provide the denied claimant with the right to review the claim file and challenge whether material had been wrongfully excluded or improperly included in the claim file. The RSA Review excludes any claimant who had their claim closed because of a "return to work" or "failure to meet the elimination period"; the Class Review seeks to include the right of review for all such claims.

The Court in the above-reference actions has not yet ruled on pending motion for class certification and the Court has not yet certified a class. If the Court certifies a class and the class action proceeds, you may be entitled to a re-review of your denied claim by an independent claim review process according to the terms provided for by the Class Review. If you elect to have your denied claim reviewed by Defendants, you will have your claim reviewed pursuant to the terms of the RSA Review. According to the terms of the RSA Review, if Defendants award even one dollar more after completing their review, you will be prevented from seeking any other recovery through independent action or participation in the class action.

## EXAMINATION OF PAPERS AND INQUIRIES

For a more detailed statement of the matters involved in these actions, reference is made to the pleadings and other papers filed in this action which may be inspected in the Office of the Clerk of the Worcester, Massachusetts Superior Court Department during business hours of each business day.

00003850.WPD ; 1                                    3

Other inquiries regarding the proposed class actions should be addressed to one of the following Plaintiffs' attorneys:

Douglas M. Brooks
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts 01906
Tel.: (781) 231-7850

Seymour J. Mansfield
Denise Y. Tataryn
Richard J. Fuller
MANSFIELD TANICK & COHEN P.A.
1700 Pillsbury Center South
220 South Sixth Street
Minneapolis, Minnesota 55402-4511
Tel.: (612) 339-4295

Alan M. Sandals
Scott M. Lempert
SANDALS & ASSOCIATES, P.C.
One South Broad Street, Suite 1850
Philadelphia, Pennsylvania 19107-3418
Tel.: (215) 825-4000

Richard J. Quadrino
QUADRINO & SCHWARTZ
666 Old Country Road
Garden City, New York 11530
Tel.: (516) 745-1122

## PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE REGARDING THIS NOTICE.

Dated:_____, 2004

BY ORDER OF THE COURT
WORCESTER, MASSACHUSETTS
SUPERIOR COURT DEPARTMENT